Alex R Straus (SBN 321366)
Astraus@milberg.com
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (917) 471-1894
Fax: (865) 522-0049

*Attorney for Plaintiff*
*Additional attorneys on signature page*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

MSP RECOVERY CLAIMS,
SERIES LLC, a Delaware series
limited liability company,

    Plaintiff,

  v.

AMGEN INC.; ONYX
PHARMACEUTICALS, INC.,
ONYX THERAPEUTICS, INC.,
PATIENT ACCESS NETWORK
FOUNDATION, and CHRONIC
DISEASE FUND, D/B/A GOOD
DAYS,

    Defendants.

CASE NO.: 2:23-cv-3130

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

i

## <u>TABLE OF CONTENTS</u>

NATURE OF ACTION ........................................................................................... 1

   I.     PARTIES, JURISDICTION, AND VENUE ............ **Error! Bookmark not defined.** 9

   II.    STANDING ................................................................................. 14

   III.   REGULATORY BACKGROUND ........................................... 15

   IV.   FACTUAL ALLEGATIONS ................ **Error! Bookmark not defined.** 19

      Background ......................................... **Error! Bookmark not defined.** 19

      Congressionally Mandated Cost-Sharing under Medicare Part D ......... **Error! Bookmark not defined.** 24

      Abusing Patient Assistance Programs to Subsodize Copays: A Proven Method for Phramaceutical Compaies to Boots Sales and Increase Drug Prices ...................................................... **Error! Bookmark not defined.** 27

      The Direct Relationship Between Drug Subsidies and Volume Dispensed ................................................................ **Error! Bookmark not defined.** 31

      The Direct Relationship Between Drug Subsidies and Increased Drug Prices ................................................................ **Error! Bookmark not defined.** 35

      House Committee on Oversight and Reform: Investigation of Skyrocketing Prescription Drug Prices .......................... **Error! Bookmark not defined.** 39

      September 2020 Drug Pricing Investigation: Amgen – Enbrel and Sensipar ................................................................ **Error! Bookmark not defined.** 40

      December 2021 Drug Pricing Investigation Majority Staff Report ....... **Error! Bookmark not defined.** 45

      Defendants' Scheme Results in DOJ Settlement ........ **Error! Bookmark not defined.** 50

      The Copayment Scheme for Sensipar ...... **Error! Bookmark not defined.** 50

      The Copayment Scheme for Kyprolis ....... **Error! Bookmark not defined.** 54

      The Impact of Defendants' Scheme .......... **Error! Bookmark not defined.** 58

      Defendants Enjoy Massive Financial Returns ............ **Error! Bookmark not defined.** 58

      Defendants Misrepresentations and Omissions Tainted Claims for Subject Drugs ......................................................... **Error! Bookmark not defined.** 60

      The Assignors and Class Members Were Directly Harmed by the Scheme ................................................................ **Error! Bookmark not defined.** 71

   VI.   CLASS ALLEGATIONS ..................... **Error! Bookmark not defined.** 80

   VII.  TOLLING OF THE STATUTE OF LIMITATIONS **Error! Bookmark not defined.** 85

   VIII. CLAIMS FOR RELIEF ......................... **Error! Bookmark not defined.** 87

      FIRST CLAIM FOR RELIEF .................. **Error! Bookmark not defined.** 87

ii

SECOND CLAIM FOR RELIEF .............**Error! Bookmark not defined.**99

THIRD CLAIM FOR RELIEF ...............**Error! Bookmark not defined.**101

FOURTH CLAIM FOR RELIEF ...........**Error! Bookmark not defined.**109

FIFTH CLAIM FOR RELIEF ................**Error! Bookmark not defined.**111

DEMAND FOR JUDGMENT ..........................**Error! Bookmark not defined.**115

Plaintiff, MSP Recovery Claims, Series LLC ("MSRC" or "Plaintiff"), on behalf of itself, the putative class members consisting of Medicare Advantage health plans[1] and Medicaid health plans[2] (collectively, "Class Members"),[3] brings this action against defendants Amgen, Inc. ("Amgen"); Onyx Pharmaceuticals, Inc. and Onyx Therapeutics, Inc. ("Onyx" and collectively "Manufacturers"); and Patient Access Network Foundation ("PANF") and the Chronic Disease Funds d/b/a Good Days ("CDF" and collectively "Charity Defendants" or "Charities"), collectively "Defendants", and allege:

## NATURE OF ACTION

1.    This case arises from Defendants' conspiratorial scheme to increase the unit price and quantity dispensed of Sensipar and Kyprolis (collectively, "Subject Drugs"). Defendants' scheme violated state and federal bribery laws, thereby disqualifying claims for either Subject Drug from payment.

2.    As a result, Plaintiff's Assignors ("Assignors")[4] and the Class Members paid supra-competitive prices for the Subject Drugs for tainted and legally unpayable

---

[1] "Medicare Advantage health plans" is defined as Medicare Advantage entities such as Medicare Advantage organizations ("MAO"), Independent Practice Associations ("IPA"), Management Service organizations ("MSO"), Health Maintenance organizations ("HMO"), and other Medicare first tier, downstream, and related entities. Throughout the Complaint, "MA Plans" is used as a shorthand for all such Medicare Advantage health plans.

[2] "Medicaid health plans" is defined as Medicaid managed care organizations ("MCO") and other Medicaid first tier, downstream, and related entities. Throughout the Complaint, "Medicaid Plans" is used as a shorthand for all such Medicaid health plans.

[3] The full putative class is defined in Section VI.

[4] Plaintiff holds assigned rights through assignments from numerous entities including MAOs, MCOs, full-risk organizations such as MSOs, IPAs, and other Medicare and Medicaid first-tier, downstream, and related entities, all of which act as insurers and direct payors ("Medicare Providers"), that provide, among other things, prescription drug benefits to their enrolled beneficiaries ("Enrollees").

1

claims, and for artificially inflated quantities of dispensed Subject Drugs, on behalf of beneficiaries enrolled in their health plans ("Enrollees").

3.    Defendants created the scheme to circumvent Congressionally mandated co-payment requirements (referred to as the "Co-Payment Scheme" or "Scheme") to reduce sensitivity to the ever-increasing drug prices and increased dispensing of the Subject Drugs.[5]

4.    Defendants executed their Scheme, engaging in numerous overt acts that effectively eliminated price sensitivity. This resulted in three related, cognizable economic injuries as Assignors and Class Members paid significantly higher costs than they would otherwise have to pay, but for the Co-Payment Scheme above. First, the Scheme caused the Subject Drugs to be over-prescribed and over-dispensed. Second, the Scheme allowed Amgen and Onyx to raise prices for the Subject Drugs to supra-competitive levels. Third, the Scheme rendered claims for the Subject Drugs unpayable under state and federal law and concealed this fact.

5.    The Scheme made it possible for the Manufacturers to raise its prices to supra-competitive levels, without concern about its products not being dispensed due to Enrollee financial limitations. This resulted in the over-dispensing of supra-competitive priced drugs.

6.    By concealing the Scheme, Defendants caused Assignors and Class Members to unknowingly pay for claims that were tainted and legally unpayable. This resulted in cognizable economic damages as Assignors and Class Members lost

_____

[5] When Medicare beneficiaries, including those covered by MA Plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that pharmaceutical companies can demand for their drugs. Austin, Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 [hereinafter *Cloak of Social Responsibility*].

money or property that they otherwise would still have but for the Co-Payment Scheme.

7.    As to Sensipar, Amgen and PANF colluded and agreed that PANF would act as an illegal conduit, disguised as an independent charity, by which Amgen could funnel kickbacks, bribes, and drug subsidies through PANF's disease funds. Amgen and PANF agreed that PANF would create a fund that would exclusively, or nearly so, cater to patients taking Sensipar and that Amgen would be the primary, and often the only, donor to the fund.

8.    Once a relationship between Amgen and PANF had been created, Amgen then poured millions into PANF, at which point, Amgen and PANF began referring patients and prescribers to PANF. By funneling patients, and funds, through PANF, Amgen and PANF caused claims for payment to certain Medicare Providers, including Assignors and Class Members.

9.    Amgen bribed and/or provided kickbacks to PANF (and its management/agents) to serve as Amgen's conduit, funnel the kickbacks, and copay subsidies.

10.    As to Kyprolis, the Manufacturers and CDF colluded and agreed that CDF would act as an illegal conduit, disguised as an independent charity, by which Amgen could funnel kickbacks, bribes, and drug subsidies through CDF disease funds. Amgen and CDF agreed that CDF would create a fund that would exclusively, or nearly so, cater to patients taking Kyprolis, and that Amgen would be the primary, and often the only, donor to the fund.

11.    The Manufacturers bribed and/or provided kickbacks to CDF (and its management/agents) to serve as a conduit and funnel the kickbacks and copay subsidies. Amgen bribed and/or provided kickbacks to PANF (and its management/agents) to serve as Amgen's conduit, funnel the kickbacks, and copay subsidies.

3

12.     Once a relationship between the Manufacturers and CDF had been created, Amgen and Onyx then poured millions into CDF, at which point, the Manufacturers and CDF began referring patients and prescribers to CDF. By funneling patients and funds, through CDF, the Manufacturers and CDF caused claims for payment to certain third-party payors, including Assignors and Class Members.

13.     The Manufacturers bribed and/or provided kickbacks to CDF (and its management/agents) to serve as a conduit, funnel the kickbacks, and copay subsidies.

14.     Despite knowingly participating in the Scheme, Defendants routinely submitted false certifications of compliance with state and federal laws—by false statement, misrepresentation, or omission. This resulted in millions of dollars paid by Medicare Providers for claims they otherwise would not have paid for.

15.     As part of this Scheme, the Charities agreed to create and finance disease funds for Medicare patients that were prescribed Sensipar or Kyprolis.

16.     In doing so, Defendants artificially increased the quantity of claims paid by the Assignors and Class Members for the Subject Drugs. As a result, the Assignors and Class Members were forced to pay artificially increased prices for an increased quantity of the drugs.

17.     The Charities routinely provided the Manufacturers with information (through the wire and mail) to enable the Manufacturers to conduct ROI calculations relating to the amount of Corporate Contributions made to the Charities. At the same time, to ensure their Scheme remained undetected, the Charities actively misled government agencies, and the public, by certifying compliance with all state and federal laws and regulations, despite knowing their Scheme violated such laws and regulations.

18.     In other words, despite certifying to the OIG (where such certifications were made publicly available), Defendants routinely used the mail and wire to exchange information to ensure the Manufacturers possessed sufficient data to maximize profits from its Corporate Contributions to the Charities. This exchange occurred in contravention of OIG guidance.

19.     Submission of bills for payment to Medicare providers, like Plaintiff's Assignors, carry an implied certification that the bill is free from any claim of material falsity, including that the submission was not obtained as a result of a violation of any state or federal bribery or anti-kickback statute.

20.     Upon information and belief, Defendants funneled MA Plan and Medicaid Plan patients away from Amgen's free drug program. Defendants excluded individuals from participating in Amgen's free drug program because the individuals were eligible for participation in the federal health programs. In other words, Defendants treated customers differently based on eligibility for participation in the federal health programs.

21.     The Manufacturers ensured that the large sums of money that the Manufacturers continuously paid to the Charities improperly influenced their practices. Likewise, Defendants ensured that the co-payment assistance grants and healthcare travel expense—paid for by the Manufacturers, then distributed by the Charities—improperly influenced the practices of patients receiving, and pharmacies dispensing the Subject Drugs.

22.     Defendants advertised and provided marketing materials to patients and prescribing physicians to influence the decision to start and obtain the Subject Drugs, by informing those patients and prescribing physicians, they could obtain the Subject Drugs for "free". Defendants did not inform those patients and prescribing physicians of information that would have enabled them to know of the illegality of

5

Defendants' Scheme to obtain "free" drugs, thus tainting the decision-making process.

23.    Defendants executed their Scheme, engaging in numerous overt acts that both effectively eliminated price sensitivity, allowing the Manufacturers to raise its prices to supra-competitive levels and causing the Subject Drugs to be dispensed in artificially inflated quantities. This resulted in cognizable economic damages, as the Assignors and Class Members paid substantially more than they otherwise would have but for the Co-Payment Scheme.

24.    The Manufacturers bribes and/or kickbacks to the Charities constituted violations of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, thereby rendering each claim unpayable by federal healthcare programs and disqualifying Amgen from receiving any payment from such programs for Sensipar during the course of the Scheme.

25.    The Manufacturers' bribes and/or kickbacks also violated several state laws, namely, (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) Mass. Gen. Laws ch. 175H, § 3; (4) S.C. Code Ann. § 44-113-60; and (5) Va. Code Ann. § 32.1-315. Accordingly, these bribes and/or kickbacks constituted "unlawful activity" under 18 U.S.C. § 1952(b), as bribery in violation of the laws of the United States, Connecticut, Florida, Massachusetts, South Carolina, and Virginia. Defendants used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity, and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity.

26.    Claims relating to these bribes and kickbacks, violating the AKS and above state laws, will hereinafter be referred to as the "AKS-tainted" or "tainted" claims. Additionally, "tainted" claims refers to those that induced Enrollees to purchase the Subject Drugs as a result of the Manufacturers drug subsidies.

Assignors and Class Members were proximately harmed each time a tainted claim was submitted to the Assignor and the Assignor paid the claim, under the false pretense that it was a "clean" claim and paid by the Assignors and Class Members. This caused the Assignors and Class Members to not get the "benefit of their bargain," that is/for example, paying a claim that was free from unlawful activity.

27.    Defendants' Scheme effectively eliminated the price sensitivity—because the patients (i.e., consumers) were no longer incurring any cost—thereby eliminating price considerations and barriers, thus increasing the quantity dispensed by pharmacies, and the amount of claims paid by Assignors and Class Members for the Subject Drugs. The number of claims paid directly relates to damages Assignors and Class Members suffered. The Co-Payment Scheme provided the illusion that while the Subject Drugs were supra-competitively priced, beneficiaries were able to afford their cost sharing obligations and therefore not raise any alarms. Accordingly, with price sensitivity eliminated, the Co-Payment Scheme allowed the Manufacturers to circumvent congressional safeguards and artificially increase the price of the Subject Drugs to supra-competitive levels.

28.    As a result, the Assignors and Class Members were forced and deceived into paying tainted claims, at artificially increased prices for the Subject Drugs, and for an increased quantity of claims for the Subject Drugs. This resulted in cognizable economic damages, as the Assignors and Class Members paid substantially more for the Subject Drugs than they otherwise would have but for the Co-Payment Scheme.

29.    The Manufacturers, both sophisticated pharmaceutical manufacturers, knew that the intended victims of the Scheme were the health plans Plaintiff seeks to represent. Indeed, after a patient's cost sharing obligation is paid, health plans such as the Assignors and Class Members must then pay for the subject Drugs at prices set by the Manufacturers. To be clear, if a patient does not provide their cost

sharing obligations (e.g., co-pay), a claim will not be submitted to the health plan and a prescription will not be dispensed from a pharmacy.

30.    In April 2019, Amgen paid $23.85 million to settle the United States' claims that Amgen violated the Anti-Kickback Statute ("AKS") and False Claims Act, 31 U.S.C. § 3729 ("FCA"). Amgen entered into a Settlement Agreement ("Amgen Settlement") with the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG") relating to the general conduct at issue in this lawsuit. *See* the Amgen Settlement, attached as **Exhibit A**; and Amgen DOJ Press Release, attached as **Exhibit B**.

31.    The Amgen Settlement did not address or settle damages sustained by the Assignors and Class Members. The terms of the Amgen Settlement did not address the claims Plaintiff sets forth in the action.

32.    Plaintiff brings this lawsuit to redress the damages sustained by Assignors and Class Members as a result of Defendants' unlawful Scheme to increase the price and dispensed quantity of the Subject Drugs.

33.    Each Defendant named in this action is jointly and severally liable for the conduct of the others.

34.    The improper actions alleged herein allowed the Manufacturers to maintain supra-competitive prices by eliminating price sensitivity that would have directly benefited consumers, and the public at large, by forcing the Manufacturers to price their products at market realities. Patient price sensitivity counterbalances the Manufacturers' desire to inflate prices for its drugs—which is why Congress relies on price sensitivity as a vital mechanism for combatting supra-competitive pricing for Government Payors.

35.    The Charities' co-payment assistance program allowed the Manufacturers to increase the price of the Subject Drugs without regard to the

8

relevant market conditions by insulating the Manufacturers from the realities of patients' inability to afford their co-payment obligations—obligations that would have had to have been capped at a reasonable amount but for the unlawful Scheme alleged herein. Not only did this allow the Manufacturers to charge supra-competitive prices, but also resulted in the artificially increased volume of dispensed Subject Drugs.

36.    Defendants used mail and wires in furtherance of their racketeering Scheme. The Manufacturers utilized the mail and wires to transmit their Corporate Contributions to the Charities, which, in reality, were bribes and/or kickbacks to the Charities. The Charities would then transmit data using the mail and wires that it was prohibited from sharing—directly to the Manufacturers—allowing the Manufacturers to perform what amounted to ROI calculations on their Corporate Contributions. This resulted in claims being submitted to Assignors and Class Members.

37.    Defendants' conduct violated the AKS, 42 U.S.C. § 1320a-7b; the Travel Act, 18 U.S.C. § 1952; Mail Fraud, 18 U.S.C. § 1341; Wire Fraud, 18 U.S.C. § 1343; Conn. Gen. Stat. §§ 53a-161c and 53a-161d; Fla. Stat. §§ 456.054 and 817.505; Mass. Gen. Laws ch. 175H, § 3; S.C. Code Ann. § 44-113-60; and Va. Code Ann. § 32.1-315.

## PARTIES, JURISDICTION, AND VENUE

**Plaintiff**

38.    Plaintiff has obtained assignments from its Assignors to recover payment from Defendants. The Assignors provide health insurance coverage, pursuant to Medicare Part C and Part D, to individual beneficiaries subscribed to their plans ("Enrollees"). Specifically, the Assignors made payments on behalf of, or otherwise became financially responsible for, their Enrollees' illegally inflated

medical expenses as a result of Defendants' scheme. Said representative assignments are attached as Exhibit C.

*MSPRC*

39.     MSPRC is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

40.     MSPRC has established various designated series pursuant to Delaware law to maintain various claims recovery assignments separate from other Company assets, and to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name, or it may elect to bring suit in the name of its designated series.

41.     MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC.

42.     Defendants' Co-Payment Scheme triggered payment obligations of Plaintiff's Assignors and other members of the putative class. These actions caused the Assignors and members of the putative class to pay artificially inflated prices, to purchase artificially inflated quantities of dispensed Subject Drugs, and to unknowingly pay for tainted claims that were legally unpayable. The fraudulent and anticompetitive conduct described herein directly caused damage to Plaintiff and the members of the putative class.

**Defendants**

*Amgen Inc.*

43.     Defendant Amgen is a Delaware corporation with its principal executive offices located in Thousand Oaks, California. Amgen manufacturers and markets pharmaceutical products, including Sensipar and Kyprolis. At all relative times herein, Amgen advertised, marketed, and sold pharmaceutical products, including Sensipar and Kyprolis, throughout all states and territories in the United States, including California. Amgen derived substantial revenue related to Sensipar and Kyprolis from its business throughout each of the states and territories of the United States, including California.

44.     This Court has personal jurisdiction over Amgen because Amgen's principal executive offices are located within the state of California and therefore Amgen is at home in the state.  In addition, as a result of the Co-Payment Scheme, Assignors and the Class Members sustained financial and economic injuries in California. Amgen maintains systematic and continuous contacts in California, and regularly transacts business in California. Amgen purposefully availed itself of the privilege of conducting activities in California, thus taking advantage of the protections and benefits of the law.

*Onyx*

45.     Defendant Onyx Therapeutics, Inc. is a corporation organized under the laws of the State of Delaware, having a principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1799. Onyx Therapeutics, Inc. is a wholly owned subsidiary of Onyx Pharmaceuticals, Inc. Onyx Pharmaceuticals, Inc. is a wholly owned subsidiary of Amgen Inc.

46.     This Court has personal jurisdiction over Onyx because Onyx is headquartered in Newbury Park, CA. In addition, as a result of the Co-Payment Scheme, Assignors and the Class Members sustained financial and economic

11

injuries in California. Onyx maintains systematic and continuous contacts in California, and regularly transacts business in California. Onyx purposefully availed itself of the privilege of conducting activities in California, thus taking advantage of the protections and benefits of the law.

*Patient Access Network Foundation*

47.    Defendant PANF, the Patient Access Network Foundation, is a 501(c)(3) organization located in Washington, D.C. PANF operates funds that receive donations from, *inter alia*, pharmaceutical manufacturers, and uses a portion of those payments to subsidize the co-payment obligations of patients, including Plaintiff's Assignors' Enrollees and the Class Members.

48.    This Court has personal jurisdiction over PANF under Cal. Civ. Proc. Code § 410.10 because PANF purposefully availed itself of the privilege of conducting activities in California by conducting its business in California, and the claims at issue here arise out of PANF's actions in California and PANF acts around the country, making it reasonable to be subject to personal jurisdiction in California. Therefore, PANF engaged in substantial and non-isolated activity throughout the State of California relating to the Co-Payment Scheme, resulting in Plaintiff's Assignors and the putative class members sustaining financial injuries in California. PANF maintains systematic and continuous contacts in California, and regularly transacts business in California. PANF purposefully availed itself of the privilege of conducting activities in California, thus taking advantage of the protections and benefits of the law.

*Chronic Disease Fund, Inc*.

49.    Defendant CDF is a Texas non-profit corporation with a principal place of business in Frisco, Texas. CDF operates funds that receive donations from, *inter alia*, pharmaceutical manufacturers, and uses a portion of those payments to

subsidize drug co-payment obligations of patients, including Assignors' Enrollees
and the Class Members

50.     This Court has personal jurisdiction over CDF under Cal. Civ. Proc. Code §
410.10 because CDF purposefully availed itself of the privilege of conducting
activities in California by conducting its business in California, and the claims at
issue here arise out of CDF's actions in California and CDF acts around the country,
making it reasonable to be subject to personal jurisdiction in California. Therefore,
CDF engaged in substantial and non-isolated activity throughout the State of
California relating to the Co-Payment Scheme, resulting in Assignors and the Class
Members sustaining financial injuries in California. CDF maintains systematic and
continuous contacts in California, and regularly transacts business in California.
CDF purposefully availed itself of the privilege of conducting activities in
California, thus taking advantage of the protections and benefits of the law.

51.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The
causes of action alleged herein arise under federal law.

52.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because
Plaintiff is completely diverse from Defendants and the amount in controversy
exceeds $75,000.00, exclusive of interest and costs.

53.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because
at least one member of the Class is a citizen of a state different from the Defendants
and the amount in controversy exceeds $5,000,000.00, exclusive of interest and
costs.

54.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367,
as the state law claims are so related to the federal claims as to form part of the same
case or controversy.

55.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)
because a substantial part of the events that gave rise to this lawsuit occurred in

13

California. Plaintiff's California Assignors purchased the Subject Drugs in California. Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) because Defendants transact their affairs in California.

## STANDING

56.    Plaintiff's Assignors provide Medicare benefits to beneficiaries who have elected coverage under Medicare Part C or Medicare Part D under either (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii) state and federal laws that provide for the reimbursement of payments made by the assignorhealth plans.

57.    The assignments the Assignors provided to Plaintiff are valid and binding contracts, empowering Plaintiff to bring and recover on the claims asserted in this lawsuit.

58.    Although Plaintiff seeks recovery on behalf of each Assignor who paid for or reimbursed the cost of the Subject Drugs at inflated prices, one representative assignment for each Plaintiff to establish standing. A copy of each representative assignment is attached hereto as **Exhibit C**, and **Exhibit V**.

59.    Plaintiff also seeks recovery on behalf of each Assignor who paid for claims relating to the Subject Drugs tainted by Defendants' violations of the AKS, and other state bribery laws, including, but not limited to: (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) Mass. Gen. Laws ch. 175H, § 3; (4) S.C. Code Ann. § 44-113-60; and (5) Va. Code Ann. § 32.1-315.

60.    At all material times hereto, one or more of Plaintiff's Assignors provided Medicare benefits to Medicare Advantage plan beneficiaries and paid inflated prices as a result of Defendants' illegal scheme and anticompetitive conduct and paid for tainted claims that were legally unpayable.

61.    Defendants' fraudulent conduct through use of the Co-payment Scheme triggered payment obligations for the Subject Drugs at inflated prices and induced

14

the purchase and dispensing of the Subject Drugs over cheaper and therapeutically

equivalent generic alternatives.

62.    The claims paid for by Assignors for the Subject Drugs involved
transactions (and related events) in at least the following fourteen states and
territories: Alabama, Colorado, Connecticut, Florida, Kansas, Maryland,
Massachusetts, New Jersey, New York, North Carolina, South Carolina, Tennessee,
Virginia, and Washington.

63.    Assignors paid **$29,576,756.28** million in claims on behalf of covered
patients receiving Sensipar from at least October 1, 2011, through present. (*See,*
**Exhibit W,** Representative Claims Data).

64.    Assignors provided payment for Sensipar throughout the United States,
including in the state of California.

65.    Assignors paid **$25,77,353.92** million in claims on behalf of covered
patients receiving Kyprolis from at least October 1, 2011, through present. (*See,*
**Exhibit W,** Representative Claims Data).

66.    Assignors provided payment for Kyprolis throughout the United States,
including in the state of California.

## REGULATORY BACKGROUND

67.    In 1965, Congress amended the Social Security Act to create the
Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a
federally funded health insurance program for the nation's elderly and disabled. The
Medicare Act consists of five parts—Parts A, B, C, D, and E. Parts A and B "create,
describe, and regulate traditional fee-for-service, government-administered
Medicare."[6]  Part C outlines the Medicare Advantage program and provides that
Medicare beneficiaries may elect for private insurers to deliver their Medicare

---

[6] *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 357 (3rd Cir. 2012)
(citing 42 U.S.C. §§ 1395(c)-1395(i)-(5); 1395(j)-1395(w)).

benefits. 42 U.S.C. §§ 1395w-21-29. Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions."

68.     Plaintiff's Assignors provide Medicare benefits under Parts C and D.

69.     Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

70.     Unlike Parts A and B, yet much like Medicare Part C, Medicare Part D is based on a private-market model, wherein Medicare contracts with private entities, known as Part D "sponsors." These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

71.     A Part D sponsor submits a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

72.     If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium. Centers for Medicare and Medicaid Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

73.     All providers and suppliers of medical services and items—including drug manufacturers who supply covered medications indirectly—must enroll with Medicare to be eligible to receive any payment for their items or services through Medicare. 42 CFR § 424.505. To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 CFR § 424.510(d)(3).

74.     The application forms used by all providers and suppliers to enroll in Medicare includes the following attestation: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in . . . this application. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b))."[7]  (emphasis added). The AKS was enacted to protect the "public's confidence in the government" because the government is harmed by bribery even absent any financial harm. *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (citing *United States v. Miss. Valley Generating Co*., 364 U.S. 520, 562 (1961)). Defendants are routinely held liable for abusing this trust relationship,[8] and the federal government has emphasized the necessity of "closely scrutiniz[ing]" renumerations relating to the recommendation of medical products" because it involves "exceptional position[s] of public trust[.]" Re: OIG Advisory Opinion No. 11-08, 2011 WL 4526111, at *4.

75.     In addition, "in order for coverage to be available under Medicare Part D for applicable drugs of a manufacturer, the manufacturer must," among other things, enter "into and have in effect an agreement described in § 423.2315(b)." 42 CFR § 423.2310(a). This manufacturer agreement requires that "[e]ach manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program." 42 CFR § 423.2315. In other words, this

---

[7]  Medicare Enrollment Application, CMS Form 855i, available online at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf.;  *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

[8]  *See, e.g.*, *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) ("[A]s medical equipment suppliers, [defendants] were in positions of trust with respect to Medicare."); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (holding that defendant who violated the AKS held a position of trust); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) ("[False] claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system.") (cleaned up).

agreement is a precondition for any of Subject Drugs to qualify for payment by Assignors. Further, Congress has unequivocally instructed that "compliance with federal health care laws, including the [AKS], is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1260 (11th Cir. 2005).

76.    Further, when a bill is submitted to a Medicare Provider, that bill carries an implied certification that the bill is free from material misrepresentations, including violations of the AKS and analogous state law bribery statutes referenced herein.

77.    Likewise, MA Plans are required to certify compliance with the AKS and are prohibited from paying for claims that are tainted by an AKS violation or are rendered unpayable due to disqualifying conduct by the underlying provider or supplier. 42 CFR § 422.504(h)(1). Every subcontract that the MA Plan enters must also contain this certification of compliance. 42 CFR § 422.504(i).

78.    MA Plans and other Part C entities play an important role in the U.S. healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation."[9] In 2017, 33% of Medicare-eligible individuals got received their health insurance from Medicare Advantage entities. In 2021, that figure rose to 42% and will likely rise further in the coming years.[10]

79.    "In 2022, more than 28 million people are enrolled in a Medicare Advantage plan, accounting for nearly half or 48 percent of the eligible Medicare

---

[9] *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 363 (3rd Cir. 2012).
[10] See Meredith Freed, *Medicare Advantage in 2021: Enrollment Update and Key Trends*, (June 21, 2021), Kaiser Family Foundation. [available online at: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2021-enrollment-update-and-key-trends/.]

population, and $427 billion (or 55%) of total federal Medicare spending (net of
premiums)."

80.    Medicare Advantage entities cannot play the vital role that Congress
intended if they are hamstrung by a competitive disadvantage. When Medicare
Advantage entities "faithfully pursue and recover from liable third parties," they
"will have lower medical expenses and will therefore be able to provide additional
benefits to their enrollees." *In re Avandia*, 685 F.3d at 363 (quoting Policy and
Technical Changes to Medicare Advantage and the Medicare Prescription Drug
Benefit Programs, 75 Fed. Reg. 19678, 19797 (April 15, 2010)).

## **FACTUAL ALLEGATIONS**

### *Background*

81.    The Manufacturers, and every physician who prescribed Sensipar or
Kyprolis submitted a Medicare Provider and/or Supplier Application. Each of these
entities explicitly certified compliance with the AKS and CMS regulations and
program guidelines.[11] These entities knew that this certification and compliance was
a precondition for eligibility to receive payment for any services or items to
provided—directly or indirectly—to Medicare beneficiaries.

82.    As an additional eligibility requirement to participate in the Part D
program, the Manufacturers entered into contractual agreements with CMS agreeing
to comply with all Medicare Program rules, including the AKS. Without this
contract, none of the Subject Drugs would have been eligible for payment under
Medicare Part D.

---

[11] At all relevant times, and in often cases, Defendants caused claims to be submitted to Assignors
electronically, by, among other ways, causing generation of a Prescription Drug Event ("PDE").
Upon submission of claims to Assignors, Defendants repeatedly and routinely certified the legality
of the circumstances in which the claims arose. *See, e.g.,* 42 §423.505. These certifications, made
to Assignors through the mail and wire (as discussed below), were false, resulting in unpayable
(or "tainted") claims paid for by Assignors.

83.    "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs."[12]  Legitimate patient assistance programs ("PAP") (of which PANF or CDF is not, as further discussed below) aim to help financially needy patients afford necessary medications during this difficult period .

84.    There are two ways that pharmaceutical companies give PAPs. First, manufacturers can establish their own PAPs. "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients. The second option is through independent charity PAPs (herein referred to as "co-payment charities")." *See Cloak of Social Responsibility*.

85.    Pharmaceutical companies donate money to co-payment charities, purportedly to help patients who cannot afford their drugs. These patients often have health insurance (usually Medicaid or Medicare) but apply to these charities to help cover all or a portion of their co- payment obligations.

86.    There are two key differences between these two giving options. "First, companies donate drugs in option 1 and money in option 2. Second, pharmaceutical companies receive no money besides a [tax] deduction in option 1, *but under option 2 they receive a [tax] deduction and money from the insurer paying the other portion of the drug costs*. Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not reduce the price of prescription drugs to the healthcare payer. These are one-sided discounts." *Id*. (emphasis added).

---

[12] *See* Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, R44264 (June 15, 2017), https://crsreports.congress.gov/product/pdf/R/R44264/5) [hereinafter "*Discount Coupons and Patient Assistance Programs*"].

87. A small donation to a co-payment charity results in a pharmaceutical company receiving a substantial portion of the prescription's cost from Medicare Advantage Plans, such as the Assignors.[13]

88. As pharmaceutical drug company "giving" to co-payment charities rises, the co- payment charity benefits as well. In fact, executives at co-payment charities (including PANF and CDF) are among some of the *highest paid executives* in the United States.

89. Thus, in this context, pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations and establish disease funds to cover co- payments of the pharmaceutical company's expensive specialty drugs and ensure federal healthcare programs bear the cost of these drugs, so the co-payment charity can show "results" for the pharmaceutical company, justifying increased donations.

---

[13] *See* Michael Banigan, *A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions*, Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). *See also Cloak of Social Responsibility* (explaining that example of "charitable margin" can yield a "charitable margin of 220 percent"); *see also* Citi Research, *The Straw that Could Break the Camel's Back*: *DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 [hereinafter Citi Research] (explaining that "*[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, funded by the US Government*.") (emphasis added).

21

90.     Given these shared economic incentives, it's no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. *See Cloak of Social Responsibility* (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, while overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities, including PANF and CDF, from

| Table A-1. Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | |
|---|---|---|---|---|---|
| | Patient Access Network Foundation[a] | Chronic Disease Fund/ Good Days[b] | Caring Voice Coalition[c] | Healthwell Foundation[d] | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | — | — | — | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | $80,383 | — | $6,982,842 | $11,301,748 |
| 2005 | $7,557,312 | $5,597,689 | $5,257,803 | $15,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,834 | $66,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,700 | $15,816,549 | $59,391,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,533 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,953 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $49,521,777 | $39,983,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $58,221,721 | $36,995,288 | $50,332,148 | $436,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,464 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $496,427,781 | $170,628,203 | $98,027,539 | $29,039,150 | $73,735,080 | $867,857,753 |

*Source:* ProPublica's Nonprofit Explorer Database.
*Notes:* These totals come from line 13 titled "Total Grants" on Form 990, although for some entities before 2008, the totals come from line 23, part II.
[a]Excluded 2004 return because it was an initial return.
[b]Excluded 2004 return because it was an initial return.
[c]Excluded 2002 return because it was an initial return and their reporting years run July to June.
[d]Excluded 2004 return because it was an initial return.

2001 to 2014.

91.     The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the clear economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

92.     First, this increased giving to co-payment charities occurred during a period in which there was a surge in the number of Americans with prescription drug coverage as a result of the enactment of Medicare Part D and, subsequently, the

22

passing of the Affordable Care Act in 2010 ("ACA"), which expanded Medicaid prescription drug benefits. "Before these public insurance expansions, federal government spending on prescription drugs was 25 percent of total spending in 2005. In 2014 it was 41 percent." *See Cloak of Social Responsibility*.

93.    Specialty drug prices are set by drug manufacturers with an intimate knowledge of the drug market. This knowledge enables manufacturers to set supra-competitive drug prices by using PAPs to circumvent beneficiary co-payment obligations, thus eliminating price sensitivity.

94.    Second, along with these public insurance programs, specialty drugs (generally defined as expensive prescriptions requiring extra handling or administration in treating complex diseases) have contributed to the growth of co-payment charities. "In recent years, spending for specialty drugs has grown faster than spending for other pharmaceuticals. Although specialty medications account for only one percent of prescriptions, they account for almost a third of U.S. prescription spending. For Medicare Part D, specialty drugs accounted for a quarter of a percent of prescriptions in 2013 but eleven percent of total drug cost." *Id*.

95.    Co-payment charities allow pharmaceutical companies to manage price sensitivity for these more expensive specialty drugs. The OIG noted that PAPs "may steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available." *Id*.

96.    Moreover, the rise of co-payment charities was in response to federal anti-kickback law. The AKS made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime. The AKS makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person to purchase or recommend any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b). Several state laws prohibit similar conduct involving any health insurance

transaction, namely Plaintiff also seeks recovery on behalf of each Assignor who paid for claims relating to the Subject Drugs tainted by Defendants' violations of the AKS, and other state and federal bribery laws, including, but not limited to: (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) Mass. Gen. Laws ch. 175H, § 3; (4) S.C. Code Ann. § 44-113-60; and (5) Va. Code Ann. § 32.1-315.

97.     As it relates to PAPs, the OIG has stated that the AKS could be violated "if a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items."[14]

98.     Congress has determined that any Medicare or Medicaid claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

### Congressionally Mandated Cost-Sharing Under Medicare Part D

99.     There are four payment stages to a Medicare Part D drug plan: (1) Annual Deductible, (2) Initial Coverage, (3) Coverage Gap, and (4) Catastrophic Coverage. In each stage, the enrollee, Plan Sponsor, and/or Medicare are required to contribute their independent and exclusive portion of the total costs in accordance with the applicable cost-sharing parameters. The cost-sharing allocation in each stage varies. For instance, the table below displays the cost-sharing parameters for 2018:

---

[14] *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120, 31121 (May 30, 2014) attached as **Exhibit D** – Supplemental Special Advisory Bulletin (May 2014).



**Medicare Part D Standard Benefit Design in 2018**

*Note.* Some amounts rounded to nearest dollar. *The estimate of $8,140 in total drug costs corresponds to a $5,000 out-of-pocket threshold for catastrophic coverage in 2018.
*Source.* KFF, Based on 2018 Part D benefit parameters.

100.   In 2018, the Part D standard benefit had a $405 deductible and 25% coinsurance up to an Initial Coverage limit of $3,750 in total drug costs, followed by a Coverage Gap. During the Coverage Gap, Plans covered 15% of costs for brand-name drugs and 56% of costs for generic drugs. Once the Catastrophic Coverage stage begins, Plan Sponsors are responsible for 15% of drug costs.

101.   To illustrate cost-sharing in practice:

The retail price for 30 tablets of Sensipar, 90mg each, is approximately $2,557.87.[15] The dosage for Sensipar ranges up to 90mg, four times per day—i.e., 120 tablets of Sensipar per month, costing approximately $10,228.[16] Under the 2018 cost-sharing parameters, using the aforementioned price and dosage,

---

[15] *See* https://www.drugs.com/price-guide/sensipar
[16] *Id.*

a Plan Sponsor, *not Medicare*, would pay approximately $20,500.65 annually for a single beneficiary.

102.   Under Medicare Part D cost-sharing parameters, there is an exclusive portion of total drug expenses that are always paid for by the Assignors and Class Members—i.e., Plan Sponsors. This portion is entirely independent of any expenses covered by Medicare.

103.   Thus, because the Assignors and Class Members pay for a portion of beneficiaries' prescriptions, Defendants' Scheme, which increased prices and utilization of the Subject Drugs, necessarily resulted in injury to the Assignors and Class Members. As such, using the Scheme to boost drug sales at inflated prices will necessarily cause injury to Assignors and Class Members regardless of whether Medicare is also injured in the process.

104.   In fact, since Defendants used illegal subsidies to insulate beneficiaries from price increases, the cost-sharing table above clearly demonstrates that the Assignors and Class Members are always going to be the first entity harmed.

105.   In the same way Defendants used kickbacks or bribes to cause the submission of AKS-tainted claims for payment by Medicare, Defendants caused the submission of AKS-tainted claims for payment by the Assignors and Class Members. However, unlike Medicare, the Assignors and Class Members have not recovered any of their losses.

106.   The DOJ separately and independently recovered Medicare losses associated with the submission of AKS-tainted claims. Liability attaches at the moment a claim is submitted; thus, Defendants were equally liable for submitting claims to Medicare and the Assignors and Class Members. However, the Amgen Settlement did not address or settle damages sustained by the Assignors and Class

Members caused by the exact same Scheme. The terms of the Amgen Settlement did not address the claims Plaintiff sets forth in this action.

### *Abusing Patient Assistance Programs to Subsidize Drug Copays: A Proven Method for Pharmaceutical Manufacturers to Boost Sales and Increase Drug Prices*

107.   Defendants' Scheme was constructed to achieve two primary goals: (1) to increase utilization[17] of the Subject Drugs by inducing purchases or otherwise causing claims to be submitted; and (2), giving the Manufacturers free reign to increase drug prices by subsidizing patient copays, thereby insulating enrollees and shifting the high costs to MA Plans and Medicare.[18]

108.   Under Medicare, however, copay or coinsurance subsidies, providing monetary or other valuable incentives, and other forms of remuneration[19] (including any conduct resulting in insulation from cost-sharing obligations) designed to *induce*[20] beneficiaries to purchase or physicians to prescribe specific drugs violate federal law.[21]

---

[17] "Drug utilization focuses on the various medical, social, and economic aspects of patient drug use. Economic issues deal with the cost of drugs and treatment for patients and society." Douglas T. Steinke, in "*Clinical Pharmacy Education, Practice and Research*", 2019.

[18] "Those partial payments ("copays") are intended to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products and to encourage drug manufacturers to price their products upon market forces" *United States v. Teva Pharmaceuticals USA, Inc.* 560 F.Supp.3d 412, 416 (Mass. Sept. 9, 2021).

[19] "The cost-sharing subsidies provided indirectly [donations] by a Funding Manufacturer [Amgen and Onyx] to eligible Part D enrollees filling prescriptions for the drugs it manufactures, and directly by Requestor [PANF and CDF] to eligible Part D enrollees, plainly would constitute remuneration." Attached as **Exhibit E** – OIG Advisory Opinion 10-22.

[20] *See* "Inducement", BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act or process of enticing or persuading another person to take a certain course of action.").

[21] *See, e.g., Pfizer, Inc. v. HHS*, No. 1:20-cv-4920, 2021 WL 4523676 (S.D.N.Y. Sept. 30, 2021) ("[T]here is no language in the [AKS] proximate to or modifying 'induce' that premises liability on a corrupt quid pro quo transaction where a benefit must flow to the requestor. The plain meaning of the word 'inducement' implies a 'one-way' transaction, where the requestor simply gets someone to take an action." . . . In other words, the [AKS] requires only that payments are made

109. The harmful impact of circumventing federal law to avoid congressionally imposed pricing controls is well-documented, along with the correlating increase in profits for pharmaceutical manufacturers.[22]

110. For instance, Dana Kuhn, co-founder and president of Patient Services, Inc., a charity which solicits money from drug companies, made the following obvious observation, patient assistance programs are "a win-win situation… companies make a small contribution to help the patient *and get much more money back when the insurer pays for the drug*."[23] Mr. Kuhn further emphasized that pharmaceutical manufacturers can "make money by donating". *Id.*[24]

111. Unsurprisingly, the OIG asserted that Mr. Kuhn's program, largely replicated by Defendants here, "interposes an independent charitable organization between donors and patients in a manner that effectively *insulates patients* and *doctors* from making prescribing decisions based on the donations." *Id* (emphasis added).

112. Similarly, on multiple occasions, the OIG explained the effects of programs like Defendants' Scheme. For example:

    a) In a 2005 Bulletin, the OIG noted "[C]ost-sharing subsidies can be very profitable for manufacturers, providing additional

---

with an intent to influence a decision about medical care or purchases, and does not require any further proof of intent or purpose.").

[22] *See* The House Committee on Oversight and Reform, "*Drug Pricing Investigation Majority Staff Report*", (December 10, 2021) [attached as **Exhibit F** – 2021 Drug Price Report] ("documents reviewed by the Committee reveal that drug companies [*including Amgen*] view donations to third-party foundations as an 'investment' for future returns, with the expectation that such donations would drive their drugs' sales.").

[23] *See* Geeta Anand, "*Through Charities, Drug Makers Help People – and Themselves*" Wall St. J. (Dec. 1, 2005) [hereinafter "*Drug Makers Help Themselves*"]

[24] *See also Giving a Buck or Making a Buck? Donations by Pharmaceutical Manufacturers to Independent Patient Assistance Charities*, Health Affairs, Nurses, Care Delivery, Pharmaceuticals, & More 41, No. 9 (2022) (noting how the charities affected drug sales, that for the 10 most expensive conditions, the leading drug manufacturers needed to induce a median of only 3% of sales via their donations in 2017 to break even.")[hereinafter "*Giving a Buck or Making a Buck?*"]

incentives for abuse . . . . These profits can be considerable, especially for expensive drugs for chronic conditions.";[25]

b) In a 2014 Supplemental Bulletin, the OIG indicated that pharmaceutical manufacturer's "ability to subsidize copayments for their own drugs may encourage manufacturers to increase prices at additional costs to health care programs.";[26] and

c) In a 2022 Advisory Opinion, the OIG explained how programs, such as Defendants' Scheme, "could further hinder a Part D plan sponsor's ability to control costs", and "circumvent one of the key pricing controls (exposing beneficiaries to the economic effects of drug prices set by manufacturers) that Congress instituted . . . and would lay bare the dangers of allowing manufacturers to dictate the terms of this market safeguard." The OIG further explained how a program, such as Defendants' Scheme, "would create an avenue for manufacturers, via Requestor, to direct remuneration to Part D enrollees that would remove a financial barrier (i.e., cost) for those Part D enrollees utilizing the manufacturer's drug" and "prescribers could be dissuaded from prescribing a product for which a beneficiary would pay the full cost-sharing amount if a different, clinically appropriate drug were covered" by an arrangement like Defendants' Scheme.[27]

113. The same perverse effects of abusing patient assistance programs were warned of during the implementation of Medicare Part D. For example, in 2004, the Congressional Budget Office ("CBO") stated:

"If a drug's target population consisted mainly of Medicare beneficiaries and close substitutes for the drug did not exist"—precisely the case here—"the manufacturer could raise the drug's price . . . the loss in sales resulting from that price hike would not

---

[25] OIG Special Advisory Bulletin 70 Fed. Reg. 70623-03(Nov. 2005), attached as **Exhibit G** – OIG 2005 Special Advisory Bulletin.
[26] **Exhibit D** – Supplemental Special Advisory Bulletin (May 2014).
[27] OIG Advisory Opinion No. 22-19 (October 2022), attached as **Exhibit H** – OIG Advisory Opinion 22-19.

29

be large enough to reduce the manufacturer's profit, however, because beneficiaries would pay only a portion of that higher price."[28]

114.   These sources plainly indicate a causal connection: when Medicare enrollees, such as Assignor and Class Member beneficiaries, are insulated from steep drug prices, there is an increase in expenses for prescription medications paid by MA Plans and Medicare. The effect of which, once again, benefits pharmaceutical manufacturers.

115.   This causal relationship between Defendants' Scheme and increased sales (i.e., volume dispensed) and inflated prices is well-documented by healthcare experts, economists, Congressional Committees, and the DOJ. It is no surprise that the Scheme benefited Defendants in the exact way it was intended to.

116.   In addition to economic benefits, pharmaceutical manufacturers view patient assistance programs as "tools for 'image improvement' and to offset negative public perception of its price increases."[29] Notably, pharmaceutical manufacturers conceal their true motive under the guise of 'charitable donations' to 'help' patients afford medication. Yet, the same pharmaceutical companies—including Amgen and Onyx—created the very problem they are now purporting to assist with.

117.   As discussed below, the House Committee on Oversight and Reform ("Committee") found Amgen's decisions to increase prices were driven by maximizing revenue and executive compensation, not helping patients. Moreover, the actual expenses to Amgen associated with Sensipar were dwarfed by profits.

---

[28] *See* Congress of the United States, Congressional Budget Office, *A Detailed Description of Cost Estimate for the Medicare Prescription Drug Benefit* (July 2004), https://www.cbo.gov/publication/15841 [hereinafter "*CBO: Medicare Prescription Drug Benefit*"].
[29] *See* **Exhibit F** – 2021 Drug Price Report.

*The Direct Relationship Between Drug Subsidies and Volume Dispensed*

118.  First, regarding increased sales of drugs (i.e., volume dispensed), the Scheme ensured greater utilization of the Subject Drugs by inducing purchases and thwarting prescription abandonment.[30] This is primarily because many beneficiaries will simply stop taking their prescription medication due to pharmaceutical manufacturers charging unaffordable prices.[31] It is "widely understood that high co-payments are a leading cause, and lowering co-payments significantly reduces abandonment for highly effective chronic treatments."[32] Hence, Defendants' Scheme was necessary to simultaneously increase prices and utilization.

119.  In order to avoid abandonment of increasingly expensive drugs, programs, like Defendants' Scheme, allow pharmaceutical manufacturers to "subsidize a Part D enrollee's out-of-pocket cost for only its drugs—for a category of patients for whom medication non-adherence is common because of high cost-sharing obligations."[33] Thus, if the reason a Part D enrollee would not fill out a prescription is inability or unwillingness to pay the out-of-pocket drug costs, then

---

[30] Prescription abandonment—when a prescription is transmitted to the pharmacy but never filled—is a major concern for both providers and drug manufacturers. Prescription abandonment is multi-faceted, but it is widely understood that high co-payments are a leading cause and lowering co-payments significantly reduces abandonment for highly effective chronic treatments. *See* Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 Jama 61, 61–69 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697/; *see also* Congressional Budget Office, *Prescription Drugs: Spending, Use, and Prices* (Jan. 2022), https://www.cbo.gov/publication/57772#_idTextAnchor027 ("The reduction in consumers' out-of-pocket costs for prescription drugs is one key factor that explains the increased use of prescription drugs.").

[31] "Regardless of whether patients and doctors are induced by PAP funds at the prescription stage, the data is clear that patients are induced by co-payment assistance at the dispensing stage. Hayden B. Bosworth et al., *Medication Adherence: A Call for Action*. 162.3 Am Heart J. 412 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3947508/.

[32] Goldman, *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health* at 61–69.

[33] *See* **Exhibit H** – OIG Advisory Opinion 22-19

31

remuneration (i.e., the Manufacturers' illegal subsidies) would influence or induce the purchasing of the medication. *Id.*[34]

120.   The CBO referred to this phenomenon as the "use effect", which captures the changes in demand for drugs resulting from changes in beneficiaries' out-of-pocket expenses.[35] Under this principle, the CBO explained that beneficiaries' total drug use will increase if their own out-of-pocket costs fall.[36]

121.   Accumulating evidence further displays "patients with higher levels of cost-sharing are more likely to delay or forgo prescription medications" or "not take medication as prescribed."[37] As such, in the context of contributions made by foundations operating patient assistance programs, "that donations induce utilization is not surprising: Cost sharing is known to reduce utilization, so defraying it should logically induce some portion."[38] Other studies on copay assistance found increases for "branded drug sales by over 60%[.]" *Id.* Notably, copay assistance "may have a greater impact on the total volume of sales for single-source drugs, as consumers lack access to an inexpensive bioequivalent."[39]

122.   Similarly, in several DOJ settlements involving pharmaceutical manufacturers and 'charitable' organizations (including Defendants), the DOJ specified how schemes, nearly identical to that alleged herein, directly "induced drug purchases, or otherwise caused claims to be submitted"—i.e., increased volume.[40]

---

[34] *CBO: Medicare Prescription Drug Benefit.*
[35] *Id.* at ix.
[36] *Id.*
[37] *See* Report to Congress, *Prescription Drugs: Innovation, Spending, and Patient Access* (Dec. 7, 2016), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//192456/DrugPricing RTC2016.pdf [hereinafter "*Innovation, Spending, and Patient Access*"].
[38] *See Giving A Buck Or Making A Buck?*
[39] *See* Matthew Jordan et al., "*Discounts Shift the Demand Curve for Life-Saving Medications.*" SSRN Electronic Journal (2020).
[40] Other recent results involving the resolution of AKS and FCA claims brought by the United States on behalf of Medicare (not Medicare Advantage) against drug manufacturers participating

32

123. Moreover, in an ongoing case between the DOJ and Teva Pharmaceuticals, Inc.—to which CDF participated—the DOJ alleged, among other things:

   a) Teva intended the [donations to CDF] to ensure that Copaxone patients never faced the steep prices that Teva charged for its drug, thus inducing the patients to purchase the drug;

   b) Teva paid CDF knowing it would result in increased Copaxone sales;

   c) Teva knew that if it did not use CDF to subsidize patients' co-pays, substantially fewer patients would use Copaxone; and

   d) As one Teva employee noted, "[n]ot funding these patients has a direct and immediate impact on units [sold]".

*See* Complaint, *United States v. Teva Pharma. USA, Inc.*, No. 1:20-cv-11548 (D. Mass. Aug. 18, 2020), www.justice.gov/usao-ma/press-release/file/1395516/download.[41]

---

in improper schemes with co-payment charities include, but are not limited to: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018 to pay the United States $57 million related to claims involving Jazz's relationship with another co-payment charity, Caring Voice Coalition ("CVC") to fund co-payment for Jazz's narcolepsy drug Xyrem; (ii) United Therapeutics agreed to pay the United States $210 million to resolve the United States' AKS and FCA claims on behalf of Medicare based on United Therapeutics' relationship with CVC; (iii) H. Lundbeck A/S ("Lundbeck") agreeing in June 2018 to pay the United States $52.6 million related to claims involving Lundbeck's relationship with CVC to fund co-payment for Lundbeck's Huntington's Disease drug Xenazine; and (iv) Actelion Pharmaceuticals US, Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co- payment for Actelion's drugs Tracleer, Ventavis, Veletri, and Opsumit.

[41] In September 2021, the U.S. District Court for the District of Massachusetts denied the motion by Teva Pharmaceuticals USA, Inc., to dismiss the case brought by the Department of Justice. Memorandum and Order, *U.S. v. Teva Pharma. USA, Inc.*, No. 1:20-cv-11548 (D. Mass. Sep. 9, 2020).

33

124.    The fact that numerous DOJ cases and settlements continuously and consistently allege the same entities (pharmaceutical manufacturers and charitable organizations), operating nearly identical schemes, resulting in the same inducement of drug purchases, or otherwise causing claims to be submitted is not a coincidence. Nor is it a coincidence that pharmaceutical manufacturers—including Amgen—have paid hundreds of millions of dollars to settle these claims.[42]

125.    Simply put, circumventing congressional cost-sharing obligations resulted in a direct and immediate increase in drug sale volume for the Manufacturers. This notion adheres both to common sense and in-depth studies expounding on these exact effects.

126.    Furthermore, publicly available data similarly substantiates the effects of Defendants' Scheme. For instance, in 2012, CMS reported 625,115 total claims for Sensipar. Four years later, CMS reported 956,864 total claims for Sensipar—a 34.7% increase. This substantial increase in volume occurred despite the cost of Sensipar also increasing by approximately 63% in the same time.

127.    Notably, however, is the fact that greater utilization is not attributable to a decrease in total cost-sharing obligations. Since the inception of Medicare Part D, enrollees' standard cost-sharing obligations have increased.[43]

128.    Discovery will show Defendants' Scheme unequivocally increased the sales volume by inducing purchases of the Subject Drugs, or otherwise causing tainted claims to be submitted pursuant to the Scheme.

---

[42] *See supra*, fn. 41.

[43] Moreover, driving increase demand through patient assistance programs also increases other costs in the health care system, even before factoring the increase in drug prices. *See* S. Yousef Zafar and Jeffrey M. Peppercorn, *Patient Financial Assistance Programs: A Path to Affordability or a Barrier to Accessible Cancer Care?*, Journal of Clinical Oncology (July 2017),  www.ncbi. nlm.nih.gov/pmc/articles/PMC6553813/#b13).

34

*The Direct Relationship Between Drug Subsidies and Increased Drug Prices*

129.    Copayment assistance programs enable pharmaceutical manufacturers to increase prices[44] without exposing beneficiaries to unaffordable drug-related expenses.[45] By illegally subsidizing beneficiaries' cost-sharing obligations, the Manufacturers shifted a majority of the inflated price of the Subject Drugs to the insurers—Assignors and the Class Members.[46]

130.    To prevent pharmaceutical manufacturers from abusing copayment assistance programs in such a manner, Congress imposed various regulations and tools to manage drug prices to reduce costs for Medicare, MA Plans, and enrollees. Even the DOJ recognized "Congress included co-pay requirements, in part, to encourage market forces to serve as a check on health care costs, including the prices that pharmaceutical manufacturers can demand for their drugs."[47]

131.    Congress created additional incentives to control drug prices based on the degree of financial risk MA Plans would bear and the type of competition they would face.[48] The CBO noted that Congress' inclusion of cost management tools

---

[44] A. Pollack, *Drug firms providing kickbacks for co-pays and coinsurance: Coupons for Patients, but Higher Bills for Insurers* New York Times (Jan. 1, 2011) [hereinafter "*Higher Bills for Insurers*"] ("[T]he coupons are just marketing gimmicks that are leading to an overall increase in health care costs. That is because they circumvent the system of higher co-pays on costlier drugs that insurers use to encourage consumers to use less expensive drugs.").

[45] Leemore Dafny et al., *How do Copayment Coupons Affect Branded Drug Prices and Quantities Purchased?*, National Bureau of Economic Research ("Coupons diminish price competition among drugs and limit insurers' ability to manage drug utilization via tiered formularies"); *see also Giving A Buck Or Making A Buck?* (noting, in the context of manufacturer-supported patient assistance programs, that the assistance "are likely to induce the use of assisted drugs (some of which may be cost-ineffective or inappropriate).")

[46] *See Drug Makers Help Themselves; see also Higher Bills for Insurers* ("In providing cost-sharing assistance to the patient, the manufacturers are removing barriers to their most profitable products. Since these are more expensive, that increases the drug costs of the insurers.").

[47] U.S. Attorney's Office for the Dist. of Mass., *Fourth Foundation Resolves Allegations It Conspired with Pharmaceutical Companies to Pay Kickbacks to Medicare Patients Taking the Companies' Drugs*," (Apr. 1, 2021), https://www.justice.gov/usao-ma/pr/fourth-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay

[48] *See* CBO, *Medicare Prescription Drug Benefit*, at xi.

1  would result in lower drug prices.[49] However, Congress, the CBO, and MA Plans

2  did not account for numerous pharmaceutical manufacturers, such as the

3  Manufacturers, violating federal law to circumvent price constraints. Neither

4  Medicare nor MA Plans assumed the risk of paying costs resulting from violations

5  of federal law and other state bribery statutes. In fact, knowingly paying for tainted

6  claims would subject MA Plans to criminal and civil penalties.

7      132.  Defendants' Scheme eliminated Congressional market controls, giving

8  the Manufacturers free reign over setting drug prices without risking loss of profits.[50]

9  The Scheme had this effect because "Copay assistance gives pharmaceutical

10  companies a way to sidestep the consequences of drug price negotiations since they

11  can keep out-of-pocket costs low", and further "undermines the effect of out-of-

12  pocket expenses on healthcare utilization."[51] The Scheme permitted, and

13  encouraged, further price inflation. *Id.*

14      133.  Moreover, "programs", like Defendants' Scheme, "weaken

15  manufacturers' incentives to accept lower prices from insurers. By undermining

16  patient cost sharing, copay assistance programs leave insurers with a less effective

17  tool kit for steering utilization and containing spending."[52] In reality, the Scheme is

18

19

20  _____

   [49] *Id.* at 14.

21  [50] Peter A. Ubel, MD, and Peter B. Bach, MD, *Copay Assistance for Expensive Drugs: A Helping
   Hand That Raises Costs*, Ann Intern Med. (2016) [hereinafter "*Copay Assistance for Expensive*

22  *Drugs*"] ("But copay assistance programs act as an artificial price support, which lessens the
   incentive for consumers to factor cost into their decisions and further weakens the pressure on

23  pharmaceutical companies to lower the price of their products"); *see also* Dept. of Justice, Office
   of Public Affairs, *Patient Services Inc. Agrees to Pay $ Million for Allegedly Serving as Conduit*

24  *for Pharmaceutical Companies to Illegal Pay Patient Copy payments*, (Jan. 21, 2020) (noting that
   schemes, such as Defendants', are simply a means to "increase company profits while avoiding

25  important cost-control aspects."), https://www.justice.gov/opa/pr/patient-services-inc-agrees-pay-
   3-million-allegedly-serving-conduit-pharmaceutical-companies ]

26  [51] *See Copay Assistance for Expensive Drugs.*

27  [52] *See* **Exhibit H** – OIG Advisory Opinion 22-19 (citing "*Giving a Buck or Making a Buck?*").

28

not aimed to help beneficiaries, but rather "a clumsy way for manufacturers to game the system so they can continue their high pricing."[53]

134.   "The ability to subsidize copayments for their own products may encourage manufacturers to increase prices."[54] By subsidizing their own products, pharmaceutical manufacturers eliminate a major drug price control imposed by Congress—i.e., the beneficiary's cost-sharing obligation. The Scheme is aimed to "circumvent one of the key pricing controls (exposing beneficiaries to the economic effects of drug prices set by manufacturers) that Congress instituted….and would lay bare the dangers of allowing manufacturers to dictate the terms of this market safeguard."[55] Furthermore, the Scheme creates "an avenue for manufacturers, via Requestor [charities], to direct remuneration to Part D enrollees that would remove a financial barrier (i.e., cost) for those Part D enrollees utilizing the manufacturer's drug." *Id*.

135.   As a practical matter, beneficiary affordability acts as a control on drug prices. Pharmaceutical manufacturers are aware that many beneficiaries will not purchase their products, nor will physicians prescribe, if they are unaffordable. Hence, by removing the affordability aspect, the Manufacturers were free to set prices at supra-competitive levels, knowing their subsidies would be a small investment for the massive returns paid by the Assignors, Class Members, and Medicare.[56]

---

[53] "*Drug Makers Help Themselves*"; *see also* "*Higher Bills for Insurers.*"
[54] *See* **Exhibit D** – Supplemental Advisory Bulletin (May 2014).
[55] *See* **Exhibit E** – OIG Advisory Opinion 10-22.
[56] *See* **Exhibit F** – *2021 Drug Price Report* ("Non-public data obtained by the Committee reveals that the costs of these programs for drugs in the Committee's investigation were a small fraction of revenues brought in by those drugs."); *see also* "*Discount Coupons and Patient Assistance Programs*" ("These companies' charitable contributions are tax deductible, meaning the actual cost of these donations is even less.")

136.   According to investigative and other research-based findings relating to independent PAPs, (1) every $100 million in increased donations generates approximately $1 billion in increased drug sales for the manufacturer;[57] (2) "the vast majority of funds that are 'donated' by a pharmaceutical manufacturer are returned to it" as paid transactions for supra-competitively priced prescriptions that would have never been dispensed, in addition to the tax deductions also claimed by the manufacturers, according to an investigation conducted by the IRS;[58] (3) manufacturers' use of "independent" (or sham) 501(c)(3) PAPs, like the ARI-funds at issue here, eliminate price sensitivity for patients, thereby decreasing usage of cheaper, therapeutically equivalent generic alternatives;[59] and (4) since 2006, manufacturers, including the Manufacturers, have used "independent" PAPs, like CDF and PANF, to financially induce the use of the manufacturers' own products.[60]

137.   CMS data further supports the effect Defendants' Scheme had on drug prices.

138.   For example, Medicare Part D spending on Sensipar witnessed a trend in rising prices. In 2013, the average spending per dosage unit was $23.01. In 2017, the average spending per dosage unit jumped to $40.88 (77% increase). The average spending per beneficiary was $5,179.27 in 2013, and 9,302.02 in 2017 (79% increase).

139.   In addition, Medicaid spending for Sensipar witnessed a similar trend. In 2012, the average spending per dosage unit was $21.95. In 2016, the average

---

[57] Ikarian Point Research, *Celgene and the Chronic Disease Fund: The Next Domino to Fall?*, SEEKINGALPHA, (Dec. 11, 2013), https://seekingalpha.com/article/1892111-celgene-and-thechronic-disease-fund-the-next-domino-to-fall ("SeekingAlpha Article").
[58] Reuters, *U.S. IRS probes drug company-funded patient assistance charity*, (June 29, 2017), https://www.reuters.com/article/usa-pharmaceuticals-charity/u-s-irs-probes-drug-company-funded-patient-assistance-charity-idUKL1N1JQ0UH
[59] *Regence Health Policy Center, Drug Manufacturers' Billion-Dollar Scheme* (Feb. 7, 2023), https://regencehpc.com/publications/drug-manufacturers-billion-dollar-scheme
[60] *See "Giving a Buck or Making a Buck?"*

1  spending per dosage unit jumped to $36.10 (64% increase). The average spending
2  per claim was $736.45 in 2012, and $1,217.42 in 2016 (65% increase).

3      140.  Plaintiff's allegations demonstrate that the Manufacturers raised their
4  drug prices to supra-competitive levels without the natural market forces and
5  congressional restrictions that would have otherwise mitigated against the Scheme's
6  effect.[61]

7      141.  Finally, as discussed in the following section, the Manufacturers'
8  expenses associated with their drugs in no way justified the egregious price
9  increases. In fact, internal documents uncovered by the Committee demonstrate
10  price-related decisions were driven by revenue and executive compensation.

**House Committee on Oversight and Reform:** *Investigation of Skyrocketing Prescription Drug Prices*

12      142.  In 2019, the House Committee on Oversight and Reform (the
13  "Committee") "launched one of the most comprehensive and in-depth investigations
14  of drug price increases that Congress has ever conducted."[62]

15      143.  The Committee's findings further corroborate Plaintiff's allegations.
16  Namely, (1) Defendants' goal was to raise prices and utilization of the Subject
17  Drugs; (2) the Manufacturers leveraged the Charities to circumvent congressional
18  price controls; (3) Defendants' Scheme targeted Medicare Part D enrollees
19  (including Assignors' beneficiaries); (4) Defendants knew leveraging patient
20  assistance programs violated the AKS, FCA, and other federal and state laws; (5) as

---

[61] The type of illegal "remuneration" imposed by Defendants "presents many of the hallmark risks of fraud and abuse that the federal anti-kickback statute is designed to prevent, including the potential for inappropriately increased costs to federal heal care programs (e.g., through the ability of manufacturers to increase drug prices or set high launch prices as a result of the reduction of beneficiary sensitivity towards the price of the product); potential for beneficiary steering and anti-competitive effects; and possible interference with or skewing of clinical decision-making." **Exhibit H** – OIG Advisory Opinion 22-19
[62] *See* House Committee on Oversight and Reform, "*House Committee Initiates Sweeping Drug Price Investigation*", (Jan. 14, 2019), attached as **Exhibit I** – Committee Drug Price Investigation.

a result of leveraging its patient assistance programs, Defendants raised prices and increased utilization of the Subject Drugs; and (6) the Manufacturers decisions to increase prices was driven by maximizing revenue and executive compensation, not costs relating to the Subject Drugs, or patient well-being.

*September 2020 Drug Pricing Investigation: Amgen—Enbrel and Sensipar*

144.    On September 30, 2020, the Committee released a report titled *Drug Pricing Investigation: Amgen—Enbrel and Sensipar*.[63] The staff report findings "are based on the Committee's review of more than 400,000 pages of internal communications and data related to Enbrel and Sensipar from 2009 until present." *Id*. The staff report "focuses on Amgen's pricing practices, business strategies to maximize sales, and tactics it uses to minimize generic competition." *Id*.

145.    The September 2020 *Drug Pricing Investigation*, in relevant part, is listed in the following paragraphs 146-162.

146.    **Uninhibited Price Increases**: Amgen raised the price of Sensipar *more than 20 times* since launching the drug in 2004. These price increase have inflated the costs of a typical yearly course of Sensipar from $2,956 in 2004 to $9,814.[64] The Committee made the following findings regarding Amgen's pricing practices for Sensipar:[65]

| Drug | Price (2018) | No. of Price Increases Since Launch | Price Increase Since Launch | 2018 U.S. Net Revenue |
|------|--------------|-------------------------------------|-----------------------------|------------------------|
| Sensipar | $9,800/year[66] | 20+ | 232% | $1.4 Billion |

---

[63] *See* House Committee on Oversight and Reform, *Drug Pricing Report: Amgen—Enbrel and Sensipar* (Sept. 2020), attached as **Exhibit J** – 2020 Amgen Drug Pricing Report.

[64] Note: this figure is based on a monthly prescription of 30 tables of Sensipar (30mg each), significantly less than the recommended dosage. https://www.drugs.com/dosage/sensipar.html

[65] **Exhibit J** – 2020 Amgen Drug Pricing Report, at 3.

[66] Note: this figure is based on a monthly prescription of 30 tables of Sensipar (30mg each), significantly less than the recommended dosage. https://www.drugs.com/dosage/sensipar.html

147. **Corporate Profits Driven by Price Increases**: From 2009 to 2019, Amgen reported more than $57 billion in net U.S. revenue from Enbrel and Sensipar. Amgen's net U.S. revenue for Sensipar rose from $36 million in 2004 to $1.4 billion in 2018. Amgen's price increases for Enbrel and Sensipar fueled its profitability. *Id.* at 4.

148. **Pricing Decisions Driven by Revenue Targets**:  Internal communications show that pricing decisions by Amgen executives—including Executive Vice President Anthony Hooper—were driven primarily by the need to meet increasingly aggressive revenue targets. *Id.* at 7. For example, Amgen increased the price of Sensipar by 8% in January 2017 after concluding that forgoing the price increase would cost the company $58 million in net revenue. *Id.* at 8.

149. Mr. Hooper was Amgen's second highest-paid executive in 2017 and the individual responsible for approving price increases, sometimes in consultation with Mr. Robert Bradway—Amgen CEO. *Id.* at 7. In March 2016, Mr. Hooper prepared a memorandum for Mr. Bradway reporting an increase of $50 million in the full year sales projections due to several "adjustments" to the forecast. *Id.* The first adjustment listed was: "Pricing Impacts in the U.S. This includes the benefit of the Dec. '15 Enbrel price increase, moving Sensipar [price increases] up to Jan./Jun. actions (vs Plan of Apr./Oct.)." *Id.*

150. The memo noted that net U.S. revenue for the quarter was "$93M above Plan driven primarily by Sensipar (+35M), Enbrel (+31M), and [redacted] for the reasons described above." *Id.*

151. Other internal pricing documents show that Amgen executives raised prices—sometimes even higher than previously planned—to meet revenue targets. *Id.* For example, in June 2016, Amgen's pricing committee proposed an 8% price increase for Sensipar (*the second 8% increase in 2016*). *Id.* The justification for the price increase was that earlier projections had assumed the 8% price increase would

41

be taken and forgoing the price increase would result in a shortfall of $22.5 million in 2016 and $74.4 million in 2017. *Id.* Amgen executed the price increase on July 14, 2016. *Id.* at 7-8.

152.   In December 2016, the Amgen pricing committee considered how much to increase the prices of Enbrel and Sensipar in 2017. *Id.* at 8. For Sensipar, the pricing committee noted that Amgen was planning an 8% price increase in January 2017 and estimated that forgoing such a price increase would cost approximately $100 million in net revenue in 2017. *Id.*

153.   As Amgen's deliberations about the 2017 price increases continued, executives began warning about the financial downside of delaying the price increase. *Id.* Executives informed Mr. Hooper that delaying Sensipar's price increase for one month would cost Amgen $3 million and delaying it for 2017 would cost $58 million in net revenue, jeopardizing bonuses and executive compensation to Amgen's executives. *Id.* at 8-9. The team recommended going forward with the Sensipar increase immediately, and Mr. Hooper agreed. *Id.*

154.   **Executive Compensation System Incentivizes Price Increases**: Amgen's price increases for Enbrel and Sensipar led to higher bonuses for its executives. *Id.* at 10. In 2017 and 2018, Amgen's top executives collected $97 million in compensation. When executives raised prices to meet net revenue projections, this in turn ensured that they would also receive their bonuses. *Id.* at 11. The Committee made the following findings regarding **Amgen's Senior Executive Compensation**:

| Amgen Senior Executive Compensation | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **2017** | | | | | | |
| | Base Salary | Incentive Compensation and Performance Bonuses | Performance Units and Restricted Stock Units | Stock Options | All Other Compensation | Total |
| Robert A. Bradway, CEO | $ 1,555,962 | $ 2,683,000 | $ 8,399,812 | $ 3,599,974 | $ 661,041 | $ 16,899,789 |
| Anthony C. Hooper, EVP, GCO | $ 1,050,173 | $ 1,207,000 | $ 2,799,937 | $ 1,199,973 | $ 295,467 | $ 6,552,550 |
| David W. Meline, EVP, CFO | $ 970,769 | $ 1,116,000 | $ 2,449,878 | $ 1,049,990 | $ 271,651 | $ 5,858,288 |
| Sean E. Harper, EVP, R&D | $ 970,769 | $ 1,116,000 | $ 2,589,867 | $ 1,110,000 | $ 269,731 | $ 6,056,367 |
| Jonathan P. Graham, EVP | $ 932,577 | $ 858,000 | $ 1,749,939 | $ 749,997 | $ 231,695 | $ 4,522,208 |
| **Total Executives** | | | | | | $ 39,889,202 |
| **2018** | | | | | | |
| | Base Salary | Incentive Compensation and Performance Bonuses | Performance Units and Restricted Stock Units | Stock Options | All Other Compensation | Total |
| Robert A. Bradway, CEO | $ 1,566,000 | $ 3,898,000 | $ 8,749,818 | $ 3,749,994 | $ 591,454 | $ 18,555,266 |
| Murdo Gordon, EVP, GCO | $ 330,769 | $ 2,513,000 | $ 9,899,961 | | $ 1,336,604 | $ 14,080,334 |
| Anthony C. Hooper, Former EVP, GCO | $ 1,057,050 | $ 1,754,000 | $ 2,799,925 | $ 1,199,995 | $ 254,489 | $ 7,065,459 |
| David W. Meline, EVP, CFO | $ 977,746 | $ 1,623,000 | $ 2,799,925 | $ 1,199,995 | $ 260,102 | $ 6,860,768 |
| David M. Reese, EVP, R&D | $ 697,500 | $ 1,213,000 | $ 3,029,787 | $ 269,966 | $ 129,019 | $ 5,339,272 |
| Jonathan P. Graham, EVP | $ 938,596 | $ 1,402,000 | $ 1,959,878 | $ 839,983 | $ 204,901 | $ 5,345,358 |
| **Total Executives** | | | | | | $ 57,246,457 |

155.    Given that Enbrel's and Sensipar's net U.S. revenue combined made up 28.8% of Amgen's 2018 worldwide revenue and 26.29% of its 2017 worldwide revenue, price increases for those products appear to have been a critical factor in determining whether executives received their bonuses. *Id*. at 10.

156.    **Costs Do Not Justify Price Increases**: The pharmaceutical industry often attributes price increases to rebates, discounts, and other fees provided to pharmacy benefit managers (PBM) and other third parties within the distribution chain. *Id*. at 29. However, Amgen's internal data indicates that its price increases for Enbrel and Sensipar are not correlated with growing rebates or discounts. *Id*.

157.    Internal data reviewed by the Committee show that Amgen's rebates and discounts for Sensipar remained relatively steady from 2015 to 2018 (between 23%

43

and 29%), while Amgen raised the price of the drug five times. *Id.* As a result, Amgen's yearly net revenue for Sensipar rose by 34% over this period. *Id.* This confirms that Amgen's list price increases far outpaced any increase in rebates. *Id.*

158.   The pharmaceutical industry frequently cites the cost of manufacturing and investments in research and development ("R&D") as drivers of high and rising prices. *Id.* at 30.   Amgen's own talking points cite these justifications. Amgen executives drafted the following response when asked by a reporter about the company's pricing practices:

> "At Amgen we price our products to deliver the economic value that is delivered to patients, providers and payers, the unmet medical need, the size of the patient population, the investment and risk undertaken and the need to fund continued scientific innovation."

*Id.*

159.   However, Amgen's internal data indicate that its price increases for Sensipar are not correlated with manufacturing costs or R&D expenditures.[67] *Id.*

160.   Amgen's R&D expenditures for Sensipar do not justify its price. *Id.* at 31. Amgen reported to the Committee that from 2002 to 2018, it spent $1.4 billion on Sensipar R&D, 14.6% of its $9.8 billion in net revenue over the same period. Amgen's R&D expenditure declined significantly over time. *Id.* From 2015 to 218, Amgen spent $167 million on R&D related to Sensipar, 3.3% of its net U.S. revenue from the drug over the same time period. *Id.* at 32. Amgen's manufacturing costs for Sensipar were a fraction of its net revenue in each of these years. *Id.*

---

[67] In addition to the Committee's findings, a separate Report to Congress noted that the "recent sharp increase in Medicare Part D spending is attributable mainly to price rather than utilization growth." *See* "*Innovation, Spending, and Patient Access*". Meaning price increases are not attributable to costs to manufacturers associated with increased utilization. The Report went on to discuss how its finding "poses a challenge to the current system to ensure reasonable pricing for new entrant drugs as well as existing drugs with limited competition." *Id.*

161.   For example, Amgen spent $198 million to manufacture Sensipar in 2016—its highest manufacturing costs for any year between 2009 and 2018. *Id*. Amgen's net revenue from Sensipar that year was six times higher, $1.24 billion. *Id*. The Committee made the following findings regarding **Total Sensipar Net U.S.**



**Sales vs Costs from 2009-2018**:

162.   Amgen has taken the position that its price increases are driven by the "need to fund continued scientific innovation." *Id*. Yet, over the past three years, Amgen has spent $28.6 billion on buybacks of its own stock. *Id*. This is more than double its *company-wide* R&D expenditure of $11.4 billion over the same three-year period. *Id*.

*December 2021 Drug Pricing Investigation Majority Staff Report*

163.   On December 10, 2021, after three years of investigating "some of the largest and most profitable drug companies in the world"—including Amgen—and after reviewing "1.5 million pages of documents", the Committee released the 269-page "*Drug Pricing Investigation Majority Staff Report*" (with supporting evidence),

45

1   attached as **Exhibit F** – 2021 Drug Price Report.

2       164.   The December 2021 Drug Price Report summary, in relevant part, is

3   listed in the following paragraphs 165-180.

4       165.   **Drug Companies Target the U.S. Market for Higher Prices and Use**

5   **Medicare Programs to Boost Revenue**: The Committee's investigation uncovered

6   new evidence showing how the pharmaceutical industry has exploited the federal law

7   that prohibits HHS from engaging in direct negotiations with drug companies to

8   lower drug prices in the Medicare Part D program.[68] Internal strategy documents

9   show that drug companies targeted the U.S. market for price increases—while

10  maintaining or lowering prices in the rest of the world. *Id*. For example, Amgen

11  charges nearly double the price of Sensipar in the U.S. as it does in Canada. In the

12  U.S., a 30-tablet package of Sensipar 30mg costs $806. In Canada, the same supply

13  costs $447.99.[69]

14      166.   The Committee determined that if Medicare Part D plans had received

15  the same discounts as other federal health care programs for Sensipar, Medicare could

16  have saved $948,124,100 from 2014 to 2018. During that same period, Medicare Part

17  D spending was $3,664,400,000.[70]

18      167.   Documents obtained by the Committee show that Amgen executives

19  routinely raised the price of Sensipar to meet increasingly aggressive sales targets

20  and projections. *Id*. at 12-13. An internal "Global Product Strategy" presentation

21  prepared in March 2018 described Amgen's pricing strategy:

22          "Pricing has played a key role in driving net revenue in the
23          Rheumatology and Dermatology space in recent years. Moving
24          forward, Amgen will continue to adjust prices as necessary to

25  _____

26  [68] **Exhibit F** – 2021 Drug Price Report, at vii-viii.
    [69] **Exhibit J** – 2020 Amgen Drug Price Report, at 13.
27  [70] **Exhibit F** – 2021 Drug Price Report, at viii.

28

46

reflect the economic value provided while also considering competitive dynamics and patient access to care."

*Id*. at 39-40.

168. **Executive Compensation Created Incentives for Price Increases**: From 2016 to 2020, the drug companies investigated by the Committee spent over $2.2 billion on compensation for their highest-paid executives, reflecting an increase of 20% over that period. *Id*. at 40. The Committee's investigation identified company bonus structures that tie compensation to increasing drug-specific revenue targets year after year, creating incentives for executives to raise prices to meet those targets. *Id*. at 41-42. The Committee found that for certain drugs, price increase led directly to higher bonuses for executives. *Id*.

169. The Committee made the following findings regarding Amgen spending on **Executive Committee Compensation**:

| Company | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---------|------|------|------|------|------|-------|
| Amgen | $42,667,038 | $39,889,202 | $64,081,235 | $46,720,094 | $47,079,117 | $240,436,746 |

170. CEO compensation accounted for a substantial portion of executive committee compensation during this period. The Committee made the following findings regarding Amgen spending on **CEO Compensation**:

| Company | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---------|------|------|------|------|------|-------|
| Amgen | $16,850,001 | $16,899,789 | $18,555,266 | $19,612,793 | $20,131,408 | $92,049,257 |

171. **Companies Leverage Patient Assistance Programs to Drive Revenue**: Copay cards or coupons reduce the amount that patients pay out of pocket through their insurance plans each month. *Id*. at 150. The federal Anti-Kickback Statute prohibits pharmaceutical manufacturers from subsidizing the co-pay and other cost-sharing obligations incurred by Medicare Part D patients. *Id*.

172. According to the Office of Inspector General (OIG) of the Department of Health and Human Services (HHS), "the independent charity PAP [patient

assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices." *Id*.

173.   Drug companies often highlight the generosity of their patient assistance programs when responding to criticism of their pricing practices. *Id*. at xiv. The Committee's investigation uncovered new evidence that companies emphasized the significant returns on investment from these programs in the form of increased sales, particularly for drugs approaching loss of exclusivity. *Id*. Internal documents also show that companies view these programs as important public relations tools. For example, "[i]nternal documents show that Sanofi viewed these programs as tools for "image improvement" and to offset negative public perception of its price increases." *Id*. at 152.

174.   Yet documents reviewed by the Committee reveal that drug companies view donations to third-party foundations as an "investment" for future returns, with the expectation that such donations would drive their drugs' sales. *Id*. at 154-55. For example:

> "Teva characterized donations to third-party foundations as an "investment" for future returns, with the expectation that such donations would drive Copaxone sales. As alleged by the DOJ, Teva paid CDF and TAF [The Assistance Fund] tens of millions of dollars each year because it knew that the foundations would use Teva's money to cover Copaxone co-pays, thus increasing Copaxone sales and enriching Teva in amounts that far exceeded its payments to the foundations."

*Id*. at 156-57.

175.   Moreover, as drugs neared the end of their exclusivity periods, several companies leveraged patient assistance programs to limit competition and maintain market dominance. *Id*. For example:

"Internal Novartis documents indicate that the company strategically used its copay programs to drive demand, particularly after the loss of exclusivity. Internal documents indicate that enhanced copay programs were a crucial piece of Novartis's loss-of-exclusivity strategy for Gleevec, encouraging patients to stay on the branded drug even after generic entry. A 2015 Gleevec CoPay Strategy presentation described the company's copay promotion efforts as a way to "[h]elp to keep current customers on prescription by lessening the gap between Rx [Gleevec] and Gx [generic] costs."

*Id.* at 157.

176. Internal documents uncovered by the Committee also revealed that companies knew that leveraging patient assistance programs was a means to keep patients on their drug by subsidizing out-of-pocket costs. *Id.* at 158-59. For example:

"On November 28, 2017, Dan Klein, the President and Chief Executive Officer of the PAN Foundation, emailed AbbVie's Director of Patient Access Programs to request a donation from the company. Mr. Klein explained that if patients' out-of-pocket costs were reduced through financial assistance, they would be more likely to continue taking their "treatment"—an indirect reference to Humira: Based upon data from CMS [the Centers for Medicare and Medicaid Services] and the National Health and Nutrition Examination Survey, we know that as many as one million people with ankylosing spondylitis, plaque psoriasis, psoriatic arthritis and rheumatoid arthritis are eligible for assistance from PAN. We also know these patients would be much more likely to start and stay on treatment if they were not stymied by high out-of-pocket costs."

*Id.*

177. The Committee noted that Mr. Klein's appeal to AbbVie underscores the perverse incentives of a system that relies on financial assistance programs to help patients afford their medications. *Id.* These programs allow the companies to generate higher revenues by maintaining demand while raising prices. *Id.* at 159.

178.  Non-public data obtained by the Committee also reveals that the costs of these programs for drugs in the Committee's investigation were a small fraction of revenues brought in by those drugs. *Id.* at 151.

179.  **R&D Expenditures Compared to Buyback and Dividends**: The pharmaceutical industry has warned that any drug pricing reform efforts will harm innovation by stymieing R&D investment. *Id.* at 164. However, the Committee's investigation has demonstrated that drug companies' investments in R&D are far outpaced by spending on stock buybacks and dividends. *Id.* at 165. The Committee's analysis found that, from 2016 to 2020, the 14 leading drug companies spent $577 billion on stock buybacks and dividends—$56 billion more than they spent on R&D over the same period. *Id.* at 165-66. This analysis suggests that drug companies could maintain or even exceed their current R&D expenditures if they reduced spending on stock buybacks and dividends. *Id.*

180.  Amgen spent more on buybacks and dividend payments than on R&D expenditures in each of the past five years (2016-2020). *Id.* at 166. Of the 14 leading drug companies, Amgen, in particular, spent disproportionately to enrich shareholders. *Id.*

### Defendants' Scheme Results in DOJ Settlement

#### *The Copayment Scheme for Sensipar*

181.  Amgen conspired with PANF to illegally circumvent congressionally mandated cost-sharing obligations for Assignors' and the Class Members' beneficiaries, which allowed Amgen to raise Sensipar's price to supra-competitive levels, while *inducing*[71] the over-dispensing of Sensipar through the submission of tainted claims to Assignors and Class Members.

---

[71] The Second Circuit recently explained that "[t]he plain meaning of 'induce' is to 'entic[e] or persuad[e] another person to take a course of action," which is consistent with OIG's longstanding interpretation of such term. *Pfizer, Inc. v. HHS*, No. 21-2764-cv, slip op. at 17 (2d Cir., July 25, 2022).

182. Amgen and PANF's Scheme for Sensipar functioned in the following way:

a) Amgen conspired with PANF to act as conduit to circumvent federal law prohibiting, among other things, pharmaceutical manufacturers from subsidizing the copay and other cost-sharing obligations incurred by Medicare Part D patients—i.e., Assignors' and Class Members' beneficiaries;

b) Amgen and PANF agreed to set up a fund (Secondary Hyperparathyroidism fund) with the intent that PANF would use Amgen's donations to exclusively subsidize purchases for only those beneficiaries dispensed Sensipar;

c) Amgen exclusively financed the fund, in the form of donations, which were actually subsidies designed to remove beneficiaries' congressionally mandated cost-sharing obligations, thereby inducing the over-dispensing of Sensipar;

d) PANF continuously used Amgen's subsidies to directly relieve beneficiaries of a significant portion, if not all, of their out-of-pocket expenses for Sensipar with the intent and effect of inducing the over-dispensing of Sensipar, which would then be paid by the beneficiaries' Plan Sponsor (Assignors and Class Members);

e) Consistent with Amgen and PANF's agreement, PANF used Amgen's subsidies strictly for Sensipar; and

f) Because Amgen's illegal subsidies insulated beneficiaries from out-of-pocket expenses for Sensipar, Amgen was able to raise Sensipar prices to supra-competitive levels.

183.   The cost-sharing subsidies provided—indirectly by Amgen and directly through PANF—for Sensipar, plainly constituted unlawful remunerations (including the kickbacks or bribes from Amgen to PANF) in violation of federal law.[72]

184.   Plaintiff's allegations and the Committee's findings plainly demonstrate Amgen and PANF understood the benefits of leveraging an illegal patient assistance program.

185.   Plaintiff's allegations and the Committee's findings plainly demonstrate Amgen and PANF intended to increase price and utilization of Sensipar.

186.   Plaintiff's allegations and the Committee's findings are further corroborated by the DOJ investigations discussed below.

*Amgen Settlement Agreement with DOJ—Sensipar*

187.   As a result of the Scheme, Amgen entered a settlement agreement with the DOJ.

188.   In April 2019, Amgen entered a $24.75 million dollar settlement with the DOJ relating to its fraudulent use of PANF as a conduit in violation of the AKS, FCA, OIG regulations and state and federal bribery laws.

189.   With respect to Sensipar, the Amgen Settlement revealed the following:

> "Amgen used PANF as a conduit to pay the copay obligations of Medicare patients taking Sensipar. In late 2011 Amgen stopped donating to another foundation that provided financial support to patients taking any of several secondary hyperparathyroidism drugs and approached PANF about creating a "Secondary Hyperparathyroidism" fund that would support only Sensipar patients. PANF and Amgen then worked together to determine

---

[72] As the OIG has stated previously, "Congress's intent in placing the term '*remuneration*' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever. The statute's language makes clear that illegal payments are prohibited beyond merely 'bribes,' 'kickbacks,' and 'rebates,' which were the three terms used in the original 1972 statute." Dept. of Health and Human Services: "*Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*", 56 Fed. Reg. 35,952, 35,958 (July 29, 1991), [available online at https://oig.hhs.gov/documents/compliance/857/072991.htm.]

52

the fund's coverage parameters. In November 2011, PANF launched a "Secondary Hyperparathyroidism" fund with Amgen as its sole donor. Until June 2014, the fund covered only Sensipar. During that time, Amgen donated millions of dollars to PANF with the intent that PANF would use this money to cover the copays of Sensipar patients. Amgen engaged in this conduct even though it was aware in early 2011 that the direct cost to Amgen of providing free Sensipar to financially needy patients would be lower than the cost of making the donations necessary to cover those same patients' copays through a third-party foundation. By engaging in this conduct, Amgen caused claims to be submitted to Medicare and generated revenue for itself."

(**Exhibit A** – Amgen DOJ Settlement).

190.  In conjunction with the Amgen Settlement, the DOJ released the following statement:

"When pharmaceutical companies use foundations to create funds that are used to improperly subsidize the copays of only their drugs, it violates the law and undercuts a key safeguard against rising drug costs. Amgen conspired with two copay foundations to create funds that functioned almost exclusively to benefit patients taking Amgen drugs. As a result, the companies' payments to the foundations were not 'donations', but rather were kickbacks that undermined the structure of the Medicare program and illegally subsidized the high costs of the companies' drugs."

(**Exhibit B –** Amgen DOJ Press Release)

191.  With respect to Sensipar, the DOJ released the following statement:

"Amgen allegedly worked with [PANF] to determine the [Secondary Hyperparathyroidism] fund's coverage parameters and, in November 2011, the foundation launched a Secondary Hyperparathyroidism fund with Amgen as its sole donor. Until June 2014, the fund covered only Sensipar. By enabling the fund to cover the copays of Medicare beneficiaries, Amgen caused claims to be submitted to Medicare and generated revenue for itself."

*Id.*

192.   The Amgen Settlement, however, did not redress the harm that the Scheme caused to the Assignors and Class Members or settle any claims that the Assignors and Class Members may have against Defendants. The DOJ only recovered monies paid relating to Medicare's portion of cost-sharing obligations, not the portion of monies paid by Plan Sponsors—i.e., Assignors and Class Members.

193.   The Amgen Settlement and facts alleged therein, represent one result of a much larger ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the District of Massachusetts, into schemes by various drug manufacturers and co-payment charities that violated the AKS and FCA.[73]

### *The Copayment Scheme for Kyprolis*

194.   During the period of December 1, 2011, through December 31, 2016, Onyx used CDF as a conduit to pay the copay obligations of Medicare patients taking Kyprolis. Amgen acquired Onyx in 2013. In 2015, Onyx operations were fully integrated into Amgen. At which point, Amgen perpetuated the Scheme originated by Onyx and CDF.

     a)  Amgen/Onyx conspired with CDF to act as conduit to circumvent federal law prohibiting, among other things, pharmaceutical manufacturers from subsidizing the copay and other cost-sharing obligations incurred by Medicare Part D patients—i.e., Assignors and Class Member beneficiaries;

     b)  Amgen/Onyx and CDF agreed to set up a fund that covered copays for multiple myeloma drugs, including Kyprolis with the intent that CDF would use Amgen/Onyx's donations to exclusively subsidize only those beneficiaries using Kyprolis;

     c)  Although the fund had multiple donors, Amgen/Onyx received data from CDF on the fund's anticipated and actual

---

[73] *See supra*, fn. 41.

54

expenses for coverage of Kyprolis copays, which it used to tailor its donations to the fund to adjust the amount needed to cover the copays of Kyprolis patients;

d) Amgen/Onyx financed the fund, in the form of donations, which were actually subsidies designed to remove beneficiaries' congressionally mandated cost-sharing obligations, thereby inducing beneficiaries to purchase Kyprolis;

e) CDF continuously used Amgen/Onyx's subsidies to cover co-pay obligations for Kyprolis, with the intent to induce the purchases of Kyprolis, which would then be reimbursed by the beneficiaries' Plan Sponsor (Assignors and Class Members);

f) CDF continuously used Amgen/Onyx's subsidies to cover health care related travel expenses for patients taking Kyprolis; and

g) Consistent with Amgen/Onyx and CDF's agreement, CDF used Amgen/Onyx subsidies strictly for Kyprolis.

195. As discussed above, federal law prohibits a pharmaceutical manufacturer from providing direct or indirect remuneration to subsidize cost-sharing obligations regarding drug copays.

196. During the period of December 1, 2011, through December 31, 2016, Onyx also used CDF as a conduit to pay the travel-related expenses of Medicare patients taking Kyprolis.

197. Onyx subsidized beneficiaries' travel-related expenses because Kyprolis could only be administered at certain healthcare centers. Like beneficiary drug copays, subsidizing other healthcare related expenses with the intent to induce the purchase or dispensing of Medicare-approved drugs runs afoul federal laws and regulations.

198.   This includes travel-related healthcare expenses.[74] As recognized by the OIG, "any combination of the free or subsidized transportation, lodging, and meal expenses constitutes remuneration from Requestor to patients, some of whom are federal health care program beneficiaries, that may induce them to purchase the Drug and to receive other federally reimbursable items and services provided at the Treatment Center."[75]

199.   The cost-sharing subsidies provided to Assignors' beneficiaries—indirectly by Amgen/Onyx and directly through CDF—for Kyprolis and travel-related expenses plainly constitutes remuneration, and therefore violates federal law.[76]

200.   Plaintiff's allegations and the Committee's findings plainly demonstrate Amgen, Onyx, and CDF understood the benefits of leveraging an illegal patient assistance program.

201.   Plaintiff's allegations and the Committee's findings plainly demonstrate Amgen, Onyx, and CDF intended to increase utilization and price of Kyprolis.

202.   Plaintiff's allegations and the Committee's findings are further corroborated by the DOJ investigations discussed below.

---

[74] The AKS makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce, or in return for, the referral of an individual to a person for the furnishing of, arranging for the furnishing of, any item or service reimbursable under a federal healthcare program. The AKS' prohibition also extends to remuneration to induce, or in return for, the purchasing, leasing, or ordering of, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item reimbursable by a federal health care program. For purposes of the AKS, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly, or covertly, in cash or in kind.

[75] OIG Advisory Opinion No. 23-01, (Feb. 2023), attached at **Exhibit K** – OIG Advisory Opinion 23-01.

[76] *See supra*, fn. 73.

*Amgen Settlement Agreement with DOJ—Kyprolis*

203.   In April 2019, Amgen entered a $24.75 million dollar settlement with the DOJ relating to Amgen and Onyx's fraudulent use of CDF as a conduit in violation of the AKS, FCA, OIG regulations and state and federal bribery laws.

204.   With respect to Kyprolis, the Amgen Settlement revealed the following:

> "In 2013, Amgen acquired Onyx Pharmaceuticals, Inc. ("Onyx") which marketed and sold pharmaceutical products, including Kyprolis. During the period of December 1, 2011, through December 31, 2016, Onyx used CDF as a conduit to pay the travel expenses and copay obligations of Medicare patients taking Kyprolis. Onyx asked CDF to create a fund that, ostensibly, would cover health care related travel expenses for patients taking any multiple myeloma drug, but which, as Onyx and CDF both knew, functioned almost exclusively to cover travel expenses for patients taking Kyprolis, including Medicare patients. Onyx was the sole donor to this travel fund and Amgen, after integrating Onyx into its operations in 2015, continued to donate to the fund. CDF also operated a fund that covered copays for multiple myeloma drugs, including Kyprolis. CDF's multiple myeloma copay fund had multiple donors. For 2013, using data CDF provided to Onyx on CDF's anticipated and actual expenses for coverage of Kyprolis copays, Onyx donated to CDF's multiple myeloma copay fund in an amount Onyx expected to be sufficient only to cover the copays of Kyprolis patients, including Medicare patients."

**(Exhibit A –** Amgen DOJ Settlement)

205.   The DOJ released the following statement with respect to Kyprolis:

> "The government also alleged that Amgen's predecessor, Onyx, asked a foundation to create a fund that ostensibly would cover health care related travel expenses for patients taking any multiple myeloma drug, but which was actually used almost exclusively to cover travel expenses for patients taking Kyprolis, which must be infused at certain health care facilities. The government alleged that Onyx was the sole donor to this travel fund and that Amgen, after integrating Onyx into its operations

57

in 2015, continued to donate to the fund. The foundation also operated a second fund that covered copays for multiple myeloma drugs, including Kyprolis. While the latter fund had multiple donors, the government alleged that, for 2013, Onyx received data from CDF on the fund's anticipated and actual expenses for coverage of Kyprolis copays, which it used to tailor its donations to the fund to adjust the amount needed to cover the copays of Kyprolis patients."

(**Exhibit B –** Amgen DOJ Press Release)

206.  The Amgen Settlement, however, did not redress the harm that the Scheme caused to the Assignors and Class Members or settle any claims that the Assignors and Class Members may have against Defendants. The DOJ only recovered monies paid relating to Medicare's portion of cost-sharing obligations, not monies paid relating to Plan Sponsor's portion of cost-sharing obligations—i.e., payments made by the Assignors and Class Members.

### *The Impact of Defendants' Scheme*

<u>*Defendants Enjoy Massive Financial Returns*</u>

207.  Due to the structure of donation agreements between charities and pharmaceutical manufacturers, foundations—such as PANF and CDF—are incentivized to illicit more donations. In conjunction with donor funding, charities are permitted to allocate an agreed upon percentage of the total donations to cover the charities' administrative expenses and other costs—including executive compensation. Thus, increased donations from Amgen meant increased compensation for the Charities' executives.  The Charities were able to show "results" to Amgen and Onyx—if Amgen and Onyx "donated" money to the Charities, it would make money, not only off the new "customers" but also by its ability to raise prices, and ensure that the drugs were still dispensed, and paid for. At

the same time, these "charitable" contributions enabled Amgen to reap huge tax deductions.[77]

208.  In turn, the Charities' executives were able to increase their compensation as a result of their participation in the Scheme.

209.  For example, PANF has had two presidents since 2011: Patrick L. McKercher and Daniel Klein. Mr. McKercher left his role as President and Mr. Klein began as President in November of 2014. Mr. McKercher and Mr. Klein were among a handful of executives whose compensation is set forth in Part VII of PANF's annual Form 990 Tax Filings. PANF's Form 990 Tax Filings demonstrate that the total reported compensation between McKercher and Klein rose by more than 320% between 2011 and 2016, from $89,000 in 2011 to over $377,000 in 2016. Patrick L. McKercher, the President of PANF received compensation of $89,015 in 2011.[78] By comparison, in 2012, after the Co-Payment Scheme with Amgen began, he received compensation to the tune of $254,272. In 2015, President Daniel Klein received a compensation of $301,212. *Id.*

210.  This salary increase has a direct correlation to the amounts of donations PANF received from pharmaceutical manufacturers, like Amgen. PANF's contributions and grants increased from $89 million in 2011, to $179 million in 2012, to more than $800 million in 2015. *Id.*

211.  CDF donor contributions and executive compensation demonstrate a similar trend.

212.  In 2008, CDF received a total of $90,257,017 in contributions and grants.[79] By 2012, CDF reported total contributions and grants in the amount of

---

[77] These companies' charitable contributions are tax deductible, meaning the actual cost of these donations is even less. *See* "*Discount Coupons and Patient Assistance Programs.*"
[78] **Exhibit L** – PANF's Form 990 Tax Filings
[79] **Exhibit M** – CDF Form 990 Tax Filings

$200,401,801.[80] That same year, CDF paid $517,782 in executive compensation. *Id.* By 2019, CDF reported receiving a total of $272,663,929 in contributions and grants, while paying its executives $1,000,832 in compensation, with two executives—Clorinda Walley and Odebralsi Randall—accounting for over half the total compensation.[81]

213.   As discussed in detail above, Amgen's illegal tactics regarding Sensipar resulted in billions in US revenue, as well as hundreds of millions of dollars in executive compensation. As the Committee uncovered, the decision to increase the price of Sensipar more than 20 times, for a total value over 232%, was driven almost entirely by maximizing revenue and increasing executive compensation. *Id.*

214.   The data reflects the same trend for Kyprolis prices and revenue. In 2013, total US revenue for Kyprolis was $71 million.[82] In the next two years, US revenue skyrocketed to $306 million and $467 million, respectively. *Id.* By 2020, Kyprolis brought in $710 million in revenue—nearly 940% increase.[83] Similarly, in just three years, the average Medicare Part D spending per dosage unit of Kyprolis in 2017 was $909.27 and $1,855.96 in 2020—nearly 105% increase. This increase is almost *20 times* the CPI inflation rate during the same period. Given Amgen's executive compensation structure, the increased revenue from Kyprolis undoubtedly resulted in significant bonuses.

*Defendants' Misrepresentations and Omissions Tainted Claims for the Subject Drugs*

*OIG Guidance for Co-Payment Charities*

215.   Since 2005, in advance of Medicare Part D taking full effect, the OIG provided guidance to co-payment charities about compliance with applicable laws

---

[80] *Id.*
[81] *Id.*
[82] **Exhibit N** – Amgen 2015 10-K.
[83] **Exhibit O** – Amgen 2022 Letter to Shareholders.

and regulations, including the AKS and FCA. In this guidance, the OIG made clear that such charities violate those laws and regulations if they do not follow specified rules. Those rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity or receive information from such a charity that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

216. On November 22, 2005, the OIG released an advisory bulletin applicable to all PAPs (the "2005 PAP Bulletin").[84] "That 2005 PAP Bulletin provided guidance, in anticipation of Medicare Part D taking effect in 2006, to entities operating PAPs." *Patient Servs., Inc. v. United States*, No. 3:18CV16, 2019 WL 267872, at *4 (E.D. Va. Jan. 18, 2019). Importantly, the 2005 PAP Bulletin was issued "to alert and inform the health care industry about potential problems or areas of special interest," in anticipation of January 1, 2006, when "Part D will offer Medicare beneficiaries . . . broad coverage for . . . drugs." *Id*.

217. The OIG warned it would be a violation of the AKS and other laws for a drug manufacturer to knowingly provide subsidies to Part D beneficiaries taking its product. The OIG identified criteria for PAPs and manufacturers to avoid "potentially abusive PAP structures," and to ensure any donations from manufacturers, for Part D beneficiaries, were provided through "bona fide,[ ] [independent charities.]" *Id*.

218. The OIG explained that failure to abide by its regulations will result in "increasing costs to Medicare" and "reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs." Circumventing "cost-sharing subsidies" would "shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices." Failure to abide by its

---

[84] **Exhibit G** – OIG 2005 Special Advisory Bulletin.

regulations would "have the practical effect of locking beneficiaries into the manufacturer's products, even if there are other equally effective, less costly alternatives[.]" *Id.*

219.  Recognizing the potential for extraordinary profits that could be garnered through abuse, "the OIG expressed concern[] . . . manufacturers may seek improperly to maximize these profits by creating sham 'independent' charities to operate PAPs; by colluding with independent charity programs . . . ;or by manipulating . . . eligibility criteria to maximize the number of beneficiaries[.]" *Id.* "Simply put, the . . . PAP must not function as a conduit for payments by the . . . manufacturer to patients[.]" *Id.*

220.  Finally, the OIG identified specific procedures for entities seeking an "Advisory Opinion" from the OIG.  *Id.*

221.  Accordingly, the 2005 Bulletin also set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following Five Requirements:

a) No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

b) The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

c) The PAP awards assistance regardless of the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

d) The PAP provides assistance based on a reasonable verifiable, and uniform measure of financial need applied in a consistent manner; and

e) The drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the

amount of its donations with the number of subsidized prescriptions for its products. *Id*. at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices.")

*Id*.

*The Charities' Misrepresentations and Omissions to the OIG*

222.   When a Requestor—such as PANF and CDF—seeks OIG certification, they must certify that the information provided to the OIG is "true and correct" and "a complete description of the relevant facts and agreements among the parties." But for Defendants' misrepresentations and omissions, neither PANF nor CDF would have received compliance certifications from the OIG.

223.   In 2006, just after Part D went into effect, PANF sought an Advisory Opinion from the OIG. To do so, PANF used the wire or mail to request OIG approval for their arrangements with Amgen and other drug manufacturers. PANF certified that it provided a "complete and specific description of all relevant information bearing on the arrangement . . . and on the circumstances of the conduct," including complete copies of documents "sufficient to permit the OIG to render an informed opinion." 42 C.F.R. §1008.36. PANF certified "all of the information provided is true and correct and constitutes a complete description of the facts[.]" 42 C.F.R. §1008.38.

224.   In December 2007, the OIG issued a favorable Advisory Opinion to PAN.[85] To obtain the favorable Advisory Opinion, PANF falsely certified it was, and will, adhere to the Five Requirements identified in the 2005 Bulletin. The OIG explicitly "relied upon" those certifications when it endorsed, approved, and allowed PANF to operate its sham charitable organization, as will be discussed.

---

[85] OIG Advisory Opinion No. 07-18 to PANF. ("2007 PANF Advisory Opinion"), attached as **Exhibit P** – OIG Advisory Opinion 07-18

225.    In 2011, PANF again used the wire or mail to seek and induce the OIG to issue a Modified Advisory Opinion to (1) "move towards a specialty therapeutic model" and (2) enroll certain "Participating Pharmacies" On October 11, 2011, the OIG issued a Modified Advisory Opinion endorsing PAN's request, permitting PANF to move towards a specialty therapeutics model.[86] The OIG announced PAN had recertified compliance with the Five Requirements.

226.    In May 2014, the OIG sent PANF a letter noting that the 2011 PANF Advisory Opinion "approved certain features that [the OIG] have since determined are problematic."[87]

227.    A Supplemental Bulletin was issued in response to concerns PANF was accepting bribes to serve as a conduit for manufacturers, including Amgen. ("2014 Bulletin").[88]

228.    In the 2014 Bulletin, the OIG stated that although PAPs can provide an important safety net to financially needy patients, these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not independent enough from donors. *Id.*

229.    The OIG noted three additional areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

> a)  The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

---

[86] Four years later, in October of 2015, the OIG issued another modified opinion because endorsement of PANF's 2011 modifications proved to be "problematic" and subject to abuse.
[87] **Exhibit Q** – 2014 OIG Letter to PANF
[88] **Exhibit D** – Supplemental Special Advisory Bulletin (May 2014)

b) The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

c) The co-payment charity will not limit its assistance to high-cost or specialty drugs. Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund.

*Id.*

230.    As for the "conduct of donors," the 2014 Bulletin reiterated its prior focus (from the 2005 Special Advisory Bulletin) on co-payment charities not giving a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services, or the volume of those products supported by the PAP." *Id.* Notably, the OIG warned that:

"[t]he procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to co- payments of its own products, which would implicate the antikickback statute."

*Id.*

231.    Thus, the OIG proposed certifications to address the "problematic" features to PANF.

232.    Accordingly, the OIG requested, and received, certifications from PANF that it was complying with the Five Requirements, including not illegally

sharing data with manufacturers, nor engaging in any other conduct in violation of the AKS and OIG regulations. As a result of PANF's certifications, the OIG *publicly* ensured PANF that its prior "favorable advisory opinion will continue to protect the arrangement described in the opinion[.]"

233.   On October 2015, the OIG issued a Modified Advisory Opinion, stating PANF had, through the mail and wire, re-certified compliance with OIG regulations and AKS, and provided additional certifications concerning the legitimacy of their operations, most of which later proved to be false.[89]

234.   Yet, as the Amgen Settlement revealed, PANF's certifications of compliance were plainly false and omitted several relevant facts—namely its operation as a conduit for pharmaceutical manufacturers. Regarding PANF, the DOJ asserted

> "Between October 1, 2011, through May 31, 2014, Amgen used PANF as a conduit to pay the copay obligations of Medicare patients taking Sensipar. During that time, Amgen donated millions of dollars to PANF with the intent that PANF would use the money to cover the copays of Sensipar patients."

(**Exhibit A** – Amgen DOJ Settlement)

235.   PANF's knowing and intentional participation in the Scheme unequivocally contradicts PANF's certifications of compliance provided to the OIG.

236.   CDF similarly mislead the OIG to obtain certification.

237.   In 2006, just after Medicare Part D went into effect, CDF sought an Advisory Opinion from the OIG. To do so, CDF used the wire or mail to request OIG approval for their arrangements with Onyx and other drug manufacturers. CDF certified that it provided a "complete and specific description of all relevant

---

[89] OIG Advisory Opinion No. 07-18 ("Modified PANF Advisory Opinion"), attached as **Exhibit R** – 2015 Modified PANF Advisory Opinion.

1  information bearing on the arrangement . . . and on the circumstances of the

2  conduct," including complete copies of documents "sufficient to permit the OIG to

3  render an informed opinion." 42 C.F.R. §1008.36. CDF certified "all of the

4  information provided is true and correct and constitutes a complete description of

5  the facts[.]" 42 C.F.R. §1008.38.

6     238.  On October 26, 2015, the OIG issued its modification of the 2006 CDF

7  Advisory Opinion.[90] The Modification of the CDF Advisory Opinion noted that the

8  OIG: "asked [CDF] to certify, and [CDF] did certify, that it determines eligibility

9  according to a reasonable, verifiable, and uniform measure of financial need that is

10  applied for in a consistent manner."

11    239.  Again, the Amgen Settlement revealed CDF's certifications of

12  compliance were plainly false and omitted several relevant facts—namely its

13  operation as a conduit for pharmaceutical manufacturers. Regarding CDF, the DOJ

14  asserted:

15         "Onyx asked CDF to create a fund that, ostensibly, would cover
16         health care related travel expenses for patients taking any
          multiple myeloma drug, but which, as Onyx and CDF both knew,
17         functioned almost exclusively to cover travel expenses for
          patients taking Kyprolis. CDF also operated a fund that covered
18         copays for multiple myeloma drugs, including Kyprolis. CDF's
19         anticipated and actual expenses for coverage of Kyprolis copays,
          Onyx donated to CDF's multiple myeloma copay fund in an
20         amount Onyx expected to be sufficient only to cover the copays
21         of Kyprolis patients."

22  (**Exhibit A** – **Amgen DOJ Settlement**).

23    240.  CDF's knowing and intentional participation in the Scheme

24  unequivocally contradicts CDF's certifications of compliance provided to the OIG.

25

26  _____

27  [90] OIG Advisory Opinion No. 06-10 ("Modified CDF Advisory Opinion"), attached as **Exhibit S**
    – 2015 Modified CDF Advisory Opinion.

28

241.   Additionally, the Charities' involvement in the Scheme alleged herein is not the only instance in which the Charities were involved in DOJ settlements stemming from concealing the true nature of their operations from the public and OIG.

242.   On October 25, 2019, the Charities settled with the DOJ, for millions, to resolve allegations that they routinely engaged in conduct that is the subject of this Complaint. The DOJ informed the public that:

> "CDF and PANF worked with various pharmaceutical companies to design and operate certain funds that funneled money from the companies to patients taking the specific drugs the companies sold. These schemes enabled the pharmaceutical companies to ensure that Medicare patients did not consider the high costs that the companies charged for their drugs. The schemes also minimized the possibility that the companies' money would go to patients taking competing drugs made by other companies…CDF and PANF functioned not as independent charities, but as passthroughs for specific pharmaceutical companies to pay kickbacks to Medicare patients taking their drugs…. As a result, CDF and PANF enabled their 'donors' (the pharmaceutical companies) to undermine the Medicare program at the expense of American taxpayers…. Both the Chronic Disease Fund and the Patient Access Network used their status as charities to shield the illegal activities of pharmaceutical companies seeking to maximize profits."

(**Exhibit T** – Charity Defendants DOJ Press Release).

*Amgen and Onyx Violate Conditions for Medicare Enrollment*

243.   All providers and suppliers of medical services and items—including *drug manufacturers* who supply covered medications indirectly—must enroll with Medicare to be eligible to receive any payment for their items or services through Medicare. 42 CFR § 424.505. To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attest[] that the information

68

1  submitted is accurate and that the provider or supplier is aware of, and abides by, all

2  applicable statutes, regulations, and program instructions." 42 CFR § 424.510(d)(3).

3      244.    The application forms used by all providers and suppliers to enroll in

4  Medicare includes the following attestation: "I agree to abide by the Medicare laws,

5  regulations and program instructions that apply to me or to the organization listed in

6  . . . this application. . . . I understand that payment of a claim by Medicare is

7  conditioned upon the claim and the underlying transaction complying with such

8  laws, regulations and program instructions (including, but not limited to, the Federal

9  Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b))."[91] (emphasis added). The

10 AKS was enacted to protect the "public's confidence in the government" because

11 the government is harmed by bribery even absent any financial harm. *See United*

12 *States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (citing *United States v.*

13 *Miss. Valley Generating Co*., 364 U.S. 520, 562 (1961)). Defendants are routinely

14 held liable for abusing this trust relationship,[92] and the federal government has

15 emphasized the necessity of "closely scrutiniz[ing]" renumerations relating to the

16 recommendation of medical products" because it involves "exceptional position[s]

17 of public trust[.]" Re: OIG Advisory Opinion No. 11-08, 2011 WL 4526111, at *4.

18     245.    In addition, "in order for coverage to be available under Medicare Part

19 D for applicable drugs of a manufacturer, the manufacturer must," among other

20 things, enter "into and have in effect an agreement described in § 423.2315(b)." 42

21 CFR    §    423.2310(a).    This    manufacturer    agreement    requires    that    "[e]ach

22

23 [91] Medicare Enrollment Application, CMS Form 855i, Available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf. *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

24 [92] *See, e.g.*, *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) ("[A]s medical

25 equipment suppliers, [defendants] were in positions of trust with respect to Medicare."); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (holding that defendant who violated the

26 AKS held a position of trust); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) ("[False] claims make the administration of Medicare more difficult, and widespread fraud would

27 undermine public confidence in the system." (cleaned up)).

28

manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program." 42 CFR § 423.2315. In other words, this agreement is a precondition for the Subject Drugs to qualify for payment by Assignors. Further, Congress has unequivocally instructed that "compliance with federal health care laws, including the [AKS], is a condition of payment by the Medicare program." *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1260 (11th Cir. 2005).

246.    Further, when a bill is submitted to a Medicare Provider, that bill carries an implied certification that the bill is free from material misrepresentations, including violations of the AKS and analogous state law bribery statutes referenced herein.

247.    Moreover, whomever "knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a federal health care program is subject to criminal penalties." *See* 42 USC § 1320a-7b(1). And whomever "knowingly makes or causes to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a federal health care program, and entities that apply to participate as providers of services or supplies in such managed care organizations and such plans." *See* 42 USC § 1320a-7a(9).

248.    The bribes and/or kickbacks provided to the Charities by the Manufacturers, and the correlating copay and travel expense subsidies provided directly to Assignors' beneficiaries for the Subject Drugs plainly constitutes a remuneration, in violation of federal law.[93] Defendants operated the Scheme with

---

[93] *See supra*, fn. 73.

the knowledge and intent that MA Plans, including the Assignors, and Medicare would pay for the Subject Drugs.

249. This is a clear violation of federal law, including preconditions for participation in the Medicare program. Had the Assignors known of Defendants' illegal Scheme, Assignors would have been precluded from paying any submitted claims for the Subject Drugs or otherwise subject to criminal and civil penalties.

250. But for Defendants concealing their violations, the Assignors and Class Members would not have directly paid or reimbursed any claims for the Subject Drugs tainted by Defendants' Scheme.

### *The Assignors and Class Members Were Directly Harmed by the Scheme*

251. Beneficiary price sensitivity works to limit the market viability of raising prices. Beneficiaries on the lower end of the economic range are more sensitive to price increases and will therefore seek out cheaper alternatives. As price increases, financially constrained beneficiaries will be unable to afford their cost-sharing obligations. It is well known, including by Defendants, that as drugs become unaffordable, even life-critical drugs, beneficiaries will manage costs by changing to cheaper products or cutting the dosage or frequency of their prescription to stretch the length of a prescription or by forgoing/skipping treatment altogether for a time period. Defendants' Scheme is specifically tailored to circumvent these market constraints by funneling money directly to the beneficiaries most likely to reduce their treatment because of cost.

252. All practitioners providing services that may be paid under Medicare are obligated "to assure, to the extent of [their] authority that services or items ordered or provided by such practitioner . . . will be provided economically." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1320a-7(b)(6)(B) (prohibiting bills that are "substantially in excess of the needs of such patients."). However, upon information and belief, Defendants marketed directly to prescribing physicians and

71

pharmacies, representing that patients could get "free" Subject Drugs through the Charities.

253.    Defendants' conduct caused Enrollees to purchase the Subject Drugs, pharmacists to dispense and submit tainted claims for the Subject Drugs, and the Assignors and Class Members to pay tainted claims for the Subject Drugs.

254.    For instance:

a) Under Defendants' collusive bribery scheme, the Manufacturers routinely obtained specific data from the Charities so to allow them to conduct ROI calculations and ensure that subsequent Corporate Contributions are precisely tailored to the amount needed to maximize corporate profits;

b) In deciding whether and how much money to send to the Charities, the Manufacturers considered the revenue it would receive from prescriptions for Medicare and Medicaid patients who received assistance from the Charities to cover their co-payments for the Subject Drugs;

c) The Manufacturers used data from the Charities to confirm that the Manufacturers' revenue far exceeded the amount of their bribes to the Charities; and

d) After funneling Medicare and Medicaid patients prescribed the Subject Drugs to the Charities, Defendants caused pharmacies to dispense the Subject Drugs and submit tainted claims directly to Assignors and Class Members, resulting in direct payments by Assignors and Class Members for those tainted claims.

255. Defendants' Scheme violated the AKS prohibitions on illegal renumeration by the Manufacturers bribing the Charities to both (a) illegally funnel funds to certain pharmacies to induce Government Payors (such as Assignors and Class Members) to pay for over-priced Subject Drugs; and (b) to illegally refer,

recommend, and arrange for federal healthcare program beneficiaries to receive the Subject Drugs. 42 U.S.C. § 1320a-7b(b).

256.    Defendants also violated the AKS, and analogous state bribery statutes, prohibitions on making and causing to be made false statements and representations by 1) breaching their certifications to comply with the AKS, 2) inducing or causing the prescribing physicians and dispensing pharmacies to submit legally false claims to Assignors and Class Members, 3) providing cost-sharing subsidies to beneficiaries with the intent to induce purchase of the Subject Drugs, and 4) concealing and failing to disclose the illegal renumerations that rendered these claims false while also receiving payment for such claims and seeking deductions from the IRS for those illegal renumerations. 42 U.S.C. § 1320a-7b(a); see also *Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016).

257.    These AKS, and analogous state bribery statutes, violations were done knowingly and willfully by all Defendants. The Manufacturers' bribes to the Charities were done in exchange for and to induce the Charities to refer and arrange for Assignors' and Class Members' beneficiaries to receive the Subject Drugs. The Charities knowingly and willfully accepted these bribes or kickbacks for this illegal purpose and did in fact carry out this purpose by funneling the Manufacturers' subsidies to the beneficiaries and arranged for them to receive the Subject Drugs, causing claims to be submitted to Assignors and Class Members

258.    The Scheme violated the express and implied certifications by the Manufacturers and the Charities—made to the OIG, CMS, and Assignors each time a tainted claim was submitted—to adhere to the AKS, which were explicit preconditions of payment. The effects of this scheme extend to all claims for the Subject Drugs. Therefore, **all claims** for the Subject Drugs generated or submitted during the course of the Scheme **were disqualified from payment** by Assignors and Class Members.

259.    Because of Defendants' Scheme, Assignors and Class Members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Assignors and Class Members made for Enrollees. Such payments involved payment for illegal and unpayable claims, artificially increased quantities of prescribed and/or dispensed Subject Drugs and supra-competitive prices on all dispensed Subject Drugs.

260.    Defendants knew and intended that their Scheme would generate disqualified claims and artificially inflate the quantities of prescribed and/or dispensed Subject Drugs and allow the Manufacturers to raise the prices of the Subject Drugs to supra-competitive levels.

261.    At all relevant times herein, Defendants (their agents and conspirators) actively and falsely marketed to and misled health care providers, insurers, governmental agencies, and the public, regarding the legitimacy of their Co-Payment Scheme, tainting any and all claims for Subject Drugs submitted during the course of the Scheme.

262.    Assignors and Class Members were the primary and intended victims of Defendants' Scheme. The injury to them was a foreseeable and natural consequence of the Scheme because the Manufacturers knew that Medicare Providers such as the MA Plans and the Medicaid Plans would directly pay the cost of the Subject Drugs.

263.    Assignors and Class Members suffered direct economic injury as a direct and proximate cause of Defendants' Scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

264.    Defendants' misconduct directly damaged Assignors and the Class Members.

265.    Defendants' conduct eliminated price sensitivity with the intent to induce patients purchasing or physicians prescribing the Subject Drugs, which in

turn enabled the Manufacturers to raise the price of its Drugs to supra-competitive prices, quickly and outside of ordinary market conditions and congressionally mandated price controls. Medicare Advantage programs—including Assignors—were left to bear the cost, while the Charities were able to demonstrate results to the Manufacturers–if the Manufacturers donated money to the Charities, they would make money, not only off the new "customers" but also by their ability to raise prices, and ensure that the drugs were still prescribed, dispensed, and paid for.

266. Defendants' conduct caused Assignors and Class Members to pay tainted claims for the Subject Drugs:

    a) The Manufacturers routinely obtained data from the Charities detailing how many patients, including Medicare Advantage patients, on Sensipar and Kyprolis the Charities had assisted and how much the Charities had spent covering copay obligations for those drugs;

    b) In deciding whether and how much to donate to the Charities, the Manufacturers considered the revenue they would receive from the dispensing of the Subject Drugs to Medicare Advantage patients who received assistance from the Charities to cover the co-payments for the Subject Drugs;

    c) The Manufacturers used data from the Charities to confirm that the Manufacturers' revenue far exceeded the amount of manufacturer payments to the Charities; and

    d) To generate revenue from Medicare Advantage patients prescribed and dispensed the Subject Drugs, after paying co-payment obligations to pharmacies[94] using the

---

[94] In cases currently pending throughout the country relating to similar co-payment schemes, there is ample evidence demonstrating that many dispensing pharmacies were complicit, and substantially profited off of, the co-payment schemes. Discovery will likely demonstrate that some, if not all, of the pharmacies that received payment from Assignors for the Subject Drugs, knew or should have known of the unlawful conduct at issue in this Complaint, where they nevertheless engaged in overt acts in furtherance of the scheme through the submission of the tainted claims to Assignors and Class Members.

> Manufacturers'' funds, Defendants caused the submission of tainted claims through the mail and wire, along with false certifications, to Assignors and Class Members, resulting in direct payments from Assignors and Class Members to the submitting pharmacy.

267.   Because of Defendants' Scheme, the Assignors and Class Members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Plaintiff's Assignors and Class Members made for Medicare Advantage patients.

268.   Defendants knew and intended that their scheme would increase the number of prescriptions and disbursements of the Subject Drugs.

269.   Assignors and Class Members were the primary and intended victims of Defendants' scheme and the injury to them was a foreseeable and natural consequence of the scheme.

270.   Assignors and Class Members suffered direct economic injury as a direct and proximate cause of Defendants' scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

271.   Defendants had the shared goal of growing the co-payment assistance funds and enabling Amgen's directors and officers *to use the non-profit charities increased funds to justify a substantial increase in their own compensation.* The Co-Payment Scheme increased the number of Medicare Advantage Organizations (among other Federal healthcare programs) who were receiving co-payment assistance for the Subject Drugs, triggering Plaintiff's Assignors' coverage obligations for these Medicare Advantage patients, eliminating price sensitivity for the Subject Drugs, and allowing the Manufacturers to increase their revenues and profits from the Subject Drugs.

272.   For   Defendants,   this   was   a   "win-win"   arrangement.   The Manufacturers' Corporate Contributions to the Charities showered the alleged non-

profit managers in millions and, in return, co-payment assistance for the Subject Drugs were provided by the Charities for patients covered by Medicare Advantage Organizations, of which reports were generated and provided back to the Manufacturers to enable them to maximize profit off this Scheme, at the expense of Assignors and Class Members. As the Charities illegally provided data and information to the Manufacturers regarding the profitability of the Corporate Contributions, the Manufacturers would time their Corporate Contributions with price increases of the Subject Drugs. The Manufacturers' increasing Corporate Contributions to the Charities resulted in more Medicare Advantage patients receiving co-payment assistance, the elimination of price sensitivity for the Subject Drugs, and increased profits for the Manufacturers. And all along the way, as the drug prices increased and utilization of the Charities increased to mask the effects of the prices increases, Corporate Contributions to the Charities continued to rise, and the Charities' and Manufacturers' executives increased their own compensation and benefits.

273.    With respect to the elimination of price sensitivity for the Subject Drugs, information from the CMS and Plaintiff, and the Assignors demonstrates how Defendants' Scheme eliminated price concerns of patients purchasing and physicians prescribing the Subject Drugs, resulting in Federal healthcare programs bearing the cost.

274.    Assignors paid over **$29,576,756.28** million in claims for Sensipar from at least October 1, 2011, to present.[95] Information in the exclusive control of

---

[95] Upon information and belief, Plaintiff alleges the Scheme started before October 1, 2011, and has continued to present day, despite the Amgen Settlement limited timeframe. As revealed in the 2021 Drug Price Report, the DOJ timeframe does not necessarily represent the entire duration of other schemes similar to that alleged herein. ("Documents obtained by the Committee indicate that Teva continued its payments to TAF and other third-party foundations through at least 2018—three years beyond the scope of DOJ's complaint.") *See* **Exhibit F** – 2021 Drug Price Report.

1  Defendants will demonstrate that a significant portion of the co-payments paid on

2  behalf of Assignors' beneficiaries were made by PANF in connection with

3  Defendants' Co-Payment Scheme.

4      275.  Plaintiff's Assignors paid over **$25,77,353.92** million in claims for

5  Kyprolis from at least October 1, 2011, to the present. Information in the exclusive

6  control of Defendants will demonstrate that a significant portion of the co-payments

7  paid on behalf of Assignors' beneficiaries were made by CDF in connection with

8  Defendants' Co-Payment Scheme.

9      276.  Defendants' documents and disclosures clearly demonstrate that they

10  possess information to show exactly which patients received co-payment assistance.

11      277.  For example, PANF's Form 990 Tax Filings state in Supplemental

12  Information to Schedule I, Part I, Line 2:

> "These funds represent grants made for the benefit of patients.
> Through an application process which includes income
> attestation with random verification against criteria set by the
> board, a doctor's attestation to validate the patient medical need
> and an insurance benefits verification, [PANF] ensures that all
> patients who request our services meet the criteria for a disease
> fund before any funds are disbursed. The patient's grant will
> provide assistance for their responsibility (deductible, co-
> payment, or coinsurance) for covered medication services after
> payment from the primary insurance or the amount available to
> each patient is limited by a cap set by the board. Funds are
> disbursed to the pharmacy or physician's office, when possible,
> since we want to ensure that the patient does not need to provide
> funds out-of-pocket for their medications."[96]

278.  Additionally, CDF's Form 990 Tax Filing in 2014 stated in
Supplemental Information to Schedule I, Part IV, Line 2:

---

[96] *See* **Exhibit L** – PANF's Form 990 Tax filings.

78

"(2) The individual receives a prescription from their doctor for an FDA-approved drug for treatment of the disease (3) the individual contacts the Chronic Disease Fund seeking financial assistance for the purpose of paying the co-pay for the medication prescribed by their doctor and (4) The Chronic Disease Fund verifies that the individual's income is low enough to qualify for financial assistance...the Organization ensures that all grants and other assistances are only used to pay for the prescribed treatment by reimbursing qualifying individuals upon documentation of the purchase and cost of the prescribed medication." [97]

279.    The information alleged in this section was not, and could not have been, reasonably known or discovered by Plaintiff until at least May 2019, when some such facts were first publicly reported.

280.    In addition, Defendants intentionally and fraudulently concealed their Scheme, covering up the true nature of its payments and relationship with charities while the payments were in fact kickbacks and/or bribes for the purpose of using the Charities as conduits to effectuate the goals of artificially and deceptively inflating the drug prices and increasing the use of the drugs to increase profits at the expense of healthcare payors like Assignors and the Class Members. Defendants' concealment prevented Plaintiff, Assignors, and the Class Members from reasonably discovering the facts underlying Defendants' Schemes which caused Assignors' and the Class Members' injuries.

281.    Through their Scheme, Defendants caused pharmacies to seek payment from federal health care programs for their purchases of the Subject Drugs. The act of submitting claims for reimbursement carries with it an implied certification of compliance with governing federal rules that are a precondition of or material to payment. Pharmacies submitting claims for reimbursement therefore implied that

---

[97] *See* **Exhibit U** – CDF Form 990 Tax Filings.

79

the claims complied with federal law, including the AKS. Defendants' conduct thus caused pharmacies to provide false certifications.[98]

282.   However, because of the Charities served as conduits of the Manufacturers, they did not act as independent charities and instead acted in violation of the AKS. Therefore, the certifications submitted to Assignor for claims relating to the Scheme were false.

283.   As a result of Defendants' conduct, Plaintiff's Assignors and the Class Members were harmed by 1) paying artificially inflated prices for the Subject Drugs; 2) paying for the artificially increase volume of disbursements for the Subject Drugs; and 3) paying for claims tainted by Defendants' violations of the AKS, FCA, and other state bribery laws.

## CLASS ALLEGATIONS

284.   At all material times, Sensipar—manufactured and sold by Amgen—was shipped across state lines and sold to customers located both within and outside its state of manufacture.

285.   At all material times, Kyprolis—manufactured and sold by Amgen and/or Onyx—was shipped across state lines and sold to customers located both within and outside its state of manufacture.

286.   During the relevant time period, in connection with the purchase and sale of Sensipar and Kyprolis, monies as well as contracts, bills, and other forms of business communication and transactions, were transmitted in continuous and uninterrupted flow across state lines.

287.   During the relevant time period, various methods of communication were used to effectuate the illegal acts alleged here, including the United States mail,

---

[98] Wholesale distributors, specialty distributors, and/or pharmacies benefit from the Scheme as their sales increase *because the rate of abandonment decreases*, their *co-payment revenue increases,* as well as revenue from service fees, some of which are based on a percentage of the Wholesale Acquisition Cost.

interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

288.   Plaintiff brings this action on behalf of themselves and the following Class Members:

Federal RICO / State RICO / State Consumer Protection Statute <u>Class 1:</u>

All Medicare Advantage Organizations, Medicaid Managed Care Organizations, and at-risk, first-tier, and downstream entities in the United States and its territories that from at least October 1, 2011, through present, pursuant to Medicare and/or Medicaid contracts offering Medicare and Medicaid benefits, provided services, purchased Sensipar and/or Kyprolis, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Sensipar and Kyprolis resulting from PANF's or CDF's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute <u>Class 2:</u>

All self-funded, insurers and related entities in the United States and its territories that from at least October 1, 2011, through present, provided services, purchased the subject pharmaceuticals, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Sensipar and/or Kyprolis resulting from PANF's or CDF's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

289.   Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class.

290. As discussed in this Complaint, the Defendants' Scheme resulted in increased sales of the Sensipar and/or Kyprolis, the cost of which were borne by Assignors and Class Members. All members of the class are subject to the same AKS compliance requirements and are all prohibited from paying for claims that are unpayable due to AKS violations. The damages suffered by Plaintiff applies to all individual Class Members (and Plaintiff as the rightful assignee of those organizations that assigned their rights to Plaintiff). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Plaintiff and other insurers, class resolution is an effective tool to redress the harm.

291. Assignors and Class Members have been deprived of money as a result of their obligation to pay for prescribed Sensipar and/or Kyprolis at artificially inflated quantities and supra-competitive prices. But for the Scheme, Assignors and Class Members would have paid less for Sensipar and/or Kyprolis.

292. The Classes, defined above, are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiff believes the Class includes thousands of insurers that paid for hundreds of thousands, if not millions, of prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiff) throughout the United States that sustained damages as a result of their payment for Sensipar and/or Kyprolis by Defendants' Scheme. Thus, the numerosity element for class certification is met.

Commonality: Defendants' misconduct was directed at all Class Members. Questions of law or fact are common to all Class Members. Defendants' co- payment assistance conspiracy Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus,

82

common questions of law or fact are prevalent throughout the class, such as whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' payment for Sensipar and/or Kyprolis disbursements. Each Class Member shares the same needed remedy—namely payment for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' Co-Payment Scheme and racketeering activity that caused Assignors and Class Members to pay supra-competitive prices for artificially inflated quantities of Sensipar and/or Kyprolis.

Typicality: Plaintiff's claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by Defendants, namely Defendants' formation of their Co-Payment Scheme and racketeering activity unlawfully causing Class Members to pay pharmacies for the over-dispensing of Sensipar and/or Kyprolis at supra- competitive prices and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiff's, therefore, typical of the Class Members.

Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's interests in vindicating these claims are shared with all of the Class Members. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical industry.

293.   The Classes are properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Classes. Defendants deliberately conspired to cause Assignors to pay for Sensipar and/or Kyprolis through the formation of the Scheme that subsequently resulted in the submission

and payment of supra-competitive prices for Sensipar and/or Kyprolis by Assignors and the Class Members that otherwise would not have been paid.

294.   Assignors and Class Members paid for prescriptions of Sensipar and/or Kyprolis that they otherwise would not have paid but for Defendants' Co-Payment Scheme and racketeering activity.

295.   Additional questions of law and fact common to some or all the Classes include, but are not limited to:

a) Whether Defendants engaged in a bribery scheme and thereby violated the AKS, the applicable state bribery laws, the applicable OIG regulations, the Travel Act, and/or mail and wire fraud statutes;

b) The effect of such bribery scheme on the quantities dispensed and prices of Sensipar and/or Kyprolis; and

c) The quantum of overcharges paid by the Assignors and Class Members in the aggregate.

296.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

297.   Plaintiff knows of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

**TOLLING OF THE STATUTE OF LIMITATIONS**

*Fraudulent Concealment Tolling*

298.    The claims asserted in this Complaint have been tolled as a matter of law as Defendants took affirmative steps to conceal the wrongful conduct alleged herein including*, inter alia*, Amgen and/or Onyx utilizing the Co-payment Charities as conduits and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

299.    The claims asserted in this Complaint have been tolled as a matter of law as PANF and CDF repeatedly and continuously took affirmative steps to conceal the wrongful conduct alleged herein by misleading the OIG, DOJ, health care providers, certain pharmacies, beneficiaries, insurers, and the general public, into believing it was operating a legitimate, legal, and independent 501(c)(3) charitable organization, when in reality, it was serving as an illegal conduit for Amgen and/or Onyx.

300.    The claims asserted in this Complaint have been tolled as a matter of law as PANF and CDF took affirmative steps to conceal the wrongful conduct alleged herein.

*Continuing Violation Doctrine*

301.    The Complaint alleges a continuing course of conduct, and Defendants' unlawful conduct has inflicted continuing and accumulating harm. Defendants' unlawful conduct and the accumulating harm to the Assignors did not end alongside the DOJ Settlement Agreements. Accordingly, Plaintiff can recover for damages that they suffered during any applicable limitations period.

*Discovery Rule Tolling*

302.    Assignors did not know, and had no reasonable way of discovering, Defendants' Scheme until it became public knowledge as a result of the DOJ's press release.

303. Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct alleged herein.

304. Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants were engaged in the alleged Scheme, nor would a reasonable diligent investigation have disclosed the true facts.

305. Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that PANF and CDF were concealing their conduct alleged herein. The Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that PANF and CDF were fraudulently transferring assets, nor would a reasonable diligent investigation have disclosed the true facts.

*Equitable Tolling*

306. Defendants were under a continuous duty to disclose to Assignors and Class Members the existence and true nature of the Co-Payment Scheme, including the subsequent obligations for payment triggered by Defendant's misconduct.

307. The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they complied with federal regulations including the FCA and AKS. When Defendants made these misrepresentations and concealed their co-payment assistance conspiracy scheme, they had knowledge of the facts surrounding the Scheme's existence. Defendants concealed the co-payment assistance conspiracy scheme and made misrepresentations about it with the intention that Assignors and Class Members would rely on said misrepresentations and would pay for Sensipar and/or Kyprolis. Defendants' concealment induced Assignors and Class Members to reasonably rely and act upon these misrepresentations and were misled into paying

for Sensipar and/or Kyprolis. *See Safe Env't of Am., Inc. v. Emps. Ins. of Wausau*, 278 F. Supp. 2d 121, 126–27 (D. Mass. 2003).

308.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## CLAIMS FOR RELIEF

## FIRST CLAIM OF RELIEF

## Violation of 18 U.S.C. § 1962(c) Through the Use of the Co-Payment Charity Scheme

### *Against All Defendants*

309.   Plaintiff re-alleges and incorporates by reference paragraphs 1-309 of this Complaint as if fully set forth herein.

310.   At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

311.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

312.   Section 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The elements of a RICO claim under § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

*Description of the Co-Payment Scheme*

313. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

314. Under 18 U.S.C. § 1961(4), a RICO "Enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

315. The Co-Payment Scheme is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of the Manufacturers and the Charities, including their directors, officers, employees, and agents.

316. The Co-Payment Scheme functioned as an ongoing and continuing unit. The Co-Payment Scheme was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Enterprise.

317. The Co-Payment Scheme had a common purpose that united its members. One purpose was to steal funds from the Medicare Trust Fund. Another purpose was to generate personal profits for Defendants' executives from unlawful bribes and kickbacks.

318. Defendants' common purposes were, among other things (1) growing the Charities' funds and Charities' executive compensation; (2) eliminating price sensitivity for patients and health care providers; (3) misleading government agencies, third-party payors, health care providers, and beneficiaries regarding the legitimacy of the Charities' operations and their conduct; and (t) violating OIG regulations and providing data to allow the Manufacturers to conduct continuous ROI calculations, all of which resulted in the unlawful depletion of state and federal dollars, increased the number of patients who had their drugs purchased by

Assignors and Class Members, and increased the personal gains received by Defendants' executives through the payment of AKS-tainted claims and drugs at supra-competitive prices.

319.   By funneling and steering people into utilizing the Charities' co-payment assistance funds, the Co-Payment Scheme increased the Manufacturers' number of covered "customers," thereby triggering Assignors' coverage obligations for their Enrollees and eliminating price sensitivity to Sensipar and Kyprolis. These two prongs of the plan worked hand-in-hand, resulting in a vicious cycle that expanded profits for the Charities and the Manufacturers, at the cost to Plaintiff's and other health plans, and Amgen "customers."

320.   Each of the Defendants received substantial revenue from participating in the Co-Payment Scheme. Such revenue was exponentially greater than it would have been in the absence of such Enterprise. Each portion of the Enterprise benefitted as intended from the existence of the other parts.

321.   The Co-Payment Scheme has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant.

322.   There were interpersonal relationships between those associated with the Co-Payment Scheme. This includes relationships (1) among the Charities' officers and directors and relationships among the Manufacturers' officers, directors, principals, and agents; and (2) relationships between the Charities and the Manufacturers. This is evidenced by the Manufacturers routinely communicating (through the U.S. Mail and Wire) with the Charities to assure that its "donations" were sufficient to keep funds flowing towards potential users of the Manufacturers' drugs and drive their profits. PANF and CDF settled with the DOJ involving the exact kind of conduct at issue here, noting that PANF and CDF operated not as independent charities, but as pass-throughs for specific pharmaceutical companies,

for example, to pay kickbacks, enabling pharmaceutical companies to undermine the Medicare program at the expense of American taxpayers. This conduct shows that CDF, PANF and Amgen communicated information important to their scheme *through the mail and wires* to profit illegally, and that they had a relationship.

323.    The OIG explicitly warned PANF and CDF not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and PANF and CDF certified their understanding and compliance with the OIG's warnings. But Defendants participated in this conduct anyway. Amgen settled the DOJ's AKS and FCA claims for $24.75 million for this illegal conduct.

324.    The Co-Payment Scheme had the longevity sufficient to permit its associates to pursue the enterprise's purpose. It lasted for years, during which time its purposes were pursued. Since at least 2011, Manufacturers made "donations" to the Charities, purportedly "independent" charities, and the Charities continued to increase their executive compensation. The Manufacturers further insulated the price sensitivity of Sensipar and Kyprolis. The Manufacturers also used anticompetitive and fraudulent tactics to increase the number of "customers" buying Sensipar and Kyprolis, allowing the Manufacturers to further increase their profits.

325.    The Manufacturers carried out their business activities both with the Charities and without the Charities, including marketing and selling Sensipar and Kyprolis to other entities beside the Charities. Similarly, the Charities operated other funds without the Manufacturers. The Scheme thus did not involve parallel conduct because the Defendants participate in transactions with co-payment charities that do not result violations of the AKS, FCA, RICO, Consumer Protection Laws, OIG regulations, or other state and federal laws.

### Conduct of the Enterprise's Affairs

326.  Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Scheme's affairs. Each Defendant was

90

associated with the Co-Payment Scheme and each operated and managed the Co-Payment Scheme. Such participation included but is not limited to: (1) the Charities shared data (through the U.S. mail and wire) so the Charities and Manufacturers could effectively conduct ROI analyses on the amounts of the Manufacturers' "donations"; (2) the Manufacturers provided necessary "donations" for the co-payments, thus triggering the payment obligations of Plaintiff's Assignors; and (3) the Charities and Manufacturers steered and funneled patients into utilizing Amgen's co-payment assistance program.

327.   At all relevant times, each Defendant has been aware of the Co-Payment Scheme's conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

### Defendants' Pattern of Racketeering Activity

328.   To carry out their illegal and collusive bribery Scheme, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Scheme through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (mail fraud), and § 1343 (wire fraud).

329.   Defendants intended to, and in fact did, commit bribery in violation of state and federal law, specifically 42 U.S.C. § 1320a-7b; Conn. Gen. Stat. §§ 53a-161c and 53a-161d; Fla. Stat. §§ 456.054 and 817.505; Mass. Gen. Laws ch. 175H, § 3; S.C. Code Ann. § 44-113-60; and Va. Code Ann. § 32.1-315 (collectively, "unlawful activity"). Defendants used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity.

91

330.   Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the Co-Payment Scheme. Each of these mailings and interstate wire transmissions constitutes an instance "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Assignors.

331.   As set forth throughout this Complaint, Defendants engaged in a scheme to defraud Medicare Providers, including the Assignors. They funneled and steered patients into Amgen's co-payment assistance program, knowing Medicare Providers such as the Plaintiff's would ultimately bear the cost of the drugs. Defendants knew their scheme to funnel, steer, and refer were violative of federal and state laws including, but not limited to, the AKS and the FCA and that they were transmitting fraudulent information through mail and wire communications.

332.   Defendants' use of the mails and wires to perpetuate their fraudulent Co-Payment Scheme involved thousands of communications which involved, among others, the following:

   a. Communications from the Manufacturers and Charities to patients, steering them to the Manufacturers' co-payment assistance program utilizing the Charities;

   b. Transmittal of bribes, disguised as "donations," by the Manufacturers to the Charities so that the Charities could pay the co-payments of the Manufacturers' "customers" in the Manufacturers' co-pay assistance program;

   c. Submission of certifications by the Manufacturers and the Charities, in which they claimed to be in compliance with federal law and OIG regulations;

92

d. Submissions of data from the Charities to the Manufacturers so that the Manufacturers could conduct ROI analyses on its "donations" to the Charities and to see how much more money it could make by increasing its "donations";

e. Communications between the Charities and the Manufacturers to ensure that the Charities Sensipar and Kyprolis funds' opening coincided with Sensipar and Kyprolis price increases;

f. Certifications by the Charities that they would determine eligibility independently when in fact the Charities emphasized patients taking Sensipar and Kyprolis based on the Manufacturers' bribes, not financial need; and

g. Causing false claims, in violation of the FCA and AKS, to be submitted by pharmacies to Plaintiff's Assignors

h. Using the mail and wire to mislead the government agencies (i.e., the OIG, IRS, DOJ, and state departments of record) through false certifications and misrepresentations; and

i. Misleading third-party payors, health care providers, investors, government agencies, and the general public into believing the legitimacy of Defendants' Scheme.

333.  Defendants violated the Travel Act by using the mail and wire facilities to commit, promote, manage, establish, and carry on their bribery and/or kickback scheme in violation of the laws of the United States, namely, the AKS, as well as the laws of several States, namely, (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) Mass. Gen. Laws ch. 175H, § 3; (4) S.C. Code Ann. § 44-113-60; and (5) Va. Code Ann. § 32.1-315. Defendants further used the mail and wire facilities to distribute the proceeds of their bribery and/or kickback scheme.

334.  Defendants' activity was intended to and did in fact violate the federal AKS by knowingly and willfully offering (by the Manufacturers) and accepting (by

the Charities) bribes (i.e., "donations") in return for the Charities referring, accepting referrals for, and arranging for Assignors and Class Members to buy, and beneficiaries to receive, Sensipar and Kyprolis.

335.   Defendants' activity was intended to and did in fact violate Conn. Gen. Stat. §§ 53a 161c and 53a-161d. These two laws prohibit two sides of the same scheme. Under Conn. Gen. Stat. § 53a-161c(a), it is illegal to "knowingly solicit[], accept[] or agree[] to accept any benefit, in cash or in kind, from another person upon an agreement or understanding that such benefit will influence such person's conduct in relation to referring an individual or arranging for the referral of an individual for the furnishing of any goods, facilities or services to such other person under contract to provide goods, facilities or services to a local, state or federal agency." This was violated by the Charities accepting money from the Manufacturers to influence the Charities' conduct in referring and arranging for the referral of beneficiaries of Assignors and Class Members, who are under contract to provide health insurance benefits on behalf of state and federal agencies (e.g., CMS). Similarly, it is illegal under Conn. Gen. Stat. § 53a-161d(a) to "knowingly offer[] or pay[] any benefit, in cash or kind, to any person with intent to influence such person: (1) To refer an individual, or to arrange for the referral of an individual, for the furnishing of any goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local, state or federal agency; or (2) to purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facilities or services for which a claim of benefits or reimbursement has been filed with a local, state or federal agency." The Defendants' Scheme operated in Connecticut and thereby violated these state laws.

336.   Defendants' activity was intended to and did in fact violate Fla. Stat. §§ 456.054 and 817.505. Specifically, under Fla. Stat. § 456.054(2) "[i]t is unlawful for . . . any provider of health care services to offer, pay, solicit, or receive a kickback,

directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." The Manufacturers are providers of health care services and paid kickbacks to the Charities, and to pharmacies through the Charities, for referring patients to receive the Manufacturers' drugs. Similarly, under Fla. Stat. § 817.505(1) it is illegal "for any person . . . to (a) [o]ffer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . to induce the referral of a patient or patronage to or from a health care provider or health care facility." Likewise, subsection (b) prohibits soliciting or receiving the same. Here, the Manufacturers paid, and the Charities received, bribes to induce the referral of patients to receive Sensipar and Kyprolis. Defendants' Scheme operated in Florida and resulted in claims being submitted therein and thereby violated these state laws.

337.   Defendants' activity was intended to and did in fact violate Mass. Gen. Laws ch. 175H, § 3. Specifically, it is illegal for any person to "offer[] or pay[] [(or solicit or receive)] any remuneration, including any bribe or rebate, except as provided in subsection (b), directly or indirectly, overtly or covertly, in cash or in kind to induce any person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service, or item for which payment is or may be made in whole or in part by a health care insurer." Mass. Gen. Laws ch. 175H, § 3. The Manufacturers offered and paid, and the Charities solicited and received, bribes in return for the Charities referring patients to receive the Manufacturers' drugs and arranging for the purchase of same by funneling the Manufacturers' money to these patients. Defendants' Scheme operated in Massachusetts and resulted in claims being submitted therein and thereby violated this state law.

338.   Defendants' activity was intended to and did in fact violate S.C. Code Ann. § 44-113-60. Under South Carolina law, it is unlawful for "a health care provider or a provider of health care services to offer, pay, solicit, or receive a

95

kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." S.C. Code Ann. § 44-113-60(B). The Manufacturers are providers of health care services and paid kickbacks to the Charities, and to pharmacies through the Charities, for referring patients to receive the Manufacturers' drugs. Defendants' Scheme operated in South Carolina and resulted in claims being submitted therein and thereby violated this state law.

339.   Defendants' activity was intended to and did in fact violate Va. Code Ann. § 32.1-315. Under Virginia law, it is illegal for any person to "knowingly and willfully solicit[] or receive[] any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in-kind, or causes such remuneration to be solicited or received . . . [i]n return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under medical assistance; or . . . [i]n return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing or ordering any goods, facility, service or item for which payment may be made in whole or in part under medical assistance." Va. Code Ann. § 32.1-315(A). It is also illegal for any person to "knowingly and willfully offer[] or pay[] any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in-kind to any person to induce such person, or causes such remuneration to be offered or paid . . . [t]o refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under medical assistance; or . . . [t]o purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any goods, facility, service or item for which payment may be made in whole or in part under medical assistance." *Id*. § 32.1-315(B). The Manufacturers offered and paid, and the Charities solicited and received, bribes in return for the Charities referring patients to receive the Manufacturers' drugs and arranging for the

purchase of same by funneling the Manufacturers' money to these patients. Defendants' Scheme operated in Virginia and thereby violated these state laws.

340.   The predicate acts of violating the Travel Act, as well as mail and wire fraud, had the same purpose; that is, to make money by growing the Manufacturers' co-pay assistance program as large as possible so the Charities' officers and directors could justify increasing their compensation and that the Manufacturers could get as many "customers" for Sensipar and Kyprolis as possible, at the expense of the Assignors and the Class Members.

341.   All the predicate acts detailed above, including the certifications made by the Manufacturers and the Charities, as well as the wire communications in furtherance of their Scheme, were for the purpose of the Scheme.

342.   If the Charities had not falsely certified that they used uniform measures of financial eligibility, and if the Manufacturers and Charities had not deceptively caused innocent, non-party pharmacies to provide fraudulent bills for payment, Plaintiff's Assignors and the Class Members would not have purchased the Manufacturers' products. Defendants caused innocent, non-party pharmacies to send fraudulent bills for payment over the mail and wire so the Manufacturers could make larger bribes to the Charities, and therefore cause damage to Plaintiff's

343.   If the Scheme did not exist, the Manufacturers would not have been able to continuously increase the prices of Sensipar and Kyprolis and still remain profitable to the extent that they were.

344.   These predicate acts allowed the continuance of the Scheme to increase prescriptions for Sensipar and Kyprolis. As a result, Plaintiff's Assignors and Class Members paid increased claims for prescriptions where the Charities made the co-payment.

345.   As a result of Defendants' Scheme, Assignors and Class Members unknowingly paid tainted claims.

346.  These predicate acts perpetuated the Scheme to increase the prices and dispensed quantities of Sensipar and Kyprolis. As a result, the Assignors and Class Members paid the supra- competitive prices for an improperly increased quantity of dispensed Sensipar and Kyprolis.

347.  The Manufacturers and Charities, including officers, directors, agents, and principals of each organization, participated in all of the predicate acts. These individuals sent, or caused to be sent, all of the fraudulent certifications through the mails. They are the ones who communicated among one another and others in furtherance of the scheme.

348.  The intended and direct victims of the Scheme are the Assignors and Class Members.

349.  The violation of the Travel Act and acts of mail and wire fraud included transmission of fraudulent claims and the unlawful transmission of data and communications to further the racketeering scheme over a period of at least five years involving harm to multiple parties.

350.  Additionally, PANF was involved in a similar fraudulent scheme with other drug manufacturers. PANF allowed four pharmaceutical companies: Bayer, Astellas, and Dendreon to utilize PANF as a conduit to pay kickbacks. PANF settled these claims with the U.S. Attorney's Office, with PANF agreeing to pay $4 million to resolve the claims. PANF's and Amgen's multi-faceted fraud involved multiple victims and predicate acts and is the exact type of broad and persistent racketeering activity that RICO was intended to stop.

351.  The Co-Payment Scheme's fraudulent scheme and its predicate acts proximately caused injury to Plaintiff's Assignors' and the Class Members' business and property by triggering the Plaintiff's and the Class Members' duty to purchase Sensipar.

352.    Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Assignors and the Class Members. Defendants' actions entitle Plaintiff to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM OF RELIEF

### Violation of 18 U.S.C. § 1962(d) Through the Co-Payment Scheme

*Against All Defendants*

353.    Plaintiff re-alleges and incorporates by reference paragraphs 1-309 of this Complaint as though set forth at length herein.

354.    Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions.

355.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Scheme described previously, through a pattern of racketeering activity.

356.    The Manufacturers knowingly agreed with the Charities that the Manufacturers would perform services that would facilitate the activities of the Co-Payment Scheme. The Manufacturers, through the Charities, steered people towards the Charities co-payment assistance programs.

357.    The Manufacturers also provided the Charities with bribes, disguised as "donations," so the Charities could pay the co-payments of the Manufacturers' "customers" utilizing the co-payment assistance programs.

358.    The Manufacturers also used data provided by the Charities, in violation of the AKS and FCA, to determine how much money it was making from its "donations" and how much *more* money it could make by increases to its "donations." The shared data allowed the Manufacturers to perform ROI analyses

on the "donations" to forecast the effect of donations on revenue and profit. The Manufacturers thus set out a roadmap of illegal activities and profits.

359.   The Manufacturers and the Charities also caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

360.   Further, the Charities knowingly agreed with the Manufacturers that they would perform services that would facilitate the activities of the Co-Payment Scheme and those who were running it in an illegal manner. Some of the services that the Charities performed were steering people towards their co-payment assistance funds.

361.   The Charities sent data to the Manufacturers, in violation of the AKS and FCA, so the Manufacturers could see how much money it was making from its "donations" to the Charities, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that the Manufacturers and Charities did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-Payment Scheme. The Charities knew that if the Manufacturers provided more "donations," they would make more money. Thus, by illegally providing data to the Manufacturers, the Charities were soliciting greater contributions.

362.   The Charities knowingly agreed with the Manufacturers that one or each of them would commit at least two instances of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). In short, The Charities and the Manufacturers knew they had to abide by the AKS and FCA, and they knew the scheme they were engaged in or were going to engage violated those statutes. It also knew that each time a pharmacy filled a prescription for someone utilizing its co-pay assistance, any certifications the pharmacist made that he or she would abide by federal law would be false.

363.   Defendants knew that any communications they had over the telephone, email, or text message in furtherance of the scheme would be predicate acts.

364.   In short, the Manufacturers and Charities knowingly agreed to pursue the same objective of profiting illegally from the Co-Payment Scheme. They agreed to divide the work of accomplishing this objective. The Manufacturers would make the "donations"; the Charities would provide data; they would both steer patients and make false certifications. Each Defendant intended to further this endeavor, which, as described above, when completed, amounted to a violation of 18 U.S.C. § 1962(c) that proximately and directly caused injury to Plaintiff's Assignors and the Class Members.

365.   Plaintiff brings this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d).

### THIRD CLAIM FOR RELIEF

### Unfair and Deceptive Trade Practices Under State Law

*Against All Defendants*

366.   Plaintiff re-alleges and incorporates by reference paragraphs 1-309 of this Complaint as if fully set forth herein.

367.   Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

368.   Defendants directly misrepresented to Assignors and Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

369.   Defendants intended for payers such as Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for Sensipar and Kyprolis. These representations and certifications were made in an effort by

Defendants to have the consuming public use the Charities' funds and were addressed to the market generally by having improper and unnecessary prescriptions for Sensipar and Kyprolis paid for by Medicare, the Assignors, and Class Members. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare.

370.    Assignors and Class Members relied on these misrepresentations to their detriment, which were material to their decision to pay for Sensipar and Kyprolis.

371.    Assignors and Class Members were directly and proximately injured by Defendants' conduct suffered an injury in fact, and suffered actual, ascertainable damages.

372.    Assignors and Class Members would not have paid for nearly as much of Sensipar and Kyprolis as they did, had Defendants refrained from engineering the false representations or otherwise disclosed its Scheme. Likewise, the Assignors and Class Members would not have paid nearly as much for each prescription of Sensipar and Kyprolis as they did, had Defendants not eliminated price sensitivity through the Co-payment Circumvention Enterprise.

373.    Accordingly, Plaintiff and the Class Members in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and cost of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

### *Connecticut Unfair Trade Practices Act*
### (*Conn. Gen. Stat. §§ 42-110a* **et seq.**)

374.    Defendants' conduct occurred in "trade" or "commerce" under the Connecticut Unfair Trade Practices Act ("Connecticut UTPA"). Conn. Gen. Stat. § 42-110a(4).

375.    The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

376.    Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

377.    Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

378.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for Sensipar and/or Kyprolis.

379.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Connecticut.

380.    Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the State of Connecticut.

381.    Simultaneously with the filing of this Complaint, Plaintiff served a copy on the Attorney General and Commissioner of Consumer Protection under Conn. Gen. Stat. § 42- 110g.

382.    Plaintiff is entitled to recover their actual damages, punitive damages, and attorneys' fees under Conn. Gen. Stat. § 42-110g.

### *Florida Deceptive and Unfair Trade Practices Act*
### *(Fla. Stat. Ann. §§ 501.201 et seq.)*

383.    Plaintiff, Assignors, and Class Members and are "interested persons" and "consumers" under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. § 501.203(6)–(7).

384.    Defendants are engaged in "trade or commerce" under Fla. Stat. § 501.203(8).

103

385.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204(1).

386.   Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

387.   Defendants knew or should have known that their conduct violated FDUTPA.

388.   Defendants' illegal conduct substantially affected Florida commerce and consumers.

389.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased number and size of payments for Sensipar and/or Kyprolis.

390.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

391.   Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the State of Florida.

392.   Plaintiff seeks to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs under Fla. Stat. §§ 501.211(2) and 501.2105(1).

### *Massachusetts Consumer Protection Act*
### (*Mass. Gen. Laws ch. 93a, §§ 1* **et seq.**)

393.   Assignors, Class Members, and Defendants are "persons" under the Massachusetts Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws ch. 93A, § 1(a).

394.   Defendants are engaged in "trade or commerce" under Mass. Gen. Laws ch. 93A, § 1(b).

395.    The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws ch. 93A, § 2(a).

396.    Defendants' conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

397.    Defendants knew or should have known that their conduct violated Massachusetts CPA.

398.    Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

399.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for Sensipar and/or Kyprolis.

400.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the Commonwealth of Massachusetts.

401.    Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the Commonwealth of Massachusetts.

402.    Plaintiff seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiff is entitled to recover up to three times actual damages, but no less than two times actual damages under Mass. Gen. Laws ch. 93A, §§ 9 and 11.

403.    Plaintiff also seeks punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

### _New Jersey Consumer Fraud Act_

### _(N.J. Stat. Ann. §§ 56:8-1 et seq.)_

404.    Assignors, Class Members, and Defendants are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"). N.J. Stat. Ann. § 56:8-1.

405.    The New Jersey CFA prohibits "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . , whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

406.    Defendants' conduct constitutes "unlawful practices" in violation of the New Jersey CFA.

407.    Defendants' illegal conduct substantially affected New Jersey commerce and consumers.

408.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for Sensipar and/or Kyprolis.

409.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of New Jersey.

410.    Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the State of New Jersey.

411.    Simultaneously with the filing of this Complaint, Plaintiff served a copy on the New Jersey Attorney General under N.J. Stat. Ann. § 56:8-20.

412.   Plaintiff is entitled to recover treble damages, reasonable attorneys' fees, filing fees and reasonable costs of suit, any other appropriate legal or equitable relief.

### New York General Business Laws
### (N.Y. Gen. Bus. Laws §§ 349 et seq.)

413.   The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

414.   Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

415.   Defendants' illegal conduct substantially affected New York commerce and consumers.

416.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for Sensipar and/or Kyprolis.

417.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of New York.

418.   Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the State of New York.

419.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff has been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under N.Y. Gen. Bus. Law § 349.

***Washington Consumer Protection Act***

***(Wash. Rev. Code § 19.86.010 et seq.)***

420.    Assignors, Class Members, and Defendants are "persons" under the Washington Consumer Protection Act ("Washington CPA"). Wash. Rev. Code § 19.86.010.

421.    The Washington CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

422.    Defendants' conduct constitutes "unfair or deceptive" acts or practices in violation of the Washington CPA.

423.    Defendants' illegal conduct substantially affected Washington commerce and consumers and was injurious to the public interest because it injured, and had the capacity to injure, other persons, within the meaning of the Washington CPA.

424.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for Sensipar and/or Kyprolis.

425.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Washington.

426.    Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in the State of Washington.

427.    Plaintiff is entitled to recover actual damages together with the costs of the suit, including a reasonable attorney's fee. Wash. Rev. Code § 19.86.090.

### FOURTH CLAIM FOR RELIEF

### Unjust Enrichment Under State Law

*Against All Defendants*

428.  Plaintiff re-alleges and incorporates by reference paragraphs 1-309 of this Complaint as though set forth at length herein.

429.  Defendants benefitted from artificially inflated profits on the sale of Sensipar and Kyprolis resulting from the unlawful and inequitable acts alleged in this Complaint.

430.  Defendants' financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for direct and indirect purchases of Sensipar and Kyprolis by Assignors and the Class Members.

431.  Assignors and Class Members have conferred upon Defendants an economic benefit—profits from unlawful overcharges and monopoly profits to the economic detriment of the Assignors and Class Members.

432.  Plaintiff's analysis of its Assignors' data identified one or more purchases of Sensipar and/or Kyprolis in each of these States and Territories:

      a.     Alabama;

      b.     Colorado;

      c.     Connecticut;

      d.     Florida;

      e.     Kansas;

      f.     Maryland;

      g.     Massachusetts;

      h.     New Jersey;

      i.     New York;

      j.     North Carolina;

      k.     South Carolina;

l.    Tennessee;

m.    Virginia; and

n.    Washington.

433.  Defendants' conduct directly resulted in the unjust enrichment of the Defendants through the sale of Sensipar and/or Kyprolis in each of the States and Territory mentioned above.

434.  It would be futile for the Assignors and Class Members to seek a remedy from any party with whom they have privity of contract with for its direct or indirect purchases of Sensipar and/or Kyprolis.

435.  It would be futile for the Assignors and Class Members to seek to exhaust any remedy against any immediate intermediary in the chain of distribution from which the Assignors and Class Members purchased Sensipar and Kyprolis, as they are not liable and would not compensate the Assignors and Class Members for unlawful conduct caused by Defendants.

436.  The economic benefit of overcharges and artificially inflated quantities of dispensed Sensipar and Kyprolis derived by Defendants through charging supra-competitive and artificially inflated prices for Sensipar and Kyprolis is a direct and proximate result of Defendants' unlawful conduct.

437.  The economic benefits derived by Defendants rightfully belong to the Assignors and Class Members, as they paid anticompetitive and monopolistic prices beginning in at least 2011 and continuing through the present, and they will continue to do so until the effects of Defendants' illegal conduct cease.

438.  It would be inequitable under unjust enrichment principles under the laws of the aforementioned states for Defendants to be permitted to retain any of the overcharges for Sensipar and/or Kyprolis derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

439.   Defendants are aware of and appreciate the benefits bestowed on it by the Assignors and Class Members.

440.   Defendants should be compelled to disgorge in a common fund to benefit Plaintiff all unlawful or inequitable proceeds they received.

441.   A constructive trust should be imposed on all unlawful or inequitable sums received by Defendants traceable to the Assignors and Class Members.

## FIFTH CLAIM OF RELIEF

### Violations of the Civil Remedies for Criminal Practices Act (Fla. Stat. §§ 77101 *et seq.*)

*Against All Defendants*

442.   Plaintiff re-alleges and incorporates by references paragraphs 1-309 of this Complaint as if fully set forth herein.

443.   At all times, as set forth above, Defendants' actions were unlawful under Fla. Stat. § 772.103(3), as they were all "employed by, or associated with, any enterprise through a pattern of criminal activity."

444.   Defendants violated Fla. Stat. §§ 772.101 *et seq.*, by participating in or conducting the affairs of the Co-Payment Scheme (as described more fully above) through a pattern of racketeering activity.

445.   Plaintiff, Plaintiff's Assignors, and Class Members are "persons" as defined in Fla. Stat. § 1.01, injured in their business or property, by reason of Defendants' racketeering violations.

### *Description of the Co-Payment Scheme*

446.   Defendants are "persons" within the meaning of Fla. Stat. § 1.01.

447.   The Manufacturers and the Charities are members of and constitute an "association in-fact enterprise."

111

448. The Co-Payment Scheme is an association-in-fact of individuals and corporate entities within the meaning of Fla. Stat. § 772.101 and consists of "persons" associated together for a common purpose.

449. The purpose of the Co-Payment Scheme was to maximize the Manufacturers' profits and the Charities' executive compensation.

450. The Co-Payment Scheme had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. The Manufacturers are the source of the schemes alleged herein, including providing kickbacks to subsidize payments for Sensipar and Kyprolis whose co-payments were provided by the Charities.

451. For the Charities' part, the Charities accepted the Manufacturers' kickbacks and provided unlawful payments for Sensipar and Kyprolis.

452. The Manufacturers and the Charities, individually and collectively, fulfilled their roles in the Co-Payment Scheme.

453. The Manufacturers and the Charities were separate and distinct legal entities with distinct purposes. The Manufacturers were the architects of the Co-Payment Scheme, with the sole purpose of making as much money off of Sensipar and Kyprolis as possible before generic competition entered the market. For the Charities, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

454. The Co-Payment Scheme had an existence that was separate and distinct from the pattern of racketeering in which the Manufacturers and the Charities engaged. Specifically, the Manufacturers and the Charities conspired with each other to minimize and/or conceal the amount of information Assignors and Class Members received regarding the claims for payment of Sensipar and Kyprolis, materially resulting in Assignors' and Class Members' payment of the purchase price of Sensipar and Kyprolis that they would not have otherwise paid for. *See* Fla.

Stat. § 817.234 ("A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer: 1. Presents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claims[.]").

455.   At all relevant times herein, the Manufacturers and the Charities operated, controlled, and managed the Co-Payment Scheme, through a variety of actions. First, the Charities submitted falsely submitted the level of control that the Manufacturers had over the Charities in the PAP to the OIG on numerous occasions. Second, the Manufacturers and the Charities failed to disclose a material fact regarding the existence of the kickbacks in violation of Fla. Stat. § 817.234 (i.e., causing pharmacies to submit false submissions of payments to Assignors and the Class Members.).

456.   The Manufacturers' and the Charities' participation in the Co-Payment Scheme was necessary for the successful operation of the schemes. The members of the Co-Payment Scheme all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was a kickback, while minimizing the amount of information Assignors the Class Members, and the innocent third-party pharmacies, knew about the program. These affirmative acts and strategic omissions were material to Plaintiff's and the Class Members' decision to issue payment for Sensipar and Kyprolis. The Co-Payment Scheme's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for Sensipar and Kyprolis alleged herein.

457.   Fla. Stat. § 772.102 provides that criminal activity is any activity chargeable by indictment or information by amongst other statutes Fla. § 817.234.

Section 817.234, Florida Statutes, criminalizes situations where health care companies, such as Assignors and the Class Members, are provided incomplete or misleading information concerning any fact or thing material to a claim for payment. As set forth below, the Manufacturers and the Charities have committed violations of Fla. Stat. § 817.234 by providing incomplete or misleading information material to Plaintiff's and the Class Members' decision to issue payment for Sensipar and Kyprolis.

458.    The Manufacturers and the Charities committed numerous acts of racketeering by providing incomplete or misleading information related to Sensipar and Kyprolis. The Manufacturers and the Charities knew or had reason to know that they were providing incomplete or misleading information regarding these claims.

459.    The Manufacturers and the Charities knew or had reason to know that they were not providing complete or non-misleading information pursuant to Fla. Stat. § 817.234. Despite knowledge of these facts, they induced Assignors and the Class Members to make payment for claims that they otherwise would not have paid. Instead, the Manufacturers and the Charities knowingly provide incomplete information to enrich their bottom line.

460.    Based on these omissions, Assignors and the Class Members provided payments for Sensipar throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. The Manufacturers' and the Charities' omissions were material to the payment of Sensipar and Kyprolis that Assignors and the Class Members provided payment for. Had Assignors and the Class Members known of the Co-Payment Scheme, they would not have submitted payment for Sensipar and Kyprolis.

461.    Assignors and the Class Members were the primary victims of the Manufacturers' and the Charities' unlawful scheme. Assignors and Class Members paid for Sensipar and Kyprolis throughout the United States, including Florida,

based on the Manufacturers' and the Charities' omissions of material information pursuant to Fla. Stat. § 817.234.

462.    As part of this scheme, the Manufacturers and the Charities caused pharmacies to submit false certifications and misled Assignors and the Class Members into paying for prescriptions of Sensipar and Kyprolis. The Manufacturers and the Charities conducted or participated, directly or indirectly, in the Co-Payment Scheme through a pattern of unlawful activity.

463.    By reason of and as a result of the conduct of the Manufacturers and the Charities, and in particular, their pattern of criminal activity, Plaintiff's Assignors and the Class Members were injured in their business or property.

464.    The Manufacturers' and the Charities' violations have directly and proximately caused injuries and damages to Assignors and Class Members, and Plaintiff and the Class Members have a right to bring this action for the damages alleged herein.

465.    Pursuant to Section 772.11, Florida Statues, Plaintiff and the Class Members seek their reasonable attorneys' fees and costs associated with prosecution of this action.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff and the Class Members demand judgment against Defendants as follows:

1.    Awarding Plaintiff and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2.    Awarding Plaintiff and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

3. Declaring the acts alleged herein to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4. Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel.

5. Awarding Plaintiff and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6. Awarding such other legal or equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff and the Class Members demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38.

Dated: April 25, 2023          Respectfully Submitted,

By: */s/ Alex R. Straus*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (917) 471-1894
Fax: (865) 522-0049
Astraus@milberg.com

116

John W. Cleary*
Michael O. Mena*
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222
mmena@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com


Shereef H. Akeel*
Adam S. Akeel*
Sam R. Simkins*
Daniel W. Cermak*
Hayden E. Pendergrass*
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road 420,
Troy, Michigan 48084
shereef@akeelvalentine.com (pro hac vice)
adam@akeelvalentine.com (pro hac vice)
sam@akeelvalentine.com (pro hac vice)
daniel@akeelvalentine.com (pro hac vice)
hayden@akeelvalentine.com (pro hac vice)


* *pro hac vice* application forthcoming

117