**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, | Case No.:  2:23-cv-03130-MEMF-PD |
| Plaintiff, | **ORDER GRANTING IN PART MOTIONS TO DISMISS [ECF NOS. 88, 89, 90] AND GRANTING REQUEST FOR JUDICIAL NOTICE [ECF NO.91]** |
| v. | |
| AMGEN INC.; ONYX PHARMACEUTICALS, INC.; ONYX THERAPEUTICS, INC.; PATIENT ACCESS NETWORK FOUNDATION; and CHRONIC DISEASE FUND, D/B/A GOOD DAYS, | |
| Defendants. | |

Before the Court are the Motion to Dismiss filed by Defendants Amgen Inc., Onyx Pharmaceuticals, Inc., and Onyx Therapeutics, Inc. (ECF Nos. 88, 89) and Patient Access Network Foundation and Chronic Disease Fund (ECF No. 90), and the Request for Judicial Notice filed by Defendants Patient Access Network Foundation and Chronic Disease Fund (ECF No. 91). For the reasons stated herein, the Court hereby GRANTS IN PART the Motions to Dismiss and GRANTS the Request for Judicial Notice.

/ / /

**INTRODUCTION**

This lawsuit concerns an alleged scheme to raise prices for Sensipar and Kyprolis, drugs used to treat hyperparathyroidism and multiple myeloma, respectively. Plaintiff alleges that Defendants executed a scheme to raise the quantity dispensed and unit price of these drugs, violating state and federal bribery laws in the process.

**I.    Factual Background[1]**

**A.  The Parties**

Plaintiff MSP Recovery Claims, Series LLC ("MSP") is a series limited liability company that purchases claims from insurers participating in the Medicare system. Compl. at p. 1, ¶ 39.

Defendant Amgen Inc. ("Amgen") is a pharmaceutical manufacturer. Compl. ¶ 43. Defendant Onyx Therapeutics, Inc. ("Onyx Therapeutics") is a wholly owned subsidiary of Defendant Onyx Pharmaceuticals, Inc. ("Onyx Pharma," and with Amgen and Onyx Therapeutics, the "Amgen Defendants"), which in turn is a wholly owned subsidiary of Amgen.

Defendant Patient Access Network Foundation ("PAN") is a non-profit that helps patients subsidize their co-payment costs for prescribed medication. Compl. ¶ 47. Such non-profits are known as patient assistance programs ("PAPs"). PAN receives funding from pharmaceutical manufacturers. *Id.* Defendant Chronic Disease Fund ("CDF," and with PAN, the "PAP Defendants") is also a non-profit that, like PAN, receives funding from pharmaceutical manufacturers and helps patients subsidize their co-payments. Compl. ¶ 49.

**B.  Medicare Structure**

In 1965, Congress amended the Social Security Act to add the Medicare Act, which created a federally funded health insurance program. Compl. ¶ 67. The Medicare Act consists of five parts—A, B, C, D, and E. *Id.* At issue in this case are parts C and D. Part C outlines the Medicare Advantage program and allows Medicare beneficiaries to elect private insurers. *Id.* Part D provides Medicare beneficiaries with prescription drug coverage. *Id.*

---

[1] The following factual background is derived from the allegations in Plaintiffs Complaint, ECF No. 1 ("Compl."), unless otherwise indicated. For the purposes of the Motions to Dismiss, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they *are* true.

To participate in Medicare, private insurers submit bids as "Plan D sponsors," and the bid consists of the per month cost of providing Medicare Part D benefits to a beneficiary in a particular geographic area. Compl. ¶ 71. The Centers for Medicare and Medicaid Services advance each Plan D sponsor with monthly payments equal to their standardized bid (the bid minus a benchmark amount). Compl. ¶ 72.

All providers and suppliers of medical services and goods—including the Defendants in this case—must enroll with Medicare before they can receive any payments through the Medicare system. Compl. ¶ 73. As part of the enrollment process, enrollees agree to abide by Medicare laws, and acknowledge that payment of a claim by Medicare is conditioned upon compliance with applicable laws and regulations. Compl. ¶ 74. This includes the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, which prohibits pharmaceutical companies from inducing Medicare beneficiaries to purchase, or their physicians to prescribe, drugs that are reimbursed by Medicare. Compl. ¶ 96.

### C.  Patient Assistance Programs & Alleged Scheme

When buying prescription drugs, Part D enrollees typically pay a fraction of the cost of the drug—the "co-payment." *See* Compl. ¶¶ 99, 100. Some Part D enrollees with high drug costs experience difficulties affording their medication, especially when they are in the deductible phase and must pay a larger share of the total drug cost than the patient would after reaching their deductible (when insurance coverage sets in). Compl. ¶ 83. To help offset, the costs, patients can apply for assistance from PAPs.

Pharmaceutical companies can contribute to PAPs in two ways: (1) they can establish their own PAPs through which they donate drugs directly to patients, or (2) they can donate money to independently established PAPs. Compl. ¶ 84. The second option—donating money to an independent charity—is much more beneficial to pharmaceutical companies as they receive both a tax deduction on the donated funds, but also payment from medical insurers who pay the remaining portion of the drug cost. Compl. ¶ 86.

Prescription medication prices are set by the manufacturers based on their intimate knowledge of the drug market. Compl. ¶ 93. However, pharmaceutical companies can only set prices so high, as many beneficiaries will stop taking prescription medication if they cannot afford the high

co-payment. Compl. ¶ 118. To circumvent this check on price increases, pharmaceutical companies like the Amgen Defendants have colluded with organizations like CDF and PAN. Compl. ¶¶ 7, 10. As part of the scheme, CDF and PAN have created funds that exclusively cater to patients taking Sensipar and Kyprolis. Compl. ¶¶ 7, 10, 182. The monies in these funds come almost exclusively from the Amgen Defendants. *Id.* CDF and PAN use the Amgen Defendants' donations to these funds to subsidize purchases for Sensipar and Kyprolis, which prevents patients from switching to cheaper medication or cutting the dosage or frequency of their prescription, thus raising the amount of Sensipar and Kyprolis dispensed. *See* Compl. ¶ 251. Patients are thus "insulated" from any price sensitivity towards Sensipar and Kyprolis, as they essentially obtain their medication for free (or at a significantly low cost) since their portion of the co-payment is covered by CDF and Pan. Compl. ¶¶ 22. This enables the Amgen Defendants to raise the prices for these medications to supra-competitive levels and recoup costs from health insurers like MSP's assignors. Compl. ¶¶ 23, 27, 93.

The DOJ initiated an action against Amgen based on Amgen's use of PANF and CDF as conduits to pay the copay obligations of Medicare patients taking Sensipar and Kyprolis. Compl. ¶¶ 189. The action settled. Compl. ¶¶ 187, 203. Through these settlements, however, the DOJ only recovered monies for Medicare's portion of the cost-sharing obligation, not any of the payments made by MSP's assignors. Compl. ¶¶ 192, 206.

## II.   **Procedural History**

MSP filed its Complaint on April 25, 2023. *See* Compl. The Complaint includes the following five causes of action: (1) Violation of 18 U.S.C. § 1962(c) through the use of the co-payment charity scheme (Compl. ¶¶ 309–352); (2) Violation of 18 U.S.C. § 1962(d) through the co-payment scheme (Compl. ¶¶ 353–365); (3) Unfair and Deceptive Trade Practices under state law (Compl. ¶¶ 366–427); (4) Unjust Enrichment (Compl. ¶¶ 428–441); and (5) Violations of the Civil Remedies for Criminal Practices Act (Compl. ¶¶ 442–465).

1    The Amgen Defendants filed two Motions to Dismiss on August 17, 2023. ECF Nos. 88

2    ("Amgen 12(b)(1) Mot."), 89 ("Amgen 12(b)(6) Mot.").[2] PAN and CDF (collectively, the "PAP

3    Defendants") filed a joint Motion to Dismiss on August 17, 2023. ECF No. 90 ("PAP Mot. "). The

4    PAP Defendants also filed a Request for Judicial Notice in support of their motion to dismiss. ECF

5    No. 91 ("RJN"). MPS filed one Opposition to both motions to dismiss filed by the Amgen

6    Defendants. ECF No. 100 ("MSP Amgen Opp'n"). MSP filed another opposition to the PAP

7    Defendants' motion to dismiss. ECF No. 101 ("MSP PAP Opp'n"). The Amgen Defendants filed

8    two replies, one for each motion to dismiss, ECF Nos. 103 ("Amgen 12(b)(1) Reply"), 104 ("Amgen

9    12(b)(6) Reply"), and the PAP Defendants also filed a reply in support of their motion to dismiss.

10   ECF No. 102 ("PAP Reply").

11    The PAP Defendants also filed two Notices of Supplemental Authority. ECF Nos. 110, 111.

12   On June 11, 2024, Defendants filed a Notice of Supplemental Authority. ECF No. 118.

13   ## REQUEST FOR JUDICIAL NOTICE [ECF NO. 91]

14   ### I.    Applicable Law

15    A court may take judicial notice of facts not subject to reasonable dispute where the facts

16   "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

17   readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.

18   201(b). Under this standard, courts may take judicial notice of "undisputed matters of public record,"

19   but generally may not take judicial notice of "disputed facts stated in public records." *Lee v. City of*

20   *Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County*

21   *of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). Public records, including documents on file

22   in federal or state court, are proper subjects of judicial notice. *Harris v. County of Orange*, 682 F.3d

23   1126, 1131–32 (9th Cir. 2012).

24    A court may also consider documents "'whose contents are alleged in a complaint and whose

25   authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading'"

26

27   _____

[2] The Amgen Defendants filed both of their motions jointly. Under these circumstances, it is unclear why the
Amgen Defendants did not simply file one motion with all of their arguments. If it was to avoid the Court's

28   page limits, the Amgen Defendants should have filed one motion and sought leave to file an oversized brief
instead of filing two motions to dismiss jointly.

1  in deciding a motion to dismiss under the incorporation by reference doctrine. *Knievel v. ESPN*, 393

2  F.3d 1068, 1076 (9th Cir. 2005). The incorporation by reference doctrine is appropriate where "the

3  documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on

4  them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *see also Parrino v. FHP, Inc.*,

5  146 F.3d 699, 706 n.4 (9th Cir. 1998) (noting that the incorporation by reference doctrine covers

6  extrinsic evidence provided by a defendant on a Rule 12(b)(6) motion), *superseded by statute on*

7  *other grounds*.

8  **II.   Discussion**

9  PAN and CDF ask the Court to take judicial notice of three documents: (1) Advisory Opinion

10  NO. 06-10 issued to CDF by the Office of Inspector General of the Department of Health and

11  Human Services ("OIG"); (2) the October 24, 2019 Settlement Agreement entered into by CDF and

12  the United States Department of Justice ("DOJ") on and behalf of the OIG; and (3) the October 24,

13  2019 Settlement Agreement entered into by PAN and the DOJ on and behalf of the OIG. RJN at 3.

14  MSP does not oppose the request.

15  The Court finds that all three exhibits are properly considered under the incorporation by

16  reference doctrine, as the Complaint mentions all three documents as part of its claims. Accordingly,

17  the Court GRANTS the Request for Judicial Notice.[3]

18  **MOTIONS TO DISMISS**

19  **I.   Applicable Law**

20  **A.  Standard under Federal Rule of Civil Procedure 12(b)(1)**

21  Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for

22  lack of subject-matter jurisdiction. "Because standing and ripeness pertain to federal courts' subject

23  matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State*

24  *Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). In the context of a 12(b)(1) motion,

25  the plaintiff bears the burden of establishing Article III standing to assert the claims. *Id.*

26

27

28  [3] However, the Court notes that it did not find these documents necessary to rely on in reaching the issues in this order.

Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When a motion to dismiss attacks subject-matter jurisdiction on the face of the complaint, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing when it is being challenged on the face of the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). Thus, in terms of Article III standing, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with competent proof under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation and quotation marks omitted). The court need not accept the allegations in the complaint as true. *Safe Air for Everyone*, 373 F.3d at 1039. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Leite*, 749 F.3d at 1121.

### B.  Standard under Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir.

2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008).

**II.    Discussion**

Defendants mount several arguments in support of their motions to dismiss. The arguments can be grouped into two categories: lack of standing (both Article III standing and statutory) and failure to state a claim. The Court addresses each argument in turn.

**A.  MSP has Article III Standing**

Federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "The Constitution limits Article III federal courts' jurisdiction to deciding 'cases' and 'controversies.'" *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012) (quoting U.S. Const. art. III, § 2). "[T]o have Article III standing, a plaintiff must adequately establish: (1) an injury in fact . . . (2) causation . . . and (3) redressability." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008).

Contractual assignments allow an assignee of a claim to "step into" the shoes of the assignor and "assert the injury in fact suffered by the assignor." *Id.* at 286. Combining these principles, MSP must plead facts that—when taken as true—support the plausible inference that the assignor had standing and that the assignor validly assigned its rights in the claims to MSP.

Here, MSP has provided two assignment agreements as "representative samples"—one between itself and Fallon Community Health Plan, Inc. ("Fallon") (ECF No. 1-3), and another between Series 16-08-483 (a designated series of MSP) and EmblemHealth Services Company, LLC ("Emblem") (ECF No. 1-23). Defendants first argue that MSP has failed to adequately allege that it has Article III standing via assignment. As further explained below, the Court finds that MSP has

sufficiently pleaded Article III standing to assert claims on behalf of Emblem and Fallon, but not on behalf of the unidentified assignors.

      i.  <u>MSP has sufficiently alleged that it has the right to bring claims on behalf of Emblem and Fallon.</u>

First, the Amgen Defendants argue that MSP has not shown that it has assigned rights to bring claims on behalf of Emblem or Fallon, as the assignments are owned by non-party entities—Series 16-08-483 and 17-04-631, respectively. Amgen 12(b)(1) Mot. at 7 (citing Compl., Exs. V at pp. 9–10, C at p. 11). MSP argues that under Delaware law, it has the right to bring suits on behalf of its designated series entities and that, alternatively, the operating agreement it has with the designated series entities authorizes MSP to sue on behalf of the series. MSP Amgen Opp'n at 21–22.

The Court notes that this is a *facial* attack. The Amgen Defendants argue that they bring both a facial and factual attack (Amgen 12(b)(1) Mot. at 6), but the Court finds that the Amgen Defendants bring a facial attack because the Amgen Defendants argue that, taking everything stated in the Complaint and the documents appended to the Complaint as true, MSP has failed to show that *it* is the assignee as opposed to some other entity. Where a challenger does not dispute the truth of the allegations, but instead asserts that the allegations are insufficient to invoke federal jurisdiction, the challenger mounts a facial attack. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."). The Court thus applies the same standard that it would apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)—that is "[a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the

1    allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite*, 749 F.3d at

2    1121.[4] This standard is more lenient than a factual attack.

3            The Court finds that the allegations in the Complaint suffice at this stage. Specifically, MSP

4    alleges that although it may assign rights to a particular series or have claims assigned directly to a

5    particular series, MSP "will maintain the right to sue on behalf of each series and pursue any and all

6    rights, benefits, and causes of action arising from assignments to a series." Compl. ¶ 40. The

7    Complaint further states that MSP's "limited liability agreement provides that any rights and benefits

8    arising from assignments to its series shall belong to [MSP]." Compl. ¶ 41. The Court finds that

9    these allegations are sufficient to show that MSP has retained the right to sue on behalf of the

10   various series entities.[5] The Court thus DENIES the Amgen Defendants' motion to dismiss on this

11   ground.

12            ii.    MSP has sufficiently alleged that the claims it bases the current suit on are
13                   within the scope of the assignment agreements.

14            The Amgen Defendants and the PAP Defendants also argue that MSP has not established that

15   the claims it bases the suit on are within the scope of the assignment agreements. Specifically,

16   Defendants point to the "carve out" of claims within the assignments providing that MSP is only

17   assigned rights in claims falling within a certain date range that are not already assigned to a

18   different recovery vendor. Amgen 12(b)(1) Mot. at 7; PAP Mot. at 25.

19            The Court finds that at this stage, MSP's allegations suffice. Both assignment agreements

20   attached to the Complaint provide MSP with assignment rights to claims during a certain period. *See*

21   ECF Nos. 1-3 at 4 (assigning rights to any claims that Fallon has as of the date of the agreement,

22   2017), 1-22 (assigning rights to MSP for claims that arose from September 2011 to September 2017

23   and that have been assigned to another recovery vendor). MSP further alleges that its assignors

24

25   _____

26   [4] The Court thus cannot consider the operating agreement that MSP provided as an exhibit with its opposition,
     as this is a facial attack, and as such, the Court is confined to the allegations within the Complaint or any
27   judicially noticeable materials.
     [5] Because the Court finds that MSP's allegations suffice, it need not consider whether Delaware law provides
28   MSP with the right to sue on behalf of its designated series entities even in the absence of any contractual
     right to do so.

(including Fallon and Emblem) paid millions in claims on behalf of covered patients receiving both

Sensipar and Kyprolis from at least October 1, 2011 through present day—falling within the period

specified in the Fallon and Emblem assignments. Compl. ¶¶ 63, 65. Reading these allegations and

the implications reasonably derived therefrom in MSP's favor, as the Court must, MSP has

sufficiently alleged that at least some of the payments made by Emblem and Fallon forming the basis

of MSP's claims fall within the scope of the assignment agreements. It may very well be that not all

the payments fall within the scope of the assignment agreements, but that does not signify that MSP

does not have standing at all. The cases cited by the Amgen Defendants are non-binding and

distinguishable.[6] The Court thus DENIES the Amgen Defendants' and PAP Defendants' motions to

dismiss on this ground.

### iii.   MSP has sufficiently alleged an injury-in-fact.

Defendants also argue that MSP fails to establish injury-in-fact via assignment because the

Complaint and attached exhibits do not show or allege any alleged reimbursement by Emblem or

Fallon involving a patient who received co-pay assistance under the challenged patient support

programs. Amgen 12(b)(1) Mot. at 8; PAP Mot. at 24–25.

Again, the Court finds that MSP has sufficiently pleaded an injury in fact. MSP alleges that

Emblem and Fallon, among other assignors, paid for claims on behalf of their beneficiaries enrolled

in Medicare Part D for their Sensipar and Kyprolis prescriptions. *See* Compl. ¶¶ 63, 65. MSP further

alleges that CDF and PAN provided co-payment assistance to MSP's assignors' (including Emblem

and Fallon) beneficiaries. Compl. ¶¶ 181–188, 199. Taking the facts as true and drawing all

reasonable inferences in MSP's favor, as the Court must with a facial attack at this stage, MSP has

---

[6] In *MSP Recovery Claims, Series LLC v. Tech. Ins. Co., Inc.*, No. 18 CIV. 8036 (AT), 2020 WL 91540, at *3
(S.D.N.Y. Jan. 8, 2020), the Complaint did not include any information as to the dates of the charges forming
the basis of the plaintiff's claim. Here, by contrast, MSP alleges that the relevant time frame is October 2011
and on. Compl. ¶¶ 63, 65. In *MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co.*, No. 1:19-CV-
524-JLS-JJM, 2020 WL 8675835, at *3 (W.D.N.Y. Nov. 20, 2020), the Court ordered MSP to make an
*evidentiary showing* of their standing, but no such order has been issued here. In *MAO-MSO Recovery II, LLC
v. Mercury Gen.*, No. 21-56395, 2023 WL 1793469, at *1 (9th Cir. Feb. 7, 2023), the Ninth Circuit upheld
dismissal of claims based on standing where the assignor had assigned the rights to another entity.

met its burden and alleged that its assignors suffered an injury-in-fact. The Court thus DENIES the
Amgen Defendants' and PAP Defendants' motions to dismiss on this ground.

              iv.   <u>MSP has not sufficiently alleged Article III standing on behalf of its
unidentified assignors.</u>

In general, "the assignee of a claim has standing to assert the injury in fact suffered by the
assignor." *Sprint Commc'ns*, 554 U.S. at 269. However, "[s]tanding 'is not dispensed in gross,' and
'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief
that is sought.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

MSP asserts that it has standing to bring claims on behalf of unnamed, unpled assignors
based on the exemplar agreements it has with Fallon and Emblem. Under the principles of standing,
this is not so. As the assignee stands in the shoes of the assignor, the Court (and the defendants) need
to know whose shoes MSP claims to occupy. MSP thus needs to plead facts alleging the identity of
its assignors *and* that the assignor assigned its claims to MSP via a valid assignment. As such, the
Court GRANTS the PAP Defendants' Motion insofar as they seek dismissal of claims based on
unidentified assignors. PAP Mot. at 26. However, given that this deficiency can be cured, the Court
also GRANTS MSP leave to file an amended complaint.

              v.   <u>MSP has sufficiently alleged standing for its state claims.</u>

The Amgen Defendants also argue that MSP fails to plead standing for its state claims
because MSP has not alleged facts as to (1) which of the states Emblem and Fallon provide
healthcare coverage in; (2) the Emblem and Fallon patients in those states; and (3) that a
reimbursement was for a patient who received assistance from one of the defendants for Sensipar or
Kyprolis. Amgen 12(b)(1) Mot. at 10. However, the Complaint *does* include such allegations. *See*
Compl. ¶¶ 43 (alleging that Amgen marketed and sold Sensipar and Kyprolis throughout all the
states in the United States), 48 (assignors provided payment for Sensipar purchased throughout the
United States), 66 (assignors provided payment for Kyprolis purchased throughout the United

States).[7] Moreover, the Amgen Defendants do not point the Court to any binding case law that such allegations are insufficient at this stage.

Relatedly, the PAP Defendants argue that some of the state law claims do not apply to out-of-state wrongdoing. PAP Mot. at 43. This reading misconstrues the Complaint—there is nothing in the Complaint alleging that MSP seeks to enforce one state's law for conduct applying extraterritorially.

The Court thus DENIES the Defendants' motions to dismiss on these grounds.

/ / /

### B.   MSP Has Standing to Assert its Racketeer Influenced and Corrupt Organizations Act ("RICO") Claims, Which Are Sufficiently Pleaded

"Although the RICO statute was originally enacted to combat organized crime, 'it has become a tool for everyday fraud cases brought against respected and legitimate enterprises.' *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd*., 943 F.3d 1243, 1248 (9th Cir. 2019) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (internal quotation marks omitted)). RICO includes a civil remedy provision that provides private parties with a cause of action to sue for injuries to their business or property:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . .

18 U.S.C. § 1964(c).

Defendants also mount a series of arguments as to why the Court should dismiss MSP's RICO claims, because MSP does not have standing. As the Court explains further below, the Court finds that MSP has standing.[8]

---

[7] Because this is a facial attack, the Court does not consider Exhibit C attached to MSP's opposition, as the exhibit is outside of the Complaint.

[8] The Amgen Defendants point out that RICO does not authorize injunctive relief. *Religious Tech. Center v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986). The proper vehicle for challenging unavailable remedies is a motion to strike. *See, e.g., Torrance Redevelopment Agency v. Solvent Coating Co.*, 763 F. Supp. 1060, 1057-78 (C.D. Cal. 1991). The Court will thus strike the portions of MSP's Complaint asking for injunctive relief based on the RICO claim.

i.  RICO claims are assignable.

Defendants argue that Plaintiff lacks standing because RICO claims are not assignable.
Amgen 12(b)(1) Mot. at 9–10; PAP Mot. at 24.

The Ninth Circuit has not explicitly addressed the issue of whether RICO claims are
assignable. Defendants point to *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir.
2005) (en banc), where the Ninth Circuit held that only the owner of an exclusive under copyright
could sue under the copyright statute, for support. In *Silvers*, the plaintiff was hired by a film
production company to write a movie script for a move called "The Other Woman. *Id.* at 883/
"Under the work-for-hire doctrine, the film production company owned the copyright to the script
for 'The Other Woman.'" *Id.* The film production company assigned to the plaintiff "all right, title,
and interest in and any claims and causes of action against Sony Pictures Entertainment, Inc.," but
retained the copyright to "The Other Woman" script. *Id.* The plaintiff filed a complaint against Sony
for copyright infringement, and the Ninth Circuit affirmed the district court holding that the plaintiff
did not have a right to sue since she was not the owner of the copyright and the copyright statute
clearly states that standing is limited to the "*legal or beneficial owner* of an exclusive right under a
copyright." *Id.* at 885–86. In reaching its conclusion, the Ninth Circuit focused on the statutory
nature of copyright, noting that "[c]opyright is a creature of statute, so we will not lightly insert
common law principles that Congress has left out." *Id.* at 885.

Defendants assert that, like the Copyright Act, RICO is also a creature of statute that limits
standing to specific persons: those "injured in [their] business or property" by reason of a statutory
violation. The Court does not find, at this point, that RICO claims are unassignable. As an initial
matter, the Court does not read *Silvers* as standing for the proposition that any private right of action
conferred by federal statute is unassignable unless otherwise expressly noted. In fact, the Ninth
Circuit has upheld the assignment of claims provided by federal statute in other contexts. *See, e.g.,*
*Misic v. Building Serv. Employees Health & Welfare Tr.*, 789 F.2d 1374, 1377, 1379 (9th Cir. 1986)
(holding that "ERISA does not forbid assignment by a beneficiary of his right to reimbursement
under a health care plan to the health care provider" and that plaintiff, "as assignee of beneficiaries
pursuant to assignments valid under ERISA, has standing to assert the claims of his assignors").

Defendants argue that allowing assignment of RICO claims to confer standing to any third-party risks creating a commodity in RICO claims. The Court notes that the Ninth Circuit recognized this danger in the ERISA context in its opinion in *Simon v. Value Behavior Health, Inc.*, which clarified the holding in *Misic*. In *Simon*, the Ninth Circuit limited *Misic* to those situations where the assignee had some relationship to the transaction—that is, where the assignee was the health care provider who provided the beneficiary with medical services. *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073 (9th Cir. 2000). The Ninth Circuit noted that granting unrelated third-parties standing to sue under ERISA "would be tantamount to transforming health benefit claims into a freely tradable commodity" that would not further ERISA's purpose. Although the Court finds this concern valid, this danger is present in any context, not just ERISA or RICO. Despite this danger, the Supreme Court has held that "assignees of a claim, including assignees for collection, have long been permitted to bring suit," and the Supreme Court saw no reason to change such precedent. *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 , 275 (2008). The Court thus DENIES the Defendants' respective motions to dismiss on this ground.

ii. The Indirect Purchaser Rule does not bar MSP's claims and MSP has sufficiently pleaded proximate cause.

"The requirements for standing to maintain a civil action under RICO and the antitrust laws are similar." *Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999). Under either statutory regime, the alleged violation must be a "proximate cause" of the injury suffered. *Id.* The indirect purchaser rule ("IPR") originally developed in the antitrust context. Under the IPR, plaintiffs who have suffered "passed-on" injury lack statutory standing. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) (holding that government consumers could not sue on a theory that high prices were passed on to them as a result of the defendants' illegal price-fixing scheme).

In *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002), the Ninth Circuit stated that the Supreme Court in *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992) applied the indirect purchaser rule to RICO claims. The Ninth Circuit went on to consider three

inexhaustive factors in determining whether the injury was too remote or "indirect" to allow recovery:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza*, 301 F.3d at 1169.[9]

Here, Defendants argue that the IPR bars MSP's claim because MSP's assignors are not direct purchasers of Sensipar and Kyprolis. Amgen 12(b)(6) Mot. at 3; PAP Mot. at 28–29. Their argument fails. The health care context is unique, as although insurers do not decide what medications their beneficiaries will take, insurers do pay for a portion of the medication cost and can thus be considered a "purchaser" in part (and as such, the IPR would not bar claims from insurers). In addition, MSP alleges that patients did not pay for their Sensipar or Kyprolis medications at all, as their co-payment was covered by CDF or PAN. Generally, a purchaser is one who makes both the decision to purchase an item *and* pays for the item. Here, these aspects of a "purchaser" have been separated into three different entities—the patient, the government, and the insurers. The Court does not find that the traditional application of the IPR fits the present situation.

Furthermore, the Court finds that the three factors outlined in *Mendoza* weigh in MSP's favor. First, it does not appear to the Court, based on the allegations, that there are more direct victims of the wrongful conduct. As explained above, the current suit rests on a unique factual posture because the only victims of the wrongful conduct—unlawful price inflation—were the government and MSP's assignors. The government has already vindicated its rights but has not (and may not) vindicate the assignors' rights. Furthermore, based on the allegations in the Complaint, the Court does not find that it would be difficult to ascertain the amount of the assignors' damages, as their overpayment is separate and apart from overpayment by another "purchaser," such as the

_____

[9] The Court notes that these factors are used to evaluate proximate cause under RICO. *See Painters & Allied Trades*, 943 F. 3d at1251 (stating that the "*Holmes* factors . . . weigh[ed] [in] favor of permitting Plaintiffs' RICO claims to proceed" and analyzing the factors). Because the IPR inquiry and the cause inquiry are related, the Court analyzes them both together.

government through Medicare. As such, the Court will not have to adopt complicated rules apportioning damages.

The Amgen Defendants further argue that the cause inquiry is not satisfied because no misrepresentations were made to the assignors, and the "causal chain" between the harm (price inflation) and Defendants' wrongful conduct (the scheme) is interrupted by the independent actions of third parties. Amgen 12(b)(6) Mot. at 6. However, The Supreme Court has said that proximate cause "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case," and struck down a similar argument where the defendants made misrepresentations to someone other than the plaintiffs. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648, 654 (2008). The Supreme Court reiterated the principle that proximate cause considers the "foreseeable and natural consequence" of a defendant's actions. *Id.* at 658. Similarly, here, the inferred foreseeable and natural consequence of Defendants' scheme—including their false certifications to the government—was that they would be able to raise prices to supra-competitive levels. [10]

The Court thus DENIES Defendants' motions to dismiss on this ground.

### C. MSP Has Sufficiently Alleged a RICO Claim

Defendants also argue that MSP has failed to sufficiently allege the elements of a RICO claim. As the Court explains further below, the Court finds that MSP has sufficiently alleged the existence of a RICO enterprise, racketeering activity, and a RICO injury.

i.  MSP has sufficiently alleged a RICO enterprise.

In *Boyle v. United States*, the Supreme Court held that to qualify as an enterprise for RICO purposes, an entity must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). The Supreme Court also explicitly held that an enterprise does not need to have a structural "hierarchy," and can be fairly informal— that is, the enterprise need not be a sophisticated criminal enterprise. *Id.* at 948.

---

[10] Because of the Court's finding, it further DENIES the PAP Defendants' motion to dismiss insofar as the motion argues that the Court should dismiss MSP's state law claims by virtue of the IPR. PAP Mot. at 43.

Here, MSP has sufficiently alleged each of the three structural features. First, MSP alleges that all Defendants had the common purpose of increasing the number of people using the Amgen Defendants' drugs (Sensipar and Kyprolis) as increased use—and thus increased funds for the PAP Defendants and revenue for the Amgen Defendants—was financial beneficial to all Defendants. Compl. ¶¶ 257, 280, 317–318.[11] MSP also alleges relationships between all Defendants. *See* Compl. ¶¶ 321, 322. Lastly, MSP also alleges longevity, as the alleged scheme has been going on since about 2011 and has continued through changes of high-level executives. *See, e.g.,* Compl. ¶ 209 ("PANF has had two presidents since 2011").

The PAP Defendants argue that MSP has failed to allege "intent" on the PAP Defendants part to pursue the common purpose, but the PAP Defendants do not point to any case law showing that such allegations are necessary to allege an enterprise under RICO. The PAP Defendants also argue that MSP has failed to allege facts as to *why* the PAP Defendants would participate in the alleged scheme; however, MSP explains that executives at PAN and CDF stand to make substantially more money as donations from pharmaceutical manufacturers increase. Compl. ¶¶ 209–211.[12]

The Court thus DENIES the Defendants' motions to dismiss on this ground.

### ii.   MSP sufficiently alleges mail and wire fraud as predicate acts.

The PAP Defendants also argue that MSP fails to adequately allege mail and wire fraud as predicate acts. PAP Mot. at 31–32. The Court finds that MSP sufficiently pleaded mail and wire fraud as predicate acts.

Under RICO, mail and wire fraud are "predicate acts" of racketeering activity. 18 U.S.C. § 1961(1). The elements of mail and wire fraud are: "(1) a scheme to defraud (2) the use of either the

---

[11] *Shaw v. Nissan North Am., Inc.*, 220 F. Supp. 3d 1046, 1056 (C.D. Cal. 2016) is factually distinct, as here, the allegations sufficiently plead a *fraudulent* common purpose versus routine business activities. For example, MSP alleges that PAN and CDF routinely provided the Amgen Defendants with data allowing the Amgen Defendants to conduct ROI calculations and ensure that their donation was at an optimal level to maximize profits. Compl. ¶ 254(a). This is unlike *Shaw* where the allegations, at best, demonstrated that the parties were only associated "in a manner directly related to their own business activities." *Shaw*, 220 F. Supp. 3d at 1057 (internal quotation marks omitted).

[12] The Court also notes that the PAP Defendants do not provide binding authority that a motive must be pleaded for a RICO claim.

mail or wire, radio, or television to further the scheme, and (3) the specific intent to defraud." *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 20017). A scheme to defraud is "'any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). Intent to defraud may be shown by circumstantial evidence. *Id.* at 1208.

RICO claims premised on mail or wire fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)—that is, a plaintiff alleging such a claim must plead the circumstances of the alleged mail or wire fraud with particularity (the who, what, when, where, and how). *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989). However, conditions of the mind may be averred generally. Fed. R. Civ. P. 9(b); *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (holding that, for a wire fraud claim, the third element—specific intent to deceive or defraud—general allegations are sufficient).

The Court finds that the allegations in the Complaint meet the heightened pleading requirement of Federal Rule of Civil Procedure 9(b). For example, MSP alleges that the "Charities [CDF and PAN] routinely provided the Manufacturers [Amgen Defendants] with information (through the wire and mail) to enable the Manufacturers to conduct ROI calculations relating to the amount of Corporate Contributions made to the Charities." Compl. ¶ 17. MSP's allegations provide the who (PAN and CDF), the what (information that enabled the Amgen Defendants to calculate ROI contributions that Defendants had certified to the OIG that they did not trade, Compl. ¶ 18), and the how (wire and mail). The only arguably missing information is the when, as MSP only alleges that CDF and PAN "routinely" sent this information. However, given that the Complaint specifies a general time frame (2011 onwards), the Court does not find that MSP has failed to allege the "when" of the communications. These communications would appear to be in the exclusive possession of Defendants. *See U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) ("Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession."). Similarly, MSP's allegations in paragraph 332 of the Complaint also provide the who, what, when and where of other communications forming the basis of MSP's mail and wire fraud predicate act. *See* Compl. ¶ 332.

1    The Court thus DENIES the Defendants' motions to dismiss on this ground.

2          iii.   MSP has sufficiently alleged a RICO injury.

3    To bring a RICO claim, a plaintiff must allege that he has been injured in his business or

4 property. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). In the Ninth Circuit, "a

5 plaintiff asserting injury to property [must] allege 'concrete financial loss.'" *Canyon County v.*

6 *Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008). "Financial loss alone, however, is

7 insufficient," and a plaintiff needs to show "harm to a specific business or property interest." *Id.*

8          The Amgen Defendants argue that MSP fails to allege any cognizable RICO injury to its

9 assignors, stating that MSP's assignors are not harmed simply because they paid more for

10 prescription medication than otherwise. Amgen 12(b)(6) Mot. at 4. The Amgen Defendants argue

11 that MSP must allege that its assignors paid for something of "less value" than what was

12 represented—that is, that MSP's assignors relied on a misrepresentation. Amgen 12(b)(6) Mot. at 5.

13 The Court finds that under *Canyon County*, MSP has sufficiently alleged that it has been injured in

14 its business or property. In *Canyon County*, the Ninth Circuit noted that "[i]n the ordinary context of

15 a commercial transaction, a consumer who has been overcharged can claim an injury to her property,

16 based on a wrongful deprivation of her money." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d

17 969, 976 (9th Cir. 2008). By definition, an overcharge *is* paying more for a product than what one

18 otherwise would have. By overpaying, MSP's assignors *did* receive something of less than value that

19 what was represented—that is, because MSP's assignors overpaid for Sensipar and/or Kyprolis, their

20 beneficiaries received something of less value than what MSP's assignors paid for—namely the true

21 worth of Sensipar and/or Krypolis.

22          The Amgen Defendants' misrepresentation argument appears to target the mail/wire fraud

23 predicate act.[13] "Mail fraud . . . occurs whenever a person, 'having devised or intending to devise

24 any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or

25 artifice or attempting so to do.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)

26

27 ───────────────────
[13] The Court notes that *Travelers Indemnity Corporation v. Cephaolon, Inc.*, 32 F. Supp. 3d 538 (E.D. Penn.
2014) was based on off label prescription and promotion. *Id.* at 543–44. There is nothing in *Travelers*
28 suggesting that it applies to this case, and the *Travelers* courts statement concerning overpayment seem
squarely to apply to the context where some specifics of false advertising is alleged. *Id.* at 548.

1   (citing 18 U.S.C. § 1341). The mailing itself need not contain any false information. *See id.* ("The

2   gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential

3   part of the scheme satisfies the mailing element,'[Citation] even if the mailing itself 'contain[s] no

4   false information'"). There is no requirement of "first-party reliance," as "[u]sing the mail to execute

5   or attempt to execute a scheme to defraud" is mail fraud, even if nobody relies on any

6   misrepresentation. *Id.* at 648. Taking these principles together, the Court does not agree that MSP's

7   assignors had to rely on any untrue statement in paying for Sensipar or Kyprolis for MSP to plead a

8   RICO injury.

9        The Court thus DENIES the Defendants' motions to dismiss on this ground.

10

11

12   / / /

13               iv.   MSP's Travel Act claim is sufficiently pleaded.

14        The Travel Act prohibits, among other things, use of the mail or wires to carry out any

15   "unlawful activity," including "bribery . . . in violation of the laws of the State in which it is

16   committed or of the United States." 18 U.S.C. § 1952(b)(2). The Travel Act is a RICO predicate act.

17        The Amgen Defendants argue that the Court should reject MSP's efforts to use the Travel

18   Act as a RICO predicate because it is grounded in violations of the Anti-Kickback Statute ("AKS"),

19   False Claims Act ("FCA"), and various state bribery laws, none of which are predicate acts under

20   RICO. Amgen 12(b)(6) Mot. at 9. The Court rejects this argument, as the question is whether the

21   facts at issue allege a RICO predicate act—that is, does the conduct MSP bases its claim on violate

22   the Travel Act in addition to these other laws? The PAP Defendants argue that, under *In re EpiPen*

23   *Direct Purchaser Litigation*, a violation of the AKS cannot serve as a predicate act for a Travel Act

24   violation because the definition of "bribery" under the AKS is broader than that in the Travel Act.

25   PAP Mot. at 34. The Court declines to adopt the use of the "categorical" approach under *In re*

26   *EpiPen Direct Purchaser Litigation*, 2022 WL 1017770, at *4–*5 (D. Minn. Apr. 5, 2022), a case

27   that is not binding on this Court. In *Taylor*, the Supreme Court considered whether two second-

28   degree burglary convictions under Missouri law could be considered violent felonies for the purpose

of applying a sentencing enhancement under the Armed Career Criminal Act. *Taylor v. U.S.*, 495 U.S. 575, 579 (1990). In *Taylor*, however, the sentencing courts were looking at the offense of the conviction itself, and not at the facts underlying each conviction, an approach that was supported by the legislative history of the Armed Career Criminal Act. *Id.* at 581–89. The Court thus finds that *Taylor* is distinguishable and that the categorical approach is inappropriate here, where the Court and the jury can consider the facts and determine whether the facts add up to a violation of the Travel Act. Furthermore, assuming that a "special trust" relationship is required to allege bribery under the Travel Act, the Court finds that MSP has made such an allegation. *See* Compl. ¶ 74 ("Defendants are routinely held liable for abusing this trust relationship, and the federal government has emphasized the necessity of 'closely scrutiniz[ing]' renumerations relating to the recommendation of medical products because it involves 'exceptional position[s] of public trust[.]'" (citation omitted)).

\*\*\*

In sum, the Court finds that MSP's RICO claim is properly pled and DENIES Defendants' motions to dismiss on this basis. Because the Court finds that MSP's RICO claim is properly pled, it need not consider Defendants' arguments concerning the RICO conspiracy claim (the second cause of action) which are derivative of Defendant's arguments for the RICO claim (the first cause of action).[14]

### D. MSP Sufficiently Pleads its Various State Law Claims

Defendants urge this Court to dismiss MSP's state law claims based on lack of standing and failure to state a claim. The Court addresses the various arguments in turn.

i. MSP has standing to assert state claims on behalf of Emblem and Fallon.

The Amgen Defendants argue that MSP's state law claims are limited to its identified assignors—Emblem and Fallon—and that the assignment agreement does not provide any information as to the geographic location of Emblem and Fallon's beneficiaries (and subsequently,

---

[14] To the extent the Amgen Defendants base their arguments concerning MSP's failure to state claims under state law on the same arguments as MSP's RICO claim, the Court need not consider these arguments either. *See* Amgen 12(b)(6) Mot. at 10–11 (arguing that MSP fails to plead false statements with particularity, fails to plead injury in fact, and fails to allege proximate causation). The Court also need not reach the PAP Defendants' arguments concerning Florida RICO. PAP Mot. at 48.

22

*where* Emblem and Fallon paid for covered patients' prescription medications). Amgen 12(b)(1)

Mot. at 10. However, the Amgen Defendants misunderstand MSP's burden at this stage, as MSP

does not need to "offer evidence" indicating in which of the fourteen states at issue Emblem and

Fallon have reimbursed patients in for Sensipar or Kyprolis (*id.*).[15] MSP alleges that its assignors

(which include Emblem and Fallon) provided payment for Sensipar and Kyprolis *throughout the

United States*. Compl. ¶¶ 64, 66. The Amgen Defendants do not provide any law that this allegation

is insufficient.

    The Court thus DENIES the Amgen Defendants' motion to dismiss on this ground.


/ / /

### ii.   MSP's claims are not time barred.

    The Connecticut Unfair Trade Practices Act and the New York General Business Law

section 349 have a three-year statute of limitations. *Patane v. Nestle Waters N. Am., Inc.*, 583 F.

Supp. 3d 341, 347 (D. Conn. 2022); *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538 (E.D.N.Y.

2010). Defendants thus argue that these claims, along with others, are time barred because most of

the claims MSP asserts have a four-year statute of limitations, and the assignments are for claims

existing as of 2017, over four years ago. Amgen 12(b)(6) Mot. at 15; PAP Mot. at 26–27.

    The Court finds that MSP has sufficiently pled tolling. MSP alleges that its assignors were on

notice of their claims against Defendants on April 25, 2019, when the DOJ announced Amgen's

2019 settlement. *See* Compl. ¶ 302 ("Assignors did not know, and had no reasonable way of

discovering, Defendants' Scheme until it became public knowledge as a result of the DOJ's press

release"). Although, on its face, this timeline would result in any claim with a statute of limitations

less than five years being time-barred, MSP further alleges that the continuing violations doctrine is

applicable to its claims. Compl. ¶ 301 (alleging that "Defendants' unlawful conduct and the

accumulating harm to the Assignors did not end alongside the DOJ Settlement Agreements."). At

---

[15] As the Court discussed above, MSP does not have standing to assert claims on behalf of unidentified
assignors. *Supra* Section II(A). As such, the Court's holding is limited to the identified assignors—Emblem
and Fallon.

this stage, the Court finds that this allegation suffices, as determining whether the continuing

violation doctrine applies is a *factual inquiry* and the Court declines to make such an inquiry at the

motion to dismiss stage. *See Lewis v. City of Fresno*, No. CV-F-08-1062 OWW, 2009 WL 2905738,

at *7 (E.D. Cal. Sept. 4, 2009) ("Whether Plaintiff is entitled to the continuing violation doctrine is a

factual inquiry that must be resolved at summary judgment or trial.").

The Court thus DENIES the Defendants' motions to dismiss on this ground.

iii.   MSP has sufficiently alleged its General Business Law section 349 Claim
(New York).

To bring a claim under General Business Law section 349, a plaintiff must allege conduct

that is "consumer oriented." *North State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d

96, 101 (2d Dep't 2012). While "private contract disputes, unique to the parties" do "not fall within

the ambit of the statute," conduct that has a "broad impact on consumers at large" does. *Id.* at

(internal quotation marks omitted). The Amgen Defendants argue that MSP's claims arise from

"business to business" transactions that are not consumer oriented. The Court disagrees. As MSP

admits in its Complaint, by providing patients with co-pay assistance, Defendants' conduct induced

purchase of Sensipar and Kyprolis over other alternatives. Compl. ¶ 61.

The PAP Defendants also argue that, as charities, they cannot be engaged in trade or

commerce, as required by the Massachusetts' consumer protection laws. PAP Mot. at 44. However,

charities are not exempt from the Massachusetts' consumer protection laws. *See Linkage Corp. v.

Trustees of Boston University*, 425 Mass. 1, 26–27 (1997) ("In most circumstances, a charitable

institution will not be engaged in trade or commerce when it undertakes activities in furtherance of

its core mission. But when, as is the case here, an institution's business motivations, in combination

with the nature of the transaction and the activities of the parties, establish a 'business context' as

contemplated in *Begelfer,* G.L. c. 93A will apply because the institution has inserted itself into the

marketplace in a way that makes it only proper that it be subject to rules of ethical behavior and fair

play."). Here, the Court finds that, at this stage, MSP has sufficiently pleaded that CDF and PAN are

subject to Massachusetts' consumer protection law as MSP alleges that CDF and PAN sought to go

beyond their charitable purpose and collude with the Amgen Defendants. *See* Compl. ¶ 272 ("And

all along the way, as the drug prices increased and utilization of the Charities increased to mask the effects of the prices increases, Corporate Contributions to the Charities continued to rise, and the Charities' and Manufacturers' executives increased their own compensation and benefits.").

The Court thus DENIES the Defendants' motions to dismiss on these grounds.

> iv.  MSP has sufficiently alleged its claim under the New Jersey Consumer Fraud Act ("NJCFA").

To state a claim under the New Jersey Consumer Fraud Act ("NJCFA"), a plaintiff must allege "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). A business entity can bring a claim under the NJCFA so long as it is a consumer—that is, if it "uses (economic) goods, and so diminishes or destroys their utilities." *City Check Cashing, Inc. v. Nat'l State Bank*, 244 N.J. Super. 304, 309 (1990). Here, neither MSP nor its assignors are the user of the prescription medication purchased, and as such, MSP cannot bring a claim under the NJCFA.

The Court thus GRANTS the Amgen Defendants' motion to dismiss on this ground and dismisses the NJCFA claim.

> v.  MSP has sufficiently alleged its unjust enrichment claim as to the Amgen Defendants.

The Amgen Defendants also urge the Court to dismiss MSP's unjust enrichment claims. However, the Court does not find the Amgen Defendants' arguments persuasive.

First, the Amgen Defendants argue that unjust enrichment is not available where a plaintiff has an adequate remedy at law, and cite non-binding authority in support of their argument. Amgen 12(b)(6) Mot. at 16. However, as MSP points out, the case in question, *MSP Recovery Claims, Series LLC v. Avanir Pharmaceuticals, Inc.*, 2022 WL 17220647, at *7 (C.D. Cal. Oct. 20, 2022), dealt only with unjust enrichment under *California* law. Here, it appears that MSP seeks unjust enrichment under the laws of several states. *See* Compl. ¶¶ 432 (listing states), 438 ("It would be

1   inequitable under unjust enrichment principles under the laws of the aforementioned states for

2   Defendants to be permitted to retain. . . .”). [16]

3       Second, the Amgen Defendants argue that unjust enrichment is not available where one party

4   voluntarily paid a disclosed price in exchange for a particular good that worked as intended. Amgen

5   12(b)(6) Mot. at 16. However, the cited case, *In re Intel Corp. Microprocessor Antitrust Litig.*, 496

6   F. Supp. 2d 404, 421 (D. Del. 2007), is distinguishable as here, MSPs' assignors did not enter into

7   any contract with the Amgen Defendants whereby the assignors voluntarily negotiated some price.

8   For this same reason, the Court finds the Amgen Defendants next argument—that there is no unjust

9   enrichment claim where a contract underlies the transaction at issue—as unpersuasive. The Court

10  thus DENIES the Amgen Defendants' motion to dismiss on this ground.

11      Third, the PAP Defendants argue that MSP fails to establish *what* benefit the PAP

12  Defendants' have unjustly retained. PAP Mot. at 47. The Court agrees that, as to the PAP

13  Defendants, MSP has failed to allege what benefit the PAP Defendants have unjustly retained.

14  Unlike the Amgen Defendants, the PAP Defendants do not receive any of the monies paid by MSP's

15  assignors for Sensipar or Kyprolis. While the PAP Defendants may receive monies from the Amgen

16  Defendants, that is not a benefit conferred by MSP, MSP's assignors, or those assignors'

17  beneficiaries. Thus, the Court GRANTS the PAP Defendants' motion to dismiss on this ground. The

18  Court will provide MSP with an opportunity to amend as it appears that MSP may be able to amend

19  to plead a benefit.

20

21

22  / / /

23  / / /

24  / / /

25

26  _____

27  [16] The Court notes that unjust enrichment is not a cause of action under California law, and as such, the court
will treat the unjust enrichment action under California law as one for quasi-contract. *McBride v. Boughton*,
20 Cal. Rptr. 3d 115, 121 (Cal. Ct. App. 2004); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th

28  Cir. 2015).

1

## <u>CONCLUSION</u>

2      For the foregoing reasons, the Court hereby ORDERS as follows:

3   1.  The Amgen Defendants' first motion to dismiss (ECF No. 88) is DENIED;

4   2.  The Amgen Defendants' second motion to dismiss (ECF No. 89) is GRANTED IN PART

5       and the Court DISMISSES MSP's New Jersey consumer fraud claim;

6   3.  The PAP Defendants' motion to dismiss (ECF No. 90) is GRANTED IN PART, and the

7       Court dismisses MSP's claims insofar as they are based on unpled assignors, and dismisses

8       MSP's unjust enrichment claim as to the PAP Defendants;

9   4.  The following portion of MSP's Complaint is stricken from paragraph 352: "as well as

10      injunctive . . . relief"; and

11  5.  The Court GRANTS MSP leave to amend its complaint. If MSP chooses to amend its

12      complaint, it must file an amended complaint within 30 days of the entry of this order.

13

14      IT IS SO ORDERED.

15

16  Dated: July 15, 2024                    _____

17                                          MAAME EWUSI-MENSAH FRIMPONG

18                                          United States District Judge

19

20

21

22

23

24

25

26

27

28